**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No.:

**PALM BEACH MARITIME MUSEUM,**
**INC.**, a Florida not for profit corporation d/b/a
Palm Beach Maritime Academy,

       Plaintiff,

vs.

**HAPOALIM SECURITIES USA, INC**., a
foreign corporation, **EDWARD CHAN**,
**PATRICIA AGUIAR**, **FABIO D'ASCOLA**,
and **BILL BURCKHART**,

       Defendants,

_____/

## COMPLAINT

Plaintiff, Palm Beach Maritime Museum, Inc. d/b/a Palm Beach Maritime Academy ("Academy"), through undersigned counsel, sues Defendants Hapoalim Securities USA, Inc. ("Hapoalim"), Edward Chan ("Chan"), Patricia Aguiar ("Aguiar"), Fabio D'Ascola ("D'Ascola") and Bill Burckhart ("Burckhart"), and alleges:

### I.     SUMMARY OF ACTION

1.    Warren Buffett said "banking is a very good business unless you do dumb things." Unfortunately, as explained in more detail below, Hapoalim, Chan and their co-defendants decided to do dumb things by intentionally misleading the Academy with respect to a $24 million bond offering (the "Bond"), straddling the Academy with a burdensome debt service obligation while Hapoalim, Chan and the other defendants reaped ill-gotten financial gains.

2.    More specifically, in connection with underwriting and convincing the Academy's board of directors to misguidedly approve the issuance of the Bond, Hapoalim and

Chan, with help from the other defendants, intentionally misrepresented to the Academy the sale and expansion deal Hapoalim and Chan supposedly negotiated with the Academy's landlord ("ESJ") for a property known as Lantana 2.

3.      In particular, knowing that the debt service on the Bond would be manageable *only* if the Academy was able to improve the existing space at Lantana 2 to add additional classrooms and students (a pre-condition to the Academy approving the issuance of the Bond), Hapoalim and Chan intentionally and falsely informed the Academy that they had negotiated a deal with Lantana 2's landlord (ESJ) for the benefit of the Academy (the "Lantana 2 Deal"). Pursuant to the purported non-existent Lantana 2 Deal, $8 million of the Bond proceeds would be used to purchase Lantana 2.  In return, the landlord (ESJ) would use $2.5 million of the $8 million purchase price to develop 20,000 square feet at Lantana 2 for additional classrooms for the Academy.

4.      But, as the Academy recently learned in 2017, Hapoalim, Chan and their co-defendants, intentionally and for financial gain, falsely misrepresented to the Academy the terms of the Lantana 2 Deal.  Contrary to Hapoalim and Chan's misrepresentations and *__before__* the Bond was issued, Lantana 2's landlord (ESJ) informed Hapoalim and Chan in writing that no portion of the $8 million purchase price would be used to develop or improve Lantana 2.

5.      Rather than be truthful with the Academy about the Lantana 2 Deal, Hapoalim and Chan elected to hide the truth about the deal and misrepresent its terms, which resulted in the issuance of the Bond with the unmanageable debt service obligations that resulted in the near closure and near complete financial destruction of the Academy.

6.      In fact, Hapoalim and Chan continued their misrepresentations by falsely stating in the Bond that "$2,500,000 of the purchase price of Lantana 2 will be used by the seller to

finance the construction of a 20,000 square feet addition to the existing improvements for the purpose of adding additional classrooms."

7.    After the Bond was issued, Lantana 2's landlord (ESJ) rejected the purported Lantana 2 Deal Hapoalim and Chan claimed they had already negotiated for the purchase and development of Lantana 2.

8.    But again, rather than do right and inform the Academy that they knew all along that the purported deal for the purchase and development of Lantana 2 never existed and, in fact, that Lantana 2's landlord had specifically informed them in writing that no portion of the $8 million purchase price would be used to develop or improve Lantana 2, Hapoalim and Chan blamed Aguiar and John Grant, the Academy's former CEO, for failing to close on the purported non-existent Lantana 2 Deal.

## II.    PARTIES, JURISDICTION, AND VENUE

9.    Plaintiff Academy is a Florida not-for-profit corporation registered to and doing business in Palm Beach County, Florida.

10.    Defendant Hapoalim is a Delaware corporation with a principal place of business in New York.  Hapoalim is registered to and doing business in Florida, including in Palm Beach County, Florida.

11.    Defendant Chan is an individual and former employee of Hapoalim.  Chan is currently a resident of New Jersey, is over the age of eighteen, and is otherwise *sui juris*.

12.    Defendant Aguiar is an individual who resides in Palm Beach County, Florida, is over the age of eighteen, and is otherwise *sui juris*.

13.    Defendant D'Ascola is an individual who resides in Miami-Dade County, Florida, is over the age of eighteen, and is otherwise *sui juris*.

14.    Defendant Burckhart is an individual who resides in Palm Beach County, Florida, is over the age of eighteen, and is otherwise *sui juris*.

15.    Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331 because this matter is an action arising under the federal securities law.

16.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the events giving rise to the cause of action arose in, and the defendants are subject to, jurisdiction in Palm Beach County, Florida.

17.    The Academy has complied with all conditions precedent to pursuing this action or said conditions have been waived or have otherwise occurred.

### III.    FACTUAL ALLEGATIONS

### A.    HISTORY OF THE ACADEMY

18.    The Academy was incorporated in May 20, 1974, under the name Ocean Learning Institute, Inc., and changed its name to Palm Beach Maritime Museum, Inc. on July 7, 1992.  On July 28, 1999, the School District of Palm Beach County approved the Academy as a Charter School to educate students in kindergarten through grade eight.

19.    The governing body of the Academy is its Board of Directors, which must be comprised of at least three members.

20.    At certain times, two of the Academy's board members, Melbourne Smith and John Grant, also served as members of Palm Beach Maritime Foundation, Inc. ("Foundation"), a separate and independent entity.  The Foundation was incorporated in Florida on May 12, 2011, for the primary purpose of soliciting donations and developing other funding to support the Academy.  The other board members of the Foundation are not affiliated with the Academy.

21.     At certain times, John Grant ("Grant") was the Chief Executive Officer of the Foundation and of the Academy.  Both Melbourne Smith and Grant resigned their positions with the Academy in April and June 2014, respectively.

## B.     THE EXISTING ACADEMY AND GRANT'S DESIRE TO EXPAND TO A LARGER PERMANENT SPACE

22.     On or before 2011, the Academy leased spaced in West Palm Beach, Florida for its operations (the "West Palm Beach Lease").  The West Palm Beach Lease expired in May 2014, but the landlord had discussed with the Academy extending the lease on similar favorable terms.

23.     In or before 2010, Grant decided to expand the Academy's operations to a larger permanent space than the space covered by the West Palm Beach Lease.

24.     Consequently, in 2010 Grant discussed the possible expansion of the Academy's operations with the landlord of the West Palm Beach Lease, who agreed to lease to the Academy additional space to be used for the Academy's expanded school operations.

25.     Also in 2010, Grant approached Matthew O'Connor ("O'Connor"), a property developer, to discuss whether O'Connor could develop a larger permanent campus that could be used for the Academy's existing and expanded school operations.  O'Connor informed Grant that he could develop the space required for the Academy's existing and expanded operations.

26.     In 2010, O'Connor located a property (referred to as "Lantana 1") that satisfied the Academy's needs, and on or about March 15, 2011, entered into a lease with the Academy for the Lantana 1 space, which was conditioned on O'Connor completing due diligence on and acquiring Lantana 1 for use by the Academy.

27.     Importantly, O'Connor agreed that the Academy would not have to pay rent at Lantana 1 until after O'Connor obtained a certificate of occupancy that enabled the Academy to

occupy and use the space for its operations.  Also, O'Connor agreed to subsidize the 3 years of lease payments remaining on the West Palm Beach Lease.

### I)    THE SECRET DEVELOPMENT AND SECRET FUNDING AGREEMENTS

28.    Before O'Connor completed the due diligence on Lantana 1, Grant entered into a secret development agreement ("Secret Development Agreement") with Beacon Acquisitions, LLC ("Beacon"), which the Academy discovered in documents the Foundation turned over to the Academy in connection with a settlement reached in the 2015 lawsuit filed by the Foundation.[1]

29.    Pursuant to the Secret Development Agreement, a copy of which is attached as **Exhibit A**, Grant agreed that the Foundation would purchase from Beacon's affiliate a property in Dania Beach, Florida (the "Dania Property"), which property was a non-performing underwater asset with debt obligations secured by personal guaranties of Beacon's owners and/or investors.

30.    Beacon would help Grant and the Foundation acquire funds of at least $1.5 million, which funds Beacon later provided to the Foundation to purchase the Dania Property. The Foundation eventually lost the Dania Property because it was not able to pay the debt obligations on the property.

31.    Beacon imposed onerous obligations on the Academy in the Secret Development Agreement.  For example, Beacon required Grant to cause the Academy to obtain a bond, at no cost to Beacon, to repay the funds Beacon provided to the Foundation and to provide an agreed

---

[1] In 2015, the Foundation filed a lawsuit against the Academy and several of its board members in the 15th Judicial Circuit Court, Palm Beach County, Case No.: 2015-CA-8644 (the "Foundation Lawsuit").  In connection with the Foundation Lawsuit, Grant was required to produce emails and other correspondence regarding the Bond, which emails were maintained only on the Foundation's computers.  Grant produced the emails and other documents in 2017.  Grant was also required to produce documents he kept at the Foundation, and this production began in December 2016 and continued into 2017.

rate of return to Beacon and its investors that provided the funds to the Foundation. Also, Beacon required Grant to cause the Academy to lease property from Beacon to be used for the Academy's operations at the ***"best possible lease terms"*** for Beacon and not the Academy.

32.    Subsequent to entering into the Secret Development Agreement, Beacon and the Foundation entered into a secret funding agreement ("Secret Funding Agreement"), which was also discovered in documents produced in connection with the settlement of the Foundation Lawsuit. A copy of the Secret Funding Agreement is attached as **Exhibit B**.

33.    Pursuant to the Secret Funding Agreement, Beacon, on behalf of the Foundation, would pay $750,000.00 towards the Foundation's acquisition of the Dania Property from Beacon's affiliate. Also, Beacon would contribute, again on behalf of the Foundation, an additional $600,000.00, of which $360,000.00 would be used by the Foundation to pay the closing costs of purchasing the Dania Property from Beacon's affiliate. The remaining $240,000.00 of the $600,000.00 (the "Foundation Bribe") was for Grant's personal use.

34.    In return, the Foundation assumed the debt obligations of the Dania Property. Also, more significantly, the Foundation assumed the onerous guaranty obligations that were previously held by Beacon's owners and/or investors.

35.    After he had secured the Foundation Bribe and had agreed to the terms that were later memorialized in the Secret Funding Agreement, Grant informed O'Connor that (1) he had executed a letter of intent with Beacon for it to do the very thing O'Connor had agreed to do for the Academy -- acquire and develop the Lantana 1 property for the Academy's existing and expanded operations, (2) Beacon offered Grant $250,000.00 for personal use, which amount was inflated from the $240,000.00 in the Secret Funding Agreement, and (3) Grant would only continue working with O'Connor if he also agreed to pay Grant $250,000.00 for his personal use.

36.     O'Connor refused to pay Grant the $250,000.00, which caused Grant to terminate the business relationship with O'Connor.

37.     Subsequently, Beacon purchased Lantana 1 and agreed to lease it to the Academy on terms favorable to Beacon until Grant could cause the Academy to secure a bond.  Beacon and Grant agreed that the bond proceeds would be used to repay Beacon the monies it advanced the Foundation for the purchase of the Dania Property, to repay Beacon's investors the agreed rate of return, and to purchase Lantana 1 (the "Lantana 1 Bond Plan"), as Grant had agreed to do in the Secret Development and Secret Funding Agreements.

38.     Aguiar knew of the Secret Development and Funding Agreements.  In fact, she introduced Grant to Beacon, suggested Beacon purchase and lease Lantana 1 to the Academy, represented Beacon in connection with its acquisition of Lantana 1, and executed the Secret Funding Agreement as a witness.

## II)     TERMINATION OF THE WEST PALM BEACH LEASE

39.     Because of the Foundation Bribe and the other obligations secretly placed on the Academy in the Secret Development and Secret Funding Agreements, the Academy also could not continue leasing space from the landlord of the West Palm Beach Lease.

40.     Consequently, as he had secretly agreed to do, Grant convinced the Academy's board of directors to cancel the West Palm Beach Lease and to enter into a 20-year lease with Beacon for Lantana 1 ("Lantana 1 Lease ") on June 30, 2011, with the lease term beginning September 2, 2011.  The Lantana 1 Lease granted the Academy the right to purchase Lantana 1 for $6.8 million during the initial four years of the lease, which purchase would occur with the proceeds from the Bond the Academy was required to obtain pursuant to the Secret Development Agreement.

41.    Contrary to the obligations and duties he owed to the Academy, Grant never disclosed to the Academy's board of directors (a) the Secret Development Agreement, (b) the Secret Funding Agreement, (c) the Foundation Bribe, (d) that he was obligated to enter into the Lantana 1 Lease because of the Foundation Bribe and other secret terms, (e) that the Lantana 1 Bond Plan was devised in secret by him, Beacon and Aguiar, (f) that he had a financial interest in the Lantana 1 Bond Plan, (g) that he and Aguiar had agreed that he would later convince the Academy's board of directors to retain Aguiar's company to help procure the bond needed to purchase Lantana 1, and (h) that he, Beacon and Aguiar had agreed that he would retain Aguiar to develop a franchise system and expansion program for the Academy.

42.    The Lantana 1 Lease was more onerous for the Academy than the West Palm Beach Lease, and as required by the Secret Development Agreement, provided tremendous financial gains to Beacon.

43.    For example, the West Palm Beach Lease provided for monthly rent of $32,000.00, with an annual increase of the greater of 3% or the change in the Consumer Price Index, which had an average increase for the previous decade of 2.4%.

44.    Conversely, the Lantana 1 Lease deferred rent in the first year of the lease (September 2, 2011 to September 1, 2012) because the property was being built/converted for use by the Academy as a school.  The annual rent in the second year of the Lantana 1 Lease (September 2, 2012 to September 1, 2013) was $337,500.00, which was comparable to the annual rent of the West Palm Beach Lease.  However, the annual rent in the following years of the Lantana 1 Lease increased more significantly than the 3% increase of the West Palm Beach Lease.  For instance, in the third year of the Lantana 1 Lease (September 2, 2013 to September 1, 2014), the annual rent was $495,000.00, a 46.67% increase from the prior year's annual rent of

$337,500.00.  The annual rent in the fourth and fifth years increased to $630,000.00, a 27.27% increase.

## C.    THE QUEST TO OBTAIN A *RATED* BOND FOR THE ACADEMY TO BUY OUT THE ONEROUS LANTANA 1 LEASE

45.    After executing the Lantana 1 Lease, and as he, Aguiar and Beacon had secretly agreed he would do, Grant used, *inter alia*, the onerous Lantana 1 Lease obligations to convince the Academy's board that the Academy needed to retain an entity to help the Academy secure a bond to purchase Lantana 1 so that the Academy could free itself of the burdensome Lantana 1 Lease obligations.

46.    As a result, on or about November 17, 2011, the Academy entered into a consulting agreement with Educare Project and Development LLC ("Educare"), an entity owned, managed and controlled exclusively by Aguiar.

47.    Pursuant to the consulting agreement, Educare would facilitate the issuance of a tax-exempt bond by the Academy.  The consulting agreement required the Academy pay to Educare 3% of the total amount of any tax-exempt bonds issued by the Academy.

48.    The tax-exempt bond obtained by Educare for the Academy would be used to purchase Lantana 1 at a purchase price that secretly incorporated the repayment obligations Grant agreed to in the Secret Development and Funding Agreements.

49.    On or before February 21, 2012, Educare entered into a joint venture with Link-Up Incorporated ("Link-Up") called Edu-Link, LLC ("Edu-Link").  Educare and its principal, Aguiar, however, did not disclose to Link-Up's principal the Foundation Bribe, the Lantana 1 Bond Plan, the Secret Development and Funding Agreements, and that she, Grant and Beacon had secretly agreed that Grant would convince the Academy to retain her company to secure the bond.  Instead, Aguiar simply told Link-Up's principal that she had a client that needed

assistance with obtaining a bond and requested that Link-Up's principal, who had experience with bond issuances, assist her client obtain the bond.

50.    On February 21, 2012, the Academy and Edu-Link entered into a consulting and support services agreement beginning July 1, 2012 and ending June 30, 2019, pursuant to which Edu-Link would assist the Academy in obtaining a bond and in developing and implementing, *inter alia*, policies, procedures and programs to help the Academy meet the charter contract obligations in the areas of finance, administration, academic operations, compliance with local, state and federal regulations and other matters.

51.    On or before October 31, 2012, Link-Up's principal began evaluating various financial services companies to determine which company was best suited to help the Academy underwrite the bond needed to purchase Lantana 1.  Hapoalim was ***not*** one of the companies being considered by Link-Up's principal.

52.    However, Aguiar, who knew Hapoalim and Chan, recommend Link-Up's principal use Hapoalim and Chan to issue the bond.  Link-Up's principal rejected Aguiar's recommendation because Hapoalim and Chan were not the best company suited to underwrite the bond for the Academy.

53.    On October 31, 2012, and based on the recommendation of Link-Up's principal, the Academy and Piper Jaffray entered into an agreement ("Piper Bond Agreement"), pursuant to which Piper Jaffray represented the Academy in connection with obtaining a 30-year ***rated*** bond of $10.5 million, which the Academy would use to purchase Lantana 1 and reduce the impending lease obligations. A true and correct copy of the Piper Bond Agreement and the sources and use of bond funds are attached hereto as Composite **Exhibit C**.

54.    Grant, as he is required to do pursuant to Florida's Not for Profit Corporation Act (Fla. Stat. §§ 617.01011, *et. seq.*) and the Academy's by-laws, presented the Piper Bond Agreement to the Academy's board of directors for their approval before he executed it.

55.    The Piper Bond Agreement provided that it shall "expire when all of the Bonds have been issued", but that "[e]ither party has the right to terminate [the] agreement at any time by specifying the date of termination in a written notice delivered to the other party at least sixty days before the termination date."

## D.    THE BREACH OF THE WEST PALM BEACH LEASE AND THE RESULTING ECONOMIC STRAIN ON THE ACADEMY

56.    On or about September 2012, and pursuant to the Lantana 1 Lease, the Academy moved to Lantana 1.  In connection with the move to Lantana 1, the Academy and the landlord of the West Palm Beach Lease agreed to terminate their lease and to sublease the space to a subtenant.  However, as a condition of terminating its lease, the West Palm Beach landlord required the Academy sign a promissory note for the portion of the rent not covered by the sublease.  Also, the landlord required that the Academy guarantee all rent due under the West Palm Beach Lease in the event of a default by the subtenant.

57.    As Murphy's Law dictates, anything that can go wrong will go wrong.  During 2013, the subtenant defaulted on the West Palm Beach sublease, which resulted in the landlord suing the Academy and obtaining a judgment of $658,431 ("West Palm Beach Lease Judgment").  The Academy and the landlord entered into a settlement agreement for $500,000.00, $200,000.00 of which was to be paid in a lump sum with the balance being paid in 25 monthly installments of $12,000 starting July 20, 2013 through July 2015.

E.   **THE SECRET EVOLUTION OF THE ACADEMY'S *RATED* BOND OFFERING INTO TWO BONDS, INSTEAD OF ONE BOND**

    I)   **THE PLAN TO INCREASE THE BOND OFFERING FROM THE ORIGINAL $10 MILLION BEING UNDERWRITTEN BY PIPER JAFFRAY**

58.   Grant was aware of Aguiar's conflict of interest in representing the Academy and Beacon as early as 2010 based on her involvement with the Secret Development and Secret Funding Agreements.   At the latest, Grant was aware of Aguiar's conflict of interest in representing the Academy and Beacon by November 2011, when Aguiar emailed Grant Beacon's letter of intent regarding property Beacon hoped to develop for use by the Academy. A copy of Aguiar's email is attached as **Exhibit D**.

59.   In a November 2013 email, Aguiar, documenting her conflict of interest, told Grant that Moises Benzaquen, Beacon's managing partner, wanted her involved in any transaction affecting Beacon's interest.   A copy of the November 2013 email is attached as **Exhibit E**.

60.   During 2013, Aguiar, who had previously orchestrated the Foundation Bribe and the Lantana 1 Bond Deal, orchestrated the sale of a property known as Lantana 2 from Beacon to ESJ Capital Partners, LLC ("ESJ").

61.   After orchestrating the sale of Lantana 2, Aguiar approached Grant to discuss the possibility of expanding the Academy's operations.   Specifically, Aguiar was interested in franchising the Academy's program and using Lantana 2 and another property known as the Seminole Property as the locations for the Academy's pending high school.   The Seminole Property, like the Dania Property, was another non-performing and financially troubled asset Beacon retained Aguiar to help it sell.

62.    Aguiar, who was also representing Lantana 2's landlord (ESJ) at the same time her company was representing the Academy, offered to introduce Grant to Lantana 2's new landlord (ESJ) so that they could discuss how best to structure a deal where the Academy would use Lantana 2 for its high school operations.

63.    Also, Aguiar and Grant agreed that Grant would secure a larger bond than the one being secured by Piper Jaffray, which larger bond proceeds would be used to acquire Lantana 1 and 2 and the Seminole Property (the "Lantana 1, 2 and Seminole Bond Plan").  The plan was to use the Seminole Property for the Academy's stand-alone high school (Grades 10-12), and to use Lantana 2 for a portion of the Academy's high school (Grade 9).

64.    In furtherance of the Lantana 1, 2 and Seminole Bond Plan, and as orchestrated by Aguiar, Aguiar, Grant and Beacon met and secretly discussed the Academy using a portion of proceeds from the bond to also acquire the Seminole Property.

65.    Also as part of and in furtherance of the Lantana 1, 2 and Seminole Bond Plan, on or before July 12, 2013, Aguiar, Grant and D'Ascola, the then CFO of Lantana 2's new landlord (ESJ), met and discussed the Academy using Lantana 2 to operate a portion of the Academy's new high school and the financial benefits that would ensue to them if the Academy also purchased Lantana 2.

66.    D'Ascola, on behalf of ESJ, agreed to cause ESJ to lease Lantana 2 to the Academy, and to pay the $200,000.00 lump sum payment the Academy owed pursuant to the West Palm Beach Lease Judgment.

67.    Finally, and in furtherance of the Lantana 1, 2 and Seminole Bond Plan, on or before November 2013, Aguiar introduced Grant to Hapoalim and Chan so they could formulate

a secret plan to replace Piper Jaffray with Hapoalim and Chan, who would issue the larger bond needed to purchase Lantana 1 and 2 and the Seminole Property.

68.    Again, contrary to his obligations and duties, Grant never disclosed to the Academy's board of directors the secret Lantana 1, 2 and Seminole Bond Plan and the secret meetings he and Aguiar had with Beacon and D'Ascola in furtherance of the plan.  Also, he never disclosed Aguiar's conflicts of interest in representing the Academy, Beacon and ESJ.

69.    On July 12, 2013 and based on Grant's self-interested recommendations, the Academy signed a 20-year lease for Lantana 2 ("Lantana 2 Lease") commencing August 1, 2013.

70.    On or about the same time, the Academy received conditional approval from the School District to operate ninth grade classes at Lantana 2 pending approval by the School District of the Academy's application for a fully operational stand-alone high school.

71.    The Lantana 2 Lease, though for less space than the space of the Lantana 1 Lease, was equally onerous for the Academy.  For example, annual rent for the first and second year of the Lantana 2 Lease was $553,955.00, and $585,955.00, respectively.  The annual rent for the comparable two-year period of the Lantana 1 Lease was $495,000.00 and $630,000.00, respectively.

72.    The West Palm Beach Lease Judgment, coupled with the Academy's lease obligations under the Lantana 1 and Lantana 2 Leases, were an economic strain on the Academy and resulted in an unfavorable financial audit that required the Academy to implement corrective financial measures and to present a recovery plan to the State of Florida.

73.    Grant, who created the conditions that lead to the Academy's unfavorable audit, however, used the unfavorable audit to advance the Lantana 1, 2 and Seminole Bond Plan.  Specifically, and without disclosing his financial interest in the Lantana 1, 2 and Seminole Bond

Plan to the Academy's board of directors, in December 2013 Grant, as he had agreed with Aguiar to do, recommended that the Academy terminate the Piper Bond Agreement and enter into a new bond agreement with Hapoalim and Chan, pursuant to which Hapoalim and Chan would secure the bond necessary to purchase Lantana 1. During the same meeting, Aguiar recommended the Academy use Hapoalim and Chan to issue a bond to purchase Lantana 2 if the Academy was not able to terminate the Piper Bond Agreement.

74.     Remarkably, Grant never disclosed to the Academy's board of directors that he met Hapoalim and Chan through Aguiar and that before November 20, 2013, he began discussing with Hapoalim and Chan their roles in the Lantana 1, 2 and Seminole Bond Plan, including the information they needed to analyze and underwrite the bond necessary to ensure the success of the plan.

75.     In fact, Grant never disclosed to the Academy's board of directors that Hapoalim and Chan began analyzing as early as November 2013, *inter alia*, the Lantana 1 Lease, including the appraisal of the property, the Academy's budget for operations at Lantana 1, a draft contract for the expansion of the Academy to the Seminole Property and other related financial information of the Academy.

76.     Also, Grant never disclosed to the Academy's board of directors that on January 24, 2014, Hapoalim and Chan prepared a draft $30 million bond offering for the Academy and shared it via email *only* with Grant (the "Secret Hapoalim Bond"), which non-rated bond would be used to fulfill the secret Lantana 1, 2 and Seminole Bond Plan. Copies of the email and the Secret Hapoalim Bond are attached as **Exhibit F**.

77.     Consistent with the secret Lantana 1, 2 and Seminole Bond Plan, the Secret Hapoalim Bond states in pertinent part that it will be for the projects, defined as:

The Projects will consist of two existing charter schools, **Lantana I** ("**Lantana I**"), which is located at 1518 West Lantana Road, Lantana, Florida (Palm Beach County), **Lantana II** ("**Lantana II**") which is located at 600 East Coast Avenue, Lantana Florida (Palm Beach County), and one new school, **Seminole Maritime Academy** ("**Seminole**") at 400 East Lake Mary Boulevard, Sanford, Florida.

78.    The Lantana 1, 2 and Seminole Bond Plan, however, began unraveling when Grant and Beacon could not agree on the terms pursuant to which the Academy would lease the Seminole Property, which negotiations began in November 2013 based on the emails Grant produced in 2017.  Copies of the emails are attached as **Exhibit G**.

## II)    REVISING THE SECRET PLAN TO ISSUE TWO BONDS INSTEAD OF ONE BOND

79.    But, Grant, Aguiar, Hapoalim and Chan devised a revised plan to save the Lantana 1, 2 and Seminole Bond Plan.  Secretly, Grant, Aguiar, Hapoalim, and Chan met with D'Ascola and agreed that instead of using the Seminole Property for the Academy's stand-alone high school, the Academy would use another property known as Lantana 3, which property Aguiar would help ESJ acquire and lease to the Academy.  Then they agreed that instead of Grant convincing the Academy to secure only one bond to be used to purchase Lantana 1 and Lantana 2, he would convince the Academy to secure two separate bonds.

80.    The proceeds from the first bond would be used to purchase Lantana 1 and Lantana 2 and to develop additional space at Lantana 2 to be used by the Academy.  The proceeds from the second bond would be used to purchase Lantana 3 (collectively the "Lantana 1, 2, and 3 Bond Plan").

81.    But, D'Ascola stated that the development of the additional space at Lantana 2 would only occur if several conditions were met.  Precisely, ESJ would develop the additional space at Lantana 2 **_only_** if (1) it and the Academy entered into a 25-year lease with respect to

Lantana 3, and (2) the Academy agreed to use Hapoalim and Chan to underwrite the second

bond for the Academy's acquisition of Lantana 3 (the "ESJ Development Conditions").

82.     The Lantana 1, 2, and 3 Bond Plan would provide, *inter alia*, significant financial

benefits for Aguiar, Chan, Hapoalim, Grant, ESJ and D'Ascola.

83.     For example, Aguiar, as the sole principal of Educare, would receive a larger fee

because of the higher bond amounts.  Also, she would receive a commission for successfully

causing the sale of Lantana 1, Lantana 2 and Lantana 3 because of her business arrangement with

the landlords of the properties (Beacon and ESJ).  Finally, as she and Grant had agreed to do in

November 2013 (**Exhibit E**), Grant would convince the Academy's board of directors to enter

into a 5-year independent marketing and development consultant contract beginning August

2014 with Aguiar and/or a company controlled exclusively by her, which contract Hapoalim and

Chan would prepare and finalize for Aguiar ("Aguiar August 2014 Consulting Contract").

84.     Grant, who had all intentions of entering into and subsequently entered into a

management agreement with the Academy, would receive a higher management fee because of

the increased student capacity resulting from the expansion of the Academy.

85.     ESJ and D'Ascola would reap the financial gains of being able to sell Lantana 2

and to develop, lease and then sell Lantana 3 to the Academy.

86.     Hapoalim and Chan would receive significantly higher fees for underwriting two

bonds instead of one bond since their fees are based on a percent of the total amount of the bonds

issued.

87.     Aguiar boldly, mistakenly and/or foolishly flaunted the Lantana 1, 2 and 3 Bond

Plan via emails, one dated May 22 and the other dated May 26, 2014, both of which were

discovered in the information Grant produced in connection with the Foundation Lawsuit.

Copies of the emails are attached as **Exhibit H**.  Aguiar's May 22 email, when read alone is innocuous.  But, when read in conjunction with her May 26 email and other information provided by Grant in connection with the Foundation Lawsuit, illuminates the Lantana 1, 2 and 3 Bond Plan.

88.    In her May 22 email, Aguiar notes that the total amount of the two bonds will have to be supported by revenue generated by space based on 60 square feet per student and total space of 110,000.00 square feet.  She then explains that the first bond will be used only to purchase Lantana 1 and 2 and to develop 25,000.00 square feet at Lantana 2.  She then notes that because the revenue stream generated by the students occupying the additional 25,000.00 square feet at Lantana 2 will be used to support only the first bond's debt obligation and not the second bond's debt obligations, the second bond's debt obligations will have to be supported by the revenue generated by the amount of students occupying only 85,000.00 square feet at Lantana 3.  Specifically, she states:

> . . . As you know I am calculating 60 square feet per student.  It means a total of 110.000 (sic) square feet.  However, 25.000 (sic) feet of this construction will be develop (sic) at Lantana 2 and the revenue stream generate (sic) by the students will be allocate (sic) to Lantana 2.  Also Hapoalim bank will negotiate a buy out of the new school [Lantana 3] with ESJ for June 2015.  Is (sic) the only (sic) we get the bond for Lantana 1 and 2.

> It means the new school [Lantana 3] will have to work based in (sic) 85.000, but will carry the costs of 110.000 (sic) square feet.  Lets just play with some number basic math: is very simply ***the bond to buy the new school will be based on the same amount as the bond used to buy L1 and L2*** and the number of students will almost (sic) the same therefore it should work.

> I will rely on your careful review of the number (sic) and Ed (sic) review of the strategy in the 48 hours to see if the plan will work.  If you guys come to the conclusion that it is a GO.  ***I will find the land and negotiate a deal with ESJ.*** (Emphasis added)

89.     Also in her May 22 email, Aguiar suggests a plan to get the Academy to agree to the ESJ Development Conditions.  Specifically, she states that "[w]e believe the only way to accomplish our goals is to have a separate LOI [letter of intent] with ESJ where PBMA [the Academy] gives ESJ the rights to build and deliver by June 2015 their middle and high school in Palm Beach County for 2000 students."

90.     In her May 26 email, Aguiar explains to Grant, Hapoalim and Chan that she met with D'Ascola and they finally figured out the numbers and how to make to make the Lantana 1, 2 and 3 Bond Plan work.  For example, she states that "I did work with Fabio and I will be meeting with ESJ tomorrow in the afternoon.  As you can see on the attached proforma the deal should work.  Basically, ESJ would develop an extra 25,000 SF/400 students at Lantana 2 and allocate the construction costs on a new high school [Lantana 3] for 1400 students."

91.     Thus, Aguiar and D'Ascola had agreed that their plan would work if ESJ hid the construction costs to develop the additional space at Lantana 2 in the construction budget for ESJ to build the new high school (Lantana 3).

92.     But, then recognizing the potential complications with the secret Lantana 1, 2 and 3 Bond Plan, Aguiar reminds Grant, Hapoalim, Chan, ESJ and D'Ascola that they have "***a lot of work that needs a lot of coordination***" and warns that she is "***concern[ed] about the 'usual suspects and how they will behave***.[']"

93.     One of Aguiar's concerns was whether the Academy would be able to terminate the Piper Bond Agreement.  Another more pressing concern was whether Grant would be able to convince the Academy's board of directors to adopt, without knowing its genesis and furtive details, the Lantana 1, 2 and 3 Bond Plan with the ESJ Development Conditions.

### III) THE BOARD MEETINGS TO TRY TO CONVINCE THE ACADEMY TO ADOPT THE SECRET PLAN TO ISSUE TWO BONDS INSTEAD OF ONE BOND

94.     Grant, however, was convinced that he would be able to convince the Academy's board to adopt the Lantana 1, 2 and 3 Bond Plan with the ESJ Development Conditions, via Melbourne Smith, the then Chairman of the Academy's board of directors.

95.     More precisely, and unbeknownst to the remaining Academy's board members, Grant had agreed to pay Melbourne Smith some of the Foundation Bribe in return for Melbourne Smith helping advance the secret Lantana 1, 2 and 3 Bond Plan.  Also, Grant promised Melbourne Smith that Grant and the Foundation would secure additional funds, which would be used to support/fund Melbourne Smith's ship building program and to pay him for his role in connection with advancing the secret Lantana 1, 2 and 3 Bond Plan.

96.     Predictably, Melbourne Smith never disclosed to the other members of the Academy's board of directors that he was being paid by Grant and the Foundation in return for him helping advance the secret nefarious plans Grant had developed with Aguiar, D'Ascola, Hapoalim and Chan.

97.     On February 26, 2014, and at the direction of Melbourne Smith as the Chairman of the Academy's board of directors, the Academy authorized Grant to send a letter to Piper Jaffray terminating the Piper Bond Agreement effective April 26, 2014 (the "Piper Termination Letter").  A copy of the Piper Termination Letter is attached as **Exhibit I**.

### A) The April 22, 2014 Board Meeting

98.     On April 15, 2014, Grant scheduled an April 22, 2014 special meeting of the Academy's board of directors.

99.     On April 16, 2014, Chan emailed the Hapoalim Engagement Letter dated April 15, 2014 *only* to Grant for him to execute, which he executed without disclosing to, or getting approval to execute from the Academy's board of directors.  A copy of Chan's email is attached as **Exhibit J**.

100.    On April 22, 2014, the special board meeting was held, which was attended by others and then current board members Melbourne Smith, the Chairman, Burckhart, and Scott Shelley.  During that meeting, and as he and Grant had agreed he would do for the promises Grant made to him, Melbourne Smith resigned from the Academy's board to join the Foundation, after which Burckhart became the new chairman of the Academy's board of directors.  Also, at Grant's recommendation, Steve Bolin joined the board.

101.    With the addition of Steve Bolin, the Academy's entire board of directors was still comprised of persons recommended by Grant, who Grant mistakenly thought he could control and easily convince to go along with the furtive plans he, Aguiar, Hapoalim, Chan, and ESJ via D'Ascola made.

102.    However, Grant did not want to leave the Lantana 1, 2 and 3 Bond Plan to chance with the departure of Melbourne Smith as the chairman of the Academy's board of directors.  Accordingly, before Melbourne Smith's impending resignation from the Academy's board of directors, Grant explained the Lantana 1, 2, and 3 Bond Plan, including the ESJ Development Conditions, to Burkhart and asked him to help convince the Academy's other board of directors to approve Hapoalim and Chan underwriting two instead of one bond without Grant, Burckhart or anyone else having to disclose the genesis and details of the plan to the Academy's other board members (Scott Shelley and Steve Bolin).

103.    During the April 22 meeting, Grant did not inform the Academy's board of directors that he had received and signed the Hapoalim Engagement Letter.  In fact, Grant never presented the Hapoalim Engagement Letter, signed or unsigned, to the Academy's board of directors for their approval, as he was required to do pursuant to Florida's Not for Profit Corporation Act (Fla. Stat. §§ 617.01011, *et. seq.*), and as he previously did with the Piper Bond Agreement.

104.    Consequently, the Academy's board of directors never consented to the language and terms in the Hapoalim Engagement Letter.  The Academy's board of directors only knew what Hapoalim and Chan had agreed to do for the Academy during the meetings—*i.e.*, issue a bond with at least a 30-year maturity that the Academy could use to purchase only Lantana 1 and 2 to alleviate the burdensome lease obligations associated with the properties.

105.    Also during the April 22 meeting, Grant stated that Hapoalim and Chan would secure a bridge loan for the Academy of $1 million and would later underwrite a $20 million bond for the Academy to be used to purchase Lantana 1 and 2.  Grant then stated that the current meeting was to "approve the $1 million bond and another board meeting will be required for the $20 million bond."

106.    Chan, who was introduced during the meeting, also confirmed that he and Hapoalim would be underwriting only a $20 million bond, which would be issued in 4 – 6 months, *i.e.* August to October 2014.  He also reiterated that the main purpose of the 20 million bond was for the Academy to purchase **only** Lantana 1 and 2.

107.    Grant, Hapoalim and Chan, however, knew that their representations about the amount ($20 million) and the use of the proceeds (to purchase only Lantana 1 and 2) from the bond were patently false.

108.    For example, Hapoalim and Chan had already prepared and shared with Grant in January 2014 the Secret Hapoalim Bond, which was for $30 million and was to be used to purchase Lantana 1 and 2 and the Seminole Property.

109.    Aguiar, Burckhart, and Melbourne Smith, also in attendance at the April 22 meeting, also knew, but chose not to correct Grant, Hapoalim and Chan's patently false misrepresentations about the amount and uses of the proceeds from the bond.

### B)    The May 28, 2014 Board Meeting

110.    During the next board meeting on May 28, 2014, Grant re-introduced Chan as the placement agent for the issuance of a $22 million bond to be used to purchase only Lantana 1 and 2.  When asked by Scott Shelley about the anticipated terms of the now $22 million bond, Hapoalim and Chan stated that the bond would be amortized over 35 years at approximately 7% interest.

111.    Again, Grant did not inform the Academy's board of directors that he, contrary to his authority, had already executed the Hapoalim Engagement Letter.  Also, he did not present the Hapoalim Engagement Letter to the Academy's board of directors for their approval.

112.    However, Grant noted that he would present to the Academy's board for their approval the purchase and sale agreement pursuant to which the Academy would purchase Lantana 2 from ESJ.

113.    As he had agreed to do, Burckhart attempted to lead the discussion to a point where the Academy's board would unwittingly approve the Lantana 1, 2 and 3 Bond Plan with the ESJ Development Conditions.  In particular, Burckhart asked about the letter of intent with respect to Lantana 2 (the "Lantana 2 LOI").

114.    At that point, Grant introduced D'Ascola of ESJ and asked him to comment about the Lantana 2 LOI.  As he had agreed to do in connection with Grant's effort to convince the Academy's board of directors to adopt the Lantana 1, 2, and 3 Bond Plan with the ESJ Development Conditions, D'Ascola stated that ESJ will build additional space at Lantana 2 for the Academy and "a separate site [Lantana 3] for a high school" (the "D'Ascola False Omission").

115.    Unsurprisingly, D'Ascola knew, but failed to inform the Academy's board of directors that his statement about ESJ building a separate site (Lantana 3) was not accurate. Specifically, D'Ascola knew, but intentionally failed to also inform the Academy's board of directors that ESJ would build the additional space at Lantana 2, and build Lantana 3 *only if* the Academy agreed to the ESJ Development Conditions.

116.    There was no further discussion during the meeting about ESJ building the additional space at Lantana 2 and Lantana 3 for the Academy, or the ESJ Development Conditions.

**C)     After the May 28 Meeting and before the June 19, 2014 Board Meeting**

117.    On or about June 4, 2014, Hapoalim and Chan had a call with potential investors/purchasers of the Bond.  After the meeting, Hapoalim and Chan presented to the Academy's board of directors the information they shared with the potential investors/purchasers of the Bond ("Investor Presentation").  A copy of the Hapoalim Investor Presentation is attached as **Exhibit K**.

118.    The Investor Presentation was consistent with Hapoalim and Chan's representations at the previous board meetings.  For example, the Investor Presentation states: (1) that the bond proceeds will be used to acquire *only* Lantana 1 and 2, (2) the bond would be

structured as "***Fixed Rate Term bonds with 35 YR Final Maturity***", (3) that as part of the sale of Lantana 2 to the Academy, ESJ will use proceeds from the sale to build out space at Lantana 2 for the expansion of the Academy's high school.  The presentation stated that Lantana 2's sale price is $8 million, which includes a $1.5 million building allowance for the high school.  The $1.5 million allowance is a scrivener's error and should be $2.5 million as noted in the allegations relating to the June 19, 2014 board meeting.

119.    On June 16, 2014, Chan emailed Grant the draft purchase and sale agreement for the purchase of Lantana 2 ("Lantana 2 PSA"), and the Lantana 2 LOI discussed during the May 28 meeting.  A copy of Chan's email with the attached documents is attached as **Exhibit L**.  The Lantana 2 LOI, which was prepared on Hapoalim's letterhead, contained the ESJ Development Conditions and was prepared in connection with Grant and Burkhart's efforts to convince the Academy's board of directors to adopt the Lantana 1, 2 and 3 Bond Plan with the ESJ Development Conditions without them knowing the genesis and details of the plan or the roles of those involved in the plan.

120.    Grant forwarded the email with the Lantana 2 PSA and LOI to Link-Up's principal, who upon reading the Lantana 2 LOI with the ESJ Development Conditions, immediately responded and informed Hapoalim and Chan that the development of the additional space at Lantana 2 must be treated as separate transaction and not conditioned on the ESJ Development Conditions, *i.e.* not tied to the future development by ESJ of Lantana 3 or to the Academy entering into a 25-year lease.  A copy of the response email is attached as **Exhibit M**.

121.    Specifically, Link-Up's principal stated that:

> These two transactions should be treated separately.  ***The school should not enter into an agreement committing itself to any future site expansion it (sic) order to meet the current projections at Lantana 2***, when none of the costs are disclosed.  ***The school does not know if it can***

*and will utilize 120,000 S.F. for the high school*.  There is no cost estimate in this document for the future expansion.  What mechanism will allow the school to negotiate the best over-all price if this is signed now, requiring the school to enter into a future 25-year rent agreement in order to obtain the additional space (total requirement not confirmed) needed to meet the current bond projections at Lantana 2?

*For some time, we have been postulating that we should have multiple K-12 campuses, not a single stand-alone high school.  There should be some serious discussion of this about the model before making this kind of commitment*. (Emphasis added)

122.    Subsequently, and as added assurance that the development of the additional space at Lantana 2 would not be conditioned on the development of Lantana 3 and the other ESJ Development Conditions, Link-Up's principal requested that Hapoalim and Chan confirm in writing before the next board meeting that the bond proceeds would be used to purchase only Lantana 1 and 2, and to develop the additional space at Lantana 2, at no additional cost to the Academy.

        D)       **Information Hapoalim and Chan had before the June 19, 2014 Board Meeting and did not disclose at any of the Board Meetings**

123.    Unbeknownst to the Academy until 2017, as Aguiar, Grant, Hapoalim and Chan had agreed to do in November 2013, Hapoalim and Chan prepared the Aguiar August 2014 Consulting Contract, which Aguiar and Grant executed on June 4, 2015.  Copies of the emails and the agreement are attached as **Exhibit N.**

124.    More significantly, unbeknownst to the Academy until 2017, before the June 19, 2014 board meeting, D'Ascola became concerned that the Lantana 1, 2 and 3 Bond Plan would not succeed.  Specifically, D'Ascola was concerned by Link-Up's principal's (i) email to Hapoalim and Chan stating that the development of the additional space at Lantana 2 must be separate and not conditioned on the ESJ Development Conditions, and (ii) request for Hapoalim and Chan to write a letter confirming that the development of the additional space at Lantana 2

would be covered by the proceeds from the Bond and would be at no additional cost to the Academy.

125.    Consequently, on June 18, 2014, D'Ascola emailed Aguiar a letter he requested the Academy's board of directors sign (the "ESJ No Construction Letter").  Aguiar forwarded D'Ascola's email and letter to Grant and Chan.  Copies of the email and the letter are attached as **Exhibit O**.  The ESJ No Construction letter, required to be signed by all of the Academy's board members, states in pertinent part:

> This letter confirms that with respect to the above referenced pending Agreement, the Purchase Price of $8,000,000.00 (or as otherwise set forth in the Agreement which is finally executed between us), is the Purchase Price for the Property ***only, and no portion of the Purchase Price is advance payment or consideration on account of any future Seller obligation, construction related or otherwise.***
>
> * * * *
>
> Buyer acknowledges that this letter is a material inducement for Seller to agree to enter into the Agreement with Buyer to sell the Property [Lantana 2] to Buyer. (Emphasis added)

126.    Simply, the ESJ No Construction Letter states, contrary to what the Academy's board members were being told, that no portion of the $8 million purchase price the Academy pays for Lantana 2 will be used for the development of anything, including the development of the additional space at Lantana 2 that was critical to the Academy's ability to pay the bond's debt payments.

127.    More fundamentally, the ESJ No Construction Letter doomed the Lantana 1, 2 and 3 Bond Plan.  In particular, without ESJ developing the additional space at Lantana 2, the Academy would not have sufficient space to generate the revenue needed to pay the bond's debt payments and the bond would not be approved.

128.    Grant, Aguiar, Hapoalim, Chan and Burckhart, however, came up with a new plan to salvage the Lantana 1, 2, and 3 Bond Plan with the ESJ Development Conditions.   Their thinking was simple.  Once the Academy issued the bond based on false information, it would be faced with the Hobson's choice of (i) agreeing to the Lantana 1, 2, and 3 Bond Plan with the ESJ Development Conditions, or (ii) not agreeing to the plan and risk final ruin.

129.    Based on information produced by Grant in 2017 in connection with the Foundation Lawsuit, first they decided to egregiously and intentionally misrepresent to the Academy's board of directors that ESJ, contrary to the ESJ No Construction Letter, will sell Lantana 2 to the Academy for $8 million and will use $2.5 million of the $8 million purchase price to develop the additional space at Lantana 2.  Second, they hid from the Academy's board of directors the agreement to purchase Lantana 2 from ESJ, which clearly did not allocate $2.5 million of the $8 million purchase price for the development of the additional space at Lantana 2. Third, they moved the issue date of the bond from between August to October 2014 to June 2014, and issued the bond without resolving open questions posed by the Academy's board of directors and Link-Up's principal about the changes to the bond's amortization schedule that increased the Academy's debt obligations and made them completely unmanageable.  Fourth, they intentionally misrepresented the terms of the purported development agreement they were negotiating with ESJ for it to develop the additional space at Lantana 2.  Finally, to mask their involvement in the plan, they agreed to blame D'Ascola and ESJ if the plan failed and they were not able to convince the Academy's board of directors to adopt the Lantana 1, 2, and 3 Bond plan with the ESJ Development Conditions, which Development Conditions they needed in hand to be able to convince D'Ascola, who had removed himself from the plan, to rejoin the plan and

cause ESJ to allocate $2.5 million of the $8 million purchase price of Lantana 2 for the development of the additional space at Lantana 2 (the "Misrepresent and Salvage Plan").

**IV)   ACTS DONE IN FURTHERANCE OF THE MISREPRESENT AND SALVAGE PLAN**

**A)   FIRST PHASE – MAKE FALSE MISREPRESENTATIONS TO THE ACADEMY'S BOARD OF DIRECTORS DURING THE JUNE 19 2014 BOARD MEETING.**

130.    Grant, Hapoalim and Chan attended the next board meeting that occurred on June 19, 2014.  Not surprisingly, Grant, Hapoalim and Chan did not present the ESJ No Construction Letter to the Academy's board of directors.

131.    Instead and despite knowing the contents of the ESJ No Construction Letter, Hapoalim and Chan, as requested by Link-Up's principal, presented a letter dated June 19, 2014 ("Hapoalim Bond Use Letter") stating that the proceeds from the bond will be used *only* for the purchase of Lantana 1, Lantana 2, and the development of additional space at Lantana 2 at no additional cost to the Academy.  A copy of the letter is attached as **Exhibit P**.

132.    Specifically, the Hapoalim Bond Use Letter States:

> As stated in the current bond offering documents, the proceeds of the Series 2014 Bonds will be utilized for the acquisition of Lantana 1, the acquisition of Lantana 2, and the build-out of an additional facility for a total capacity of 1,100 students by Lantana 2's seller, ***at no additional cost to [the Academy]***.  (Emphasis added).

133.    At no point during the meeting did Grant, Hapoalim, Chan, and Burckhart, who learned of the ESJ No Construction Letter from Grant, inform the Academy's board members that none of the $8 million purchase price for Lantana 2 would be used to develop the additional space at Lantana 2.

134.    Furthermore, at no point before, during, or after the meeting, did Grant, Hapoalim, Chan, and Burckhart, inform the Academy's board of directors of the newly minted Misrepresent and Salvage Plan.

135.    In fact, contrary to the ESJ No Construction Letter, Hapoalim and Chan stated, *inter alia*, that (1) $2.5 million of the $8 million purchase price for Lantana 2 will be placed in escrow to be used for the development of the additional space at Lantana 2, (2) the purchase and development of the Lantana 2 site for $8 million is a stand alone project and is not related nor conditioned on the development of Lantana 3 or the ESJ Development Conditions, (3) the terms for the development of the additional space at Lantana 2 will be in a separate development agreement relating ***only*** to the development of the additional space at Lantana 2, (4) the Academy would be able to satisfy its bond payment and other obligations under a no-growth scenario – *i.e.* based on the number of students at only Lantana 1 and 2 and the additional space developed at Lantana 2, (5) the debt service obligations of the bond would not exceed the Academy's lease obligations under the Lantana 1 and Lantana 2 Leases, (6) the bond would have a 35-year maturity, and (7) the Academy's payment obligations under the bond would be amortized over the bond's 35-year maturity period (collectively with the statements in the Hapoalim Bond Letter the "Intentional False Bond Statements").

136.    Grant and Burckhart were fully aware that the Intentional False Bond Statements were patently false and were simply being made by Hapoalim and Chan in order to convince the Academy's board of directors to approve the Bond, thereby putting the Academy in the precarious position of having to accept the Lantana 1, 2 and 3 Bond Plan or face final ruin.

137.    But, rather than advise the Academy's board of directors that the statements were false, Grant and Burckhart remained opportunistically quiet.

138.    Aguiar, who did not attend the meeting, was also fully aware of the Intentional False Bond Statements and that Hapoalim and Chan would make them during the board meeting. Despite her obligations to the Academy via, *inter alia*, the Academy retaining Edu-Care, Aguiar never informed the Academy's board of directors that the Intentional False Bond Statements were patently false.  She, like Grant and Burckhart, also remained opportunistically quiet.

139.    Also, during and after the June 19 meeting and before the bond was issued, Hapoalim and Chan presented the Academy's board of directors a market feasibility study prepared by Fishkind & Associates, Inc. ("Fishkind"), an entity retained by Hapoalim and Chan, which showed that the Academy could only financially pay approximately $6 million of debt obligation payments from 2015-2018 without defaulting under the bond.  A copy of the debt service portion of the Fishkind Report is attached as **Exhibit Q**.

140.    Also, during and after the June 19 meeting and before the bond was issued, Hapoalim and Chan presented the Academy's board of directors their analysis of the Academy's bond payment obligations over the ***35-year maturity period*** compared to the onerous lease obligations under the Lantana 1 and 2 leases. ("Bond vs. Lease Analysis").  A copy of the Bond vs. Lease Analysis is attached as **Exhibit R**.

141.    Not surprisingly, the total Academy's debt obligation payments under the Fishkind Report and the Bond v. Lease Analysis were substantially similar, as shown in the below table:

| Year | Fishkind Report | Bond vs. Lease Analysis |
|------|-----------------|-------------------------|
| 2015 | 939,832.00 | 1,583,755.00 |
| 2016 | 1,598,900.00 | 1,583,755.00 |
| 2017 | 1,861,550.00 | 1,583,755.00 |
| 2018 | 1,859,950.00 | 1,583,755.00 |
| Total | **6,260,232.00** | **6,335,020.00** |

142.    Also during the June 19 meeting, Hapoalim and Chan, as they had agreed to do in connection with the Misrepresent and Salvage Plan, attempted to raise for discussion the Academy engaging ESJ to build Lantana 3 to be used for the Academy's stand alone high school.

143.    The Academy's board of directors, however, refused to discuss the matter and specifically stated that the topic was not relevant.   Furthermore, the Academy's board of directors requested that Hapoalim and Chan rescind the Lantana 2 LOI and confirm again that the build out of the additional space at Lantana 2 was not conditioned on the Academy building a stand-alone high school or anything else.

144.    Based on Hapoalim and Chan's representations, *i.e.* the Intentional False Bond Statements, and the information they presented during the June 19 board meeting, *i.e.* the Hapoalim Bond Letter, the Fishkind Report and the Bond v. Lease Analysis, the Academy's board of directors authorized the issuance of the Bond totaling $24,640,000.

145.    As an added safety net to their Misrepresent and Salvage Plan, and as agreed between Grant, Hapoalim, Chan, Aguiar, and Burckhart, Burckhart and Grant, without fully disclosing to the Academy's other board member the genesis and details of the Misrepresent and Salvage Plan, included in the resolution approving the bond ("Bond Resolution") language they could use to make necessary changes to ensure the success of the Misrepresent and Salvage Plan without further approval by the Academy's board of directors.

146.    More specifically, the Bond Resolution, a copy of which is attached as **Exhibit S**, states in pertinent part that Grant and Burckhart are authorized to execute the bond documents "in substantially the form presented at this meeting with ***such changes, modifications, deletions and insertions as the persons executing said documents on behalf of the Borrower may deem***

*necessary and appropriate, such execution and delivery to be conclusive evidence of the approval thereof by the Borrower, and such other documents which may be necessary or convenient to the same*[.]"

147.    It was not until 2017, after they obtained the ESJ No Construction Letter and other information from Grant via the Foundation Lawsuit, that the Academy's board of directors learned they were fraudulently induced into approving, and the true motivation for, the above language in the Bond Resolution –*i.e.*, that the language was incorporated to help ensure the success of the Misrepresent and Salvage Plan.

148.    In particular, Grant and Burckhart would be able to use the Bond Resolution to approve the bond without having to resolve open questions about the bond posed by the Academy's board of directors or others, as was done once the bond was issued.

### B)    SECOND PHASE – HIDE THE EXECUTED REVISED LANTANA 2 PURCHASE/SALE AGREEMENT FROM THE ACADEMY'S BOARD OF DIRECTORS

149.    On or before the June 19 board meeting, Grant executed a revised version of the Lantana 2 PSA ("Revised Lantana 2 PSA") that Grant first produced to the Academy in 2017 in connection with the Foundation Lawsuit.

150.    ESJ executed the Revised Lantana 2 PSA on or after June 19, 2014.  On June 23, 2014, Hapoalim and Chan emailed the fully executed Revised Lantana 2 PSA to Grant.  A copy of the email with the executed revised Lantana 2 PSA is attached as **Exhibit T**.

151.    The Revised Lantana 2 PSA, which Grant, Hapoalim and Chan had before, but did not present to the Academy's board of directors at the June 19 meeting, is significantly different from the Lantana 2 PSA presented to the Academy's board of directors before the June 19 meeting.

152.   Critically, the Revised Lantana 2 PSA is materially inconsistent with the representations Grant, Hapoalim and Chan made during the June 19 meeting about ESJ allocating and putting in escrow $2.5 million of Lantana 2's $8 million purchase price to be used for the development of the additional space at Lantana 2.

153.   In fact, the Revised Lantana 2 PSA ignores the fact that the development of the additional space at Lantana 2 was an existing requirement and material condition of the Academy's board of directors approving the increased bond amount, which increased amount would be used to purchase Lantana 2 on the condition that $2.5 million of the $8 million purchase price would be used to develop the additional space at Lantana 2.  Furthermore, it omits the requirement that ESJ allocate the $2.5 million of the purchase price for the development of the additional space at Lantana 2.

154.   Specifically, the Revised Lantana 2 PSA states that "to the extent [the Academy] ***in the future*** wishes to develop a 20,000 sqft high school addition to the [Lantana 2] . . . then [ESJ] and [the Academy] ***agree to negotiate in good faith toward a mutually agreeable construction agreement*** with respect thereto." (Emphasis added).

### C)   THIRD PHASE – ACCELERATE THE BOND ISSUANCE DATE, CHANGE THE AMORTIZATION SCHEDULE, AND ISSUE THE BOND WITHOUT THE BOARD'S APPROVAL AND WITHOUT RESOLVING THE BOARD'S OPEN QUESTIONS

155.   Significantly, before the June 24, 2014 board meeting adjourned at 5:00 pm, Grant and Burckhart knew, but did not disclose to the Academy's board of directors that Hapoalim and Chan were preparing to issue the bond within the next two days (June 26, 2014).

156.   During the June 24 meeting, the final bond documents were forwarded to bond counsel, Grant and Link-Up's principal, who upon reviewing the email the next day (June 25)

was surprised to know the bond was closing shortly, and immediately forwarded the final bond documents to the Academy's board of directors.

157.    Link-Up's principal also noted that the final debt service amortization tables were not included in the final bond documents he received.  He attempted, but was not able to reach bond counsel that sent the bond documents, and also contacted another bond counsel, who also did not see the final debt service amortization tables.

158.    After finally receiving and reviewing the final debt service amortization schedules, Link-Up's principal noticed that the debt service obligations in the final bond documents were not consistent with Hapoalim and Chan's representations at the June 19 board meeting, *i.e.* the final debt service was approximately $4 million more in the first four years compared to Hapoalim and Chan's Bond vs. Lease Analysis and the Fishkind Report.  The following table is illustrative:

| Year | Fishkind Report | Bond vs. Lease Analysis | Final Amortization |
|------|-----------------|-------------------------|--------------------|
| 2015 | 939,832.00 | 1,583,755.00 | 3,025,451.00 |
| 2016 | 1,598,900.00 | 1,583,755.00 | 2,580,000.00 |
| 2017 | 1,861,550.00 | 1,583,755.00 | 3,557,500.00 |
| 2018 | 1,859,950.00 | 1,583,755.00 | 1,460,000.00 |
| **Total** | **6,260,232.00** | **6,335,020.00** | **10,622,951.00** |

159.    Link-Up's principal emailed the Academy's board of directors, Grant, Hapoalim and Chan about the inconsistency and requested that Hapoalim and Chan provide an explanation for the significant change in the final debt service amortization schedule.

160.    Scott Shelley, one member of the Academy's board of directors, also emailed Grant to express concern about the fact that the final debt service obligations in the final bond documents were not consistent with Hapoalim and Chan's representations at the June 19 board meeting, reiterated that the debt service obligations must coincide with what was represented by Hapoalim and Chan and must work financially with the Academy's budget and enrollment, and

requested that Grant raise the issue with Burckhart, as the chairman of the board, so it could be addressed and resolved.

161.    Shortly after receiving the emails from Link-Up's principal and Scott Shelley, Grant emailed Hapoalim and Chan pretending he was interested in understating the inconsistency with the final debt service amortization schedule.  Specifically, in his email, a copy of which is attached as **Exhibit U** Grant states:

> Eddie:
>
> Bill Burckhart and I met with Skip Miller yesterday in his office for the pre-closing to sign all pertinent documents on behalf of the Museum and Foundation respectively, in accordance with the direction of our respective boards.
>
> Subsequently, that day I was advised that the final amortization schedule as presented by you in emails to Gary Troast, Dan Rishavy and Scott Shelley would not be compatible or meet the needs or our projections and potentially put us in a default position in the third year of our new operation.  This would occur because of the requirement in the first 4 years to pay a substantial part of the principal loan.
>
> Please advise.

162.    Hapoalim and Chan, as they had previously agreed with Grant to do, did not respond to any of the emails.  After being reached via phone by Link-Up's principal, however, Hapoalim and Chan assured Link-Up's principal that the Academy would be able to use certain bond proceeds to cover the increased debt service obligation.  Link-Up's principal immediately memorialized the conversation via an email to the Academy's board of directors and Chan (Exhibit M).

163.    Shortly thereafter (less than 15 minutes), Grant's assistant, using his foundation email and at Grant's and/or Burckhart's direction, sent an email at 11:22 am on June 26 to the Academy's board of directors, Link-Up's principal, and others, stating that Burckhart will

address all questions related to the bond to avoid any confusion.  A copy of the email, which is noticeably missing from the Foundation's 2017 production, is attached as **Exhibit V**.

164.    Neither Burckhart nor Grant, however, addressed any of the concerns about the inconsistent debt service amortization schedules.  Instead, as they had previously agreed to do in furtherance of the Misrepresent and Salvage Plan, and pursuant to the fraudulently induced authority granted to them by the Bond Resolution, Burckhart and Grant signed the final bond documents at 11:58 a.m., 36 minutes after the email stating that Burckhart will address all questions, without actually addressing a single question about the bond's revised amortization schedule.

165.    The final bond documents continued the false narrative -- that ESJ would use $2.5 million of the $8 million Lantana 2 purchase to develop the additional space at Lantana 2 for the Academy.  Specifically, the final bond memorandum, which was prepared by Hapoalim and Chan and is part of the Bond, states:

> Palm Beach Maritime Academy has been leasing its Lantana 2 Facility space from an unrelated third party for one year.  Palm Beach Maritime Academy plans to use the proceeds of the Bonds to purchase the Lantana 2 Facility for a ***total cost of $8,000,000.  $2,500,000 of the purchase price of Lantana 2 will be used by the seller to finance the construction of a 20,000 square feet addition to the existing improvements for the purpose of adding additional classrooms***. (Emphasis added)

> **D)    FOURTH PHASE – MISREPRESENT THE TERMS OF THE DEVELOPMENT AGREEMENT BEING NEGOTIATED WITH ESJ FOR THE ADDITIONAL SPACE AT LANTANA 2.**

166.    Now that they had managed to forcibly straddle the Academy with an insurmountable bond debt service obligation they knew the Academy could not pay without the development of and the students at the additional space at Lantana 2, Grant, Hapoalim, Chan, and Burckhart, continued the Misrepresent and Salvage Plan.

167.    In particular, they decided to misrepresent the terms of the purported development agreement that Hapoalim and Chan were negotiating with ESJ for the development of the additional space at Lantana 2 until they could finally force the Academy's board of directors to adopt, without knowing the underlying genesis of the nefarious scheme and details, the Lantana 1, 2, and 3 Bond Plan with the ESJ Development Conditions, *i.e.* ESJ, pursuant to the ESJ Development Conditions, develops Lantana 3, financed via a second bond issued by Hapoalim and Chan, and buries the costs to develop the additional space at Lantana 2 into the Lantana 3 construction budget ("ESJ Development Agreement").

168.    For example, on August 4, 2014, Hapoalim and Chan emailed Grant the ESJ Development Agreement they purportedly negotiated with D'Ascola.  Hapoalim and Chan warned Grant that the ESJ Development Agreement was "for your eyes only" and that he was not to share it.  A copy of the email and attachment is attached as **Exhibit W**.

169.    The ESJ Development Agreement for Grant's eyes only provided that the development of the additional space at Lantana 2 is conditioned on the Academy using ESJ to develop Lantana 3, which would eventually be purchased by the Academy with proceeds from a second bond Hapoalim and Chan would issue for the Academy.

170.    On the morning of August 8, 2014, the day of the next board meeting, Hapoalim and Chan emailed Wally Baldwin, the Foundation's counsel, a version of the ESJ Development Agreement that removed the dollar amounts contained in the Grant's "eyes only" version of the agreement provided by Hapoalim and Chan.

171.    Hapoalim and Chan informed Wally Baldwin that they were still negotiating the terms of the ESJ Development Agreement and requested he "not contact the Seller or Seller's

attorney about this since we are not final on terms yet. I have shared this with Skip Miller also." A copy of the email and attachment is attached as **Exhibit X**.

172.    During the August 8, 2014 board meeting, neither the version of the ESJ Development Agreement Hapoalim and Chan provided to Grant for his "eyes only", nor the version of the agreement Chan presented to Wally Baldwin, were shared with the Academy's board of directors.

173.    During the August 8 board meeting, and in complete and utter disregard for the Academy's board of directors and their previous rejection of the ESJ Development Conditions, Grant, Hapoalim and Chan falsely claimed that the Academy's board of directors had previously agreed to the ESJ Development Conditions and to Hapoalim and Chan underwriting a second bond to be used for the development of Lantana 3.

174.    Burckhart, in connection with the Misrepresent and Salvage Plan, tried to support Grant, Hapoalim and Chan, but the remaining independent members of the Academy's board of directors (Scott Shelley and Steve Bolin) rejected Grant, Hapoalim, Chan, and Burckhart's claim that the board had previously agreed to the ESJ Development Conditions and to Hapoalim and Chan issuing a second bond to be used for the development of Lantana 3.

175.    As a result of the Academy's board of directors' continued rejection of the ESJ Development Conditions, Grant, Hapoalim and Chan did not present the Academy's board of directors the ESJ Development Agreement that Hapoalim and Chan sent to Grant for his eyes only, or the modified ESJ Development Agreement that Hapoalim and Chan emailed to Wally Baldwin.

176.    Instead, Grant, Hapoalim and Chan repeated their previous false misrepresentations that (1) ESJ would put into escrow $2.5 million of Lantana 2's $8 million

purchase price for the development of the additional space at Lantana 2, (2) the development of the additional space at Lantana 2 is not conditioned on the development of the high school at Lantana 3 and the development of Lantana 3 is a separate and independent transaction, (3) the Academy was not required to use ESJ to develop the Academy's stand alone high school and could use other developers and evaluate other locations, and (4) the development of Lantana 3 by ESJ was not holding up ESJ's development of the additional space at Lantana 2.

177.    Burckhart, who was also aware of the contents of the versions of the ESJ Development Agreements that Hapoalim and Chan presented to Grant for his eyes only and to Wally Baldwin, and that the agreements contradicted Grant, Hapoalim and Chan's continued false misrepresentations, also failed to disclose or mention the development agreements.  Instead, he stated that he was working on (1) getting the escrow agreement finalized pursuant to which ESJ would put in escrow $2.5 million of Lantana 2's $8 million purchase price for the development of the additional space at Lantana 2, and (2) extending the closing date for the Academy to purchase Lantana 2.

178.    Scott Shelley expressed concerns with Hapoalim and Chan representing the Academy with the bond and with negotiating the ESJ Development Agreement.

179.    Consequently, Grant recommend the Academy's board of directors appoint Gary Troast, on behalf of the Foundation, and Burckhart, on behalf of the Academy, to continue negotiating the ESJ Development Agreement.  The Academy's other independent board of director members, who were not aware of Burckhart's role in the scheme, unwittingly agreed with Grant's recommendation.

### E) FIFTH PHASE – BLAME D'ASCOLA FOR ESJ'S REFUSAL TO PUT IN ESCROW ANY PORTION OF THE $8 MILLION PURCHASE PRICE FOR LANTANA 2

180.    On or before the September 8, 2014 board meeting, Grant, Burckhart and Gary Troast met with ESJ regarding the ESJ Development Agreement.  On September 8, 2014, they provided an update of their meeting with ESJ.

181.    Specifically, they informed the Academy's board of directors that ESJ, consistent with the undisclosed ESJ No Construction Letter, agreed that it would sell Lantana 2 to the Academy for $8 million but ***would not*** allocate any of the $8 million for the development of the additional space at Lantana 2.

182.    Simply put, ESJ's refusal to allocate any of the $8 million for the development of the additional space at Lantana 2 doomed the Misrepresent and Salvage Plan.

183.    But, rather than admit their plan was doomed and confess to the Academy's board of directors that Grant, Hapoalim, Chan, Burckhart, D'Ascola and Aguiar had intentionally conned the Academy's board of directors all along, and that they already knew based on the ESJ No Construction Letter that ESJ never intended to allocate any portion of the purchase price of Lantana 2 for the development of the additional space at Lantana 2, Grant and Burckhart blamed D'Ascola for ESJ's refusal to sell and develop the additional space at Lantana 2.

184.     In particular, they claimed that D'Ascola never communicated to, and obtained consent from, ESJ's managing director to the terms for the sale and development of Lantana 2.

185.    At no point did Grant or Burckhart admit their roles or the roles of Aguiar, Hapoalim, Chan and D'Ascola in the elaborately fraudulent scheme they laid and their attempt to salvage it, *i.e.* the Misrepresent and Salvage Plan, after the ESJ No Construction Letter doomed it.

186.    Hapoalim and Chan also refused to admit their roles in the elaborately fraudulent scheme and that, based on the ESJ No Construction Letter, they knew, but intentionally did not inform the Academy's board of directors, that ESJ never agreed to sell Lantana 2 to the Academy for $8 million and to allocate $2.5 million of the sale price for the development of the additional space at Lantana 2.

187.    In fact, Hapoalim and Chan blamed the Academy's failure to acquire and develop the additional space at Lantana 2 on Grant and Aguiar.  A copy of the letter is attached as **Exhibit Y**.

188.    Specifically, in the letter, Hapoalim and Chan state "[i]n spite of your apparent allegation that Mr. Chan negotiated a fraudulent transaction with ESJ, the owner of the Lantana 2 property, it was Mr. John C. Grant (the, President of the Academy), and Ms. Patricia Aguiar (Managing Member of Edu-Link, the then contractual manager of the Academy) who led and directed negotiations with ESJ."

## COUNT 1 – SECURITIES FRAUD - § 10(B) OF SECURITIES ACT OF 1934 (AGAINST HAPOALIM AND CHAN)

189.    The Academy incorporates paragraphs 1 through 17 and 51 through 188 as though fully set forth herein.

190.    In connection with, and to convince the Academy to approve the issuance of the approximately $24 million Bond for the Academy, Hapoalim and Chan made several significant and material false statements of facts and material omissions.

191.    Specifically, before, during and after the June 19 board meeting and before the Academy's board of directors provided their approval for Hapoalim and Chan to issue the Bond, Hapoalim and Chan made the Intentional False Bond Statements to the Academy's board of

directors, which the Academy's board of directors reasonably and justifiably relied on to approve the bond issuance.

192.    Also, during and after the June 19 board meeting and before the Academy's board of directors provided their approval for Hapoalim and Chan to issue the bond, Hapoalim and Chan had in their possession the ESJ No Construction Letter, which provided, contrary to Hapoalim and Chan's representations, that ESJ would not allocate any portion of the purchase price for Lantana 2 for the development of the additional space at Lantana 2, which additional space was crucial to the Academy's ability to generate the revenue needed to satisfy its debt service obligations under the bond.

193.    Hapoalim and Chan never shared the ESJ No Construction Letter with the Academy.  Instead, they decided to keep it secret and to continue conniving the Academy by making other intentional false misrepresentations or omissions in connection with the Misrepresent and Salvage Plan.

194.    For example, in addition to hiding the ESJ No Construction Letter, they also hid from the Academy's board of directors the Revised Lantana 2 PSA, which refuted their Intentional False Bond Statements.  And when their scheme finally came tumbling down, they blamed Grant and Aguiar in order to conceal their role in the scheme.

195.    Hapoalim and Chan made the Intentional False Bond Statements and other intentional false representations and omissions with scienter.  The ESJ No Construction Letter illustrates this point.

196.    On June 18, 2014, Hapoalim and Chan had in their possession the ESJ No Construction Letter, which specifically refuted their false statement that ESJ would sell Lantana

2 for $ 8 million and would allocate $2.5 million of the purchase price for the development of the additional space at Lantana 2.

197.    But, instead of showing the ESJ No Construction Letter to the Academy's board of directors and requesting they sign it, Hapoalim and Chan intentionally and falsely misled the Academy's board of directors into approving the issuance of the Bond, all the while hoping they would, after the Bond issued, convince the Academy's board of directors to buy into the Lantana 1, 2, and 3 Bond Plan with the ESJ Development Conditions.

198.    As a direct and proximate result of Hapoalim and Chan's Intentional False Bond Statements, and other material intentional false representations and omissions they committed in furtherance of the Misrepresent and Salvage Plan, including without limitation, their keeping secret the ESJ No Construction Letter from the Academy's board of directors, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

199.    Furthermore, the significant economic losses the Academy suffered and continues to suffer were caused directly by Hapoalim and Chan's Intentional False Bond Statements and other material intentional false representations and omissions they committed.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Hapoalim and Chan, and award it the economic damages it suffered and continues to suffer as a result of Hapoalim and Chan's actions, pre and post judgment interest, costs, and all other relief as appropriate.

**COUNT 2 – SECURITIES FRAUD – FLA. STAT. § 517.301
(AGAINST HAPOALIM AND CHAN)**

200.    The Academy incorporates paragraphs 1 through 17 and 51 through 188 as though fully set forth herein.

201.    In connection with, and to convince the Academy to approve the issuance of the approximately $24 million Bond for the Academy, Hapoalim and Chan made several significant and material false statements of facts and material omissions.

202.    Specifically, before, during and after the June 19 board meeting and before the Academy's board of directors provided their approval for Hapoalim and Chan to issue the Bond, Hapoalim and Chan made the Intentional False Bond Statements to the Academy's board of directors, which the Academy's board of directors reasonably and justifiably relied on to approve the bond issuance.

203.    Also, during and after the June 19 board meeting and before the Academy's board of directors provided their approval for Hapoalim and Chan to issue the bond, Hapoalim and Chan had in their possession the ESJ No Construction Letter, which provided contrary to Hapoalim and Chan's representations, that ESJ would not allocate any portion of the purchase price for Lantana 2 for the development of the additional space at Lantana 2, which additional space was crucial to the Academy's ability to generate the revenue needed to satisfy its debt service obligations under the bond.

204.    Hapoalim and Chan never shared the ESJ No Construction Letter with the Academy.  Instead, they decided to keep it secret and to continue conniving the Academy by making other intentional false misrepresentations or omissions in connection with the Misrepresent and Salvage Plan.

205.    For example, in addition to hiding the ESJ No Construction Letter, they also hid from the Academy's board of directors the Revised Lantana 2 PSA, which refuted their Intentional False Bond Statements.  And when their scheme finally came tumbling down, they blamed Grant and Aguiar in order to conceal their role in the scheme.

206.    Hapoalim and Chan made the Intentional False Bond Statements and other intentional false representations and omissions with scienter.  The ESJ No Construction Letter illustrates this point.

207.    On June 18, 2014, Hapoalim and Chan had in their possession the ESJ No Construction Letter, which specifically refuted their false statement that ESJ would sell Lantana 2 for $ 8 million and would allocate $2.5 million of the purchase price for the development of the additional space at Lantana 2.

208.    But, instead of showing the ESJ No Construction Letter to the Academy's board of directors and requesting they sign it, Hapoalim and Chan intentionally and falsely misled the Academy's board of directors into issuing the bond, all the while hoping they would, after the bond issued, convince the Academy's board of directors to buy into the Lantana 1, 2, and 3 Bond Plan with the ESJ Development Conditions.

209.    As a direct and proximate result of Hapoalim and Chan's Intentional False Bond Statements, and other material intentional false representations and omissions they committed in furtherance of the Misrepresent and Salvage Plan, including without limitation their keeping secret the ESJ No Construction Letter from the Academy's board of directors, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

210.    Furthermore, the significant economic losses the Academy suffered and continues to suffer were caused directly by Hapoalim and Chan's Intentional False Bond Statements and other material intentional false representations and omissions they committed.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Hapoalim and Chan, and award it the economic damages it suffered and continues to

suffer as a result of Hapoalim and Chan's actions, pre and post judgment interest, costs, and all other relief as appropriate.

**COUNT 3 – COMMON LAW FRAUD/FRAUDULENT MISREPRESENTATION (AGAINST HAPOALIM AND CHAN)**

211.    The Academy incorporates paragraphs 1 through 17 and 51 through 188 as though fully set forth herein.

212.    In connection with, and to convince the Academy to approve the issuance of the approximately $24 million Bond for the Academy, Hapoalim and Chan made several significant and material false statements of facts and material omissions.

213.    Specifically, before, during and after the June 19 board meeting and before the Academy's board of directors provided their approval for Hapoalim and Chan to issue the bond, Hapoalim and Chan made to the Academy's board of directors the Intentional False Bond Statements, which the Academy's board of directors reasonably and justifiably relied on to approve the bond issuance.

214.    Also, during and after the June 19 board meeting and before the Academy's board of directors provided their approval for Hapoalim and Chan to issue the bond, Hapoalim and Chan had in their possession the ESJ No Construction Letter, which provided contrary to Hapoalim and Chan's representations, that ESJ would not allocate any portion of the purchase price for Lantana 2 for the development of the additional space at Lantana 2, which additional space was crucial to the Academy's ability to generate the revenue needed to satisfy its debt service obligations under the bond.

215.    Hapoalim and Chan never shared the ESJ No Construction Letter with the Academy.  Instead, they decided to keep it secret and to continue conniving the Academy by

making other intentional false misrepresentations or omissions in connection with the Misrepresent and Salvage Plan.

216.    For example, in addition to hiding the ESJ No Construction Letter, they also hid from the Academy's board of directors the Revised Lantana 2 PSA, which refuted their Intentional False Bond Statements.  And when their scheme finally came tumbling down, they blamed Grant and Aguiar in order to conceal their role in the scheme.

217.    Hapoalim and Chan made the Intentional False Bond Statements and other intentional false representations and omissions with scienter.  The ESJ No Construction Letter illustrates this point.

218.    On June 18, 2014, Hapoalim and Chan had in their possession the ESJ No Construction Letter, which specifically refuted their false statement that ESJ would sell Lantana 2 for $ 8 million and would allocate $2.5 million of the purchase price for the development of the additional space at Lantana 2.

219.    But, instead of showing the ESJ No Construction Letter to the Academy's board of directors and requesting they sign it, Hapoalim and Chan intentionally mislead the Academy's board of directors into issuing the bond, all the while hoping they would, after the bond issued, convince the Academy's board of directors to buy into the Lantana 1, 2, and 3 Bond Plan with the ESJ Development Conditions.

220.    As a direct and proximate result of Hapoalim and Chan's fraud, including without limitation, their Intentional False Bond Statements and other material intentional false representations and omissions they committed in furtherance of the Misrepresent and Salvage Plan, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Hapoalim and Chan, and award it the economic damages it suffered and continues to suffer as a result of Hapoalim and Chan's actions, lost profits, punitive damages, pre and post judgment interest, costs, and all other relief as appropriate.

**COUNT 4 – NEGLIGENT MISREPRESENTATION**
**(HAPOALIM AND CHAN)**

221.    The Academy incorporates paragraphs 1 through 17 and 51 through 188 as though fully set forth herein.

222.    In connection with, and to convince the Academy to approve the issuance of the approximately $24 million Bond for the Academy, Hapoalim and Chan made several significant and material false statements of facts and material omissions.

223.    Specifically, before, during and after the June 19 board meeting and before the Academy's board of directors provided their approval for Hapoalim and Chan to issue the bond, Hapoalim and Chan made to the Academy's board of directors the Intentional False Bond Statements, which the Academy's board of directors reasonably and justifiably relied on to approve the bond issuance.  Hapoalim and Chan knew or should have known that the Intentional False Bond Statements were patently false when they were made.

224.    Also, during and after the June 19 board meeting and before the Academy's board of directors provided their approval for Hapoalim and Chan to issue the bond, Hapoalim and Chan had in their possession the ESJ No Construction Letter, which provided contrary to Hapoalim and Chan's representations, that ESJ would not allocate any portion of the purchase price for Lantana 2 for the development of the additional space at Lantana 2, which additional space was crucial to the Academy's ability to generate the revenue needed to satisfy its debt service obligations under the bond.

225.    Hapoalim and Chan never shared the ESJ No Construction Letter with the Academy.  Instead, they decided to keep it secret and to continue conniving the Academy by making other intentional false misrepresentations or omissions in connection with the Misrepresent and Salvage Plan.

226.    For example, in addition to hiding the ESJ No Construction Letter, they also hid from the Academy's board of directors the Revised Lantana 2 PSA, which refuted their Intentional False Bond Statements.  And when their scheme finally came tumbling down, they blamed Grant and Aguiar in order to conceal their role in the scheme.

227.    Hapoalim and Chan made the Intentional False Bond Statements and other intentional false representations and omissions with scienter.  The ESJ No Construction Letter illustrates this point.

228.    On June 18, 2014, Hapoalim and Chan had in their possession the ESJ No Construction Letter, which specifically refuted their false statement that ESJ would sell Lantana 2 for $ 8 million and would allocate $2.5 million of the purchase price for the development of the additional space at Lantana 2.

229.    But, instead of showing the ESJ No Construction Letter to the Academy's board of directors and requesting they sign it, Hapoalim and Chan intentionally mislead the Academy's board of directors into issuing the bond, all the while hoping they would, after the bond issued, convince the Academy's board of directors to buy into the Lantana 1, 2, and 3 Bond Plan with the ESJ Development Conditions.

230.    As a direct and proximate result of Hapoalim and Chan's fraud, including without limitation, their Intentional False Bond Statements and other material intentional false representations and omissions they committed in furtherance of the Misrepresent and Salvage

Plan, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Hapoalim and Chan, and award it the economic damages it suffered and continues to suffer as a result of Hapoalim and Chan's actions, lost profits, punitive damages, pre and post judgment interest, costs, and all other relief as appropriate.

### COUNT 5 – FRAUDULENT OMISSION
### (AGAINST HAPOALIM AND CHAN)

231.    The Academy incorporates paragraphs 1 through 17 and 51 through 188 as though fully set forth herein.

232.    Hapoalim and Chan, by virtue of their relationship with the Academy, owed the Academy a duty to fully and truthfully disclose to the Academy's board of directors the material information it needed to evaluate whether to approve the issuance of the Bond.

233.    Additionally, Hapoalim and Chan, by virtue of their decision to make material disclosures to the Academy's board of directors about the issuance of the Bond, owed a duty to fully and truthfully disclose to the Academy's board of directors all the material information it needed to evaluate whether to approve the issuance of the Bond.

234.    Hapoalim and Chan, however, did the opposite.  Instead of fully and truthfully disclosing to the Academy's board of directors the information they needed to evaluate whether to approve the bond issuance, Hapoalim and Chan kept the information secret.  Specifically, they kept secret from the Academy's board of directors the ESJ No Construction Letter, which unquestionably refuted their false representation that ESJ would sell Lantana 2 for $ 8 million and would allocate $2.5 million of the purchase price for the development of the additional space

at Lantana 2. Also, they kept secret from the Academy's board of directors the Misrepresent and Salvage Plan.

235.    Hapoalim and Chan knew that by keeping secret the ESJ No Construction Letter and the Misrepresent and Salvage Plan, the Academy's board of directors would not know the Intentional False Bond Statements were patently false and consequently, would justifiably, but misguidedly, approve the bond issuance.

236.    After the Academy's board of directors misguidedly approved the issuance of the Bond based on Hapoalim and Chan's Intentional False Bond Statements, Hapoalim and Chan continued keeping secret from the Academy's board of directors information that would refute Hapoalim and Chan's intentional misrepresentations. For example, Hapoalim and Chan kept secret the Revised Lantana 2 PSA and the various ESJ Development Agreements, which also refuted Hapoalim and Chan's intentional misrepresentations.

237.    As a direct and proximate result of Hapoalim and Chan's intentional decision to keep secret the ESJ No Construction Letter and the Misrepresent and Salvage Plan from the Academy's board of directors, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Hapoalim and Chan, and award it the economic damages it suffered and continues to suffer as a result of Hapoalim and Chan's actions, lost profits, punitive damages, pre and post judgment interest, costs, and all other relief as appropriate.

## COUNT 6 – BREACH OF FIDUCIARY DUTY
## (AGAINST HAPOALIM AND CHAN)

238.    The Academy incorporates paragraphs 1 through 17 and 51 through 188 as though fully set forth herein.

239.   Hapoalim and Chan, by virtue of their relationship with the Academy, owed the Academy fiduciary duties, to, *inter alia*, to ensure that the Academy was not mislead into authorizing a bond based on material false misrepresentations and omissions.

240.   Hapoalim and Chan, however, breached the fiduciary duties they owed the Academy.  Specifically, Hapoalim and Chan intentionally and falsely misled the Academy into approving the issuance of the Bond by, *inter alia*, making the Intentional False Bond Statements, which the Academy relied on to grant their approval for Hapoalim and Chan to issue the Bond.

241.   Hapoalim and Chan knew the Intentional False Bond Statements were false.  For example, prior to the Academy's board of directors approving the issuance of the bond, Hapoalim and Chan had in their possession the ESJ No Construction Letter, which unquestionably refuted their false representation that ESJ would sell Lantana 2 for $ 8 million and would allocate $2.5 million of the purchase price for the development of the additional space at Lantana 2.

242.   But, rather than tell the Academy's board of directors the truth, Hapoalim and Chan, in contravention of the fiduciary duty they owed the Academy, decided to keep the ESJ No Construction Letter secret and to continue conniving the Academy by making other intentional false misrepresentations or omissions in connection with the Misrepresent and Salvage Plan.

243.   For example, in addition to hiding the ESJ No Construction Letter, they also hid from the Academy's board of directors the Revised Lantana 2 PSA, which refuted their Intentional False Bond Statements.  And when their scheme finally came tumbling down, they blamed Grant and Aguiar in order to conceal their role in the scheme.

244.    As a direct and proximate result of Hapoalim and Chan's breach of the fiduciary duties they owed the Academy, the Academy approved issuance of the Bond and suffered and continues to suffer significant economic losses.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Hapoalim and Chan, and award it the economic damages it suffered and continues to suffer as a result of Hapoalim and Chan's actions, lost profits, punitive damages, pre and post judgment interest, costs, and all other relief as appropriate.

## COUNT 7 – CONSPIRACY TO COMMIT FRAUD
## (AGAINST HAPOALIM AND CHAN)

245.    The Academy incorporates paragraphs 1 through 17 and 51 through 188 as though fully set forth herein.

246.    Upon being introduced to Grant, Hapoalim and Chan were informed about Grant and Aguiar's plans to commit fraud on the Academy by, *inter alia*, causing the Academy to cancel the Piper Bond Agreement and to implement the secret Lantana 1, 2 and Seminole Bond Plan, and the Lantana 1, 2 and 3 Bond Plan, without knowing the nefarious genesis of the Plans.

247.    Rather than distance themselves from the fraudulent scheme devised by Grant, Aguiar and others, Hapoalim and Chan decided to participate in the fraudulent scheme.

248.    Consequently, in furtherance of the fraudulent scheme devised by Grant, Aguiar and others, Hapoalim and Chan started off by preparing the Secret Hapoalim Bond.  When the Lantana 1, 2 and Seminole Bond Plan began to fall apart, Hapoalim and Chan could have walked away and informed the Academy of the fraudulent scheme devised by Grant, Aguiar and others.

249.    But, instead of doing the right thing, Hapoalim and Chan continued their roles in advancing the fraudulent scheme.  In particular, they helped devise the Lantana 1, 2 and 3 Bond Plan to help salvage the scheme.

250.    When the Lantana 1, 2 and 3 Bond Plan began unraveling because of the ESJ No Construction Letter, Hapoalim and Chan had another opportunity to do the right thing and inform the Academy's board of directors about the fraudulent scheme and the evolving bond plans.

251.    In fact, they could have easily ended the fraudulent scheme and the evolving bond plans by disclosing the ESJ No Construction Letter.  But, clearly trapped in carrying out their role in the fraudulent scheme, they kept secret from the Academy's board of directors the ESJ No Construction Letter.

252.    To make matters worse, they helped devise and implement the Misrepresent and Salvage Plan, and made the Intentional False Bond Statements to the Academy's board of directors, which false statements the Academy's board of directors justifiably, albeit misguidedly, relied on to approve the issuance of the bond.

253.    As a direct and proximate result of Hapoalim and Chan's decision to conspire with, and to participate in the fraudulent scheme devised by Grant, Aguiar and others, including, without limitation, their decision to keep secret the ESJ No Construction Letter and to make the Intentional False Bond Statements in furtherance of the Misrepresent and Salvage Plan, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Hapoalim and Chan, and award it the economic damages it suffered and continues to suffer as a result of Hapoalim and Chan's actions, lost profits, punitive damages, pre and post judgment interest, costs, and all other relief as appropriate.

## COUNT 8 – AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES
## (AGAINST HAPOALIM AND CHAN)

254.    The Academy incorporates paragraphs 1 through 17 and 51 through 188 as though fully set forth herein.

255.    The members of the Academy's board of directors, pursuant to Fla. Stat. § 617.01011, *et. seq.*, and more specifically section 617.0830, each had a duty to the Academy to discharge their obligations, *inter alia*, in good faith and in the best interests of the Academy.

256.    Grant, Burckhart and Smith, as members of the Academy's board of directors breached their duties to the Academy.  More specifically, they breached their duties to act in good faith and in the best interest of the Academy by creating, implementing and/or misleading the Academy's other independent board of directors with respect to the Lantana 1, 2 and Seminole Bond Plan, the Lantana 1, 2 and 3 Bond Plan, and the Misrepresent and Salvage Plans.

257.    Hapoalim and Chan knew that Grant, Burckhart and Smith owed and were breaching their duties to act in good faith and in the best interest of the Academy.

258.    But, rather than distance themselves from Grant, Burckhart and Smith, and better yet, disclose their breach of their fiduciary duties to the Academy's other independent board of directors, Hapoalim and Chan decided to aid and abet Grant, Burckhart and Smith to continue breaching their duties.

259.    Specifically, Hapoalim and Chan helped Grant further the Lantana 1, 2 and Seminole Bond Plan, the Lantana 1, 2 and 3 Bond Plan, and the Misrepresent and Salvage Plan by, *inter alia*, making the Intentional False Bond Statements to the Academy, which statements the Academy's independent board members relied on to approve the issuance of the bond, keeping secret from the Academy's independent board of directors the ESJ No Construction Letter and the Revised Lantana 2 PSA.

260.     As a direct and proximate result of Hapoalim and Chan's decision to aid and abet Grant, Smith and Burckhart in breaching their duties to the Academy, the Academy approved issuance of the Bond and suffered and continues to suffer significant economic losses.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Hapoalim and Chan, and award it the economic damages it suffered and continues to suffer as a result of Hapoalim and Chan's actions, lost profits, punitive damages, pre and post judgment interest, costs, and all other relief as appropriate.

## COUNT 9 – NEGLIGENT SUPERVISION
### (AGAINST HAPOALIM)

261.     The Academy incorporates paragraphs 1 through 17 and 51 through 188 as though fully set forth herein.

262.     Pursuant to rules and regulations promulgated by the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"), for example, FINRA Rule 3110, FINRA Regulatory Notice 07-59, Hapoalim was required to establish and maintain a system to supervise the activities of each associated person, *e.g.* Chan, that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA Rules.

263.     More specifically, Hapoalim was required to, *inter alia*, review incoming and outgoing written correspondence, electronic or otherwise, of associates to ensure they were complying with applicable securities laws and regulations.

264.     Hapoalim, however, failed to adequately supervise and monitor incoming and outgoing written correspondence, electronic or otherwise, of Chan, and consequently, failed to properly supervise him.  In particular, it failed to monitor and detect emails that would have alerted it to the fraud being perpetuated on the Academy by Chan and others.  For example, it

had in it system, but failed to act on the Aguiar May 22 and 26 email, which when read together, should have alerted it that something was amiss and that a fraudulent scheme was being hatched by Grant and Aguiar with assistance from Chan and D'Ascola.

265.    More crucially, Hapoalim had in its system the ESJ No Construction Letter, which clearly alerted it that Chan, its associate, had made and was continuing to make false misrepresentations and omissions to the Academy's board of directors in order to convince them to misguidedly approve the Bond.

266.    But, instead of stopping Chan in his track, Hapoalim sat back and continued to look the other way while Chan continued making false misrepresentations and omissions to the Academy's board of directors.  For example, they continued to ignore the emails from Chan that would have alerted them of the Misrepresent and Salvage Plan, including, but not limited to emails Chan sent to Grant stating that the ESJ Development Agreement was "for your eyes only".

267.    To make matters worse, Hapoalim hid the truth about Chan's involvement in the fraudulent scheme perpetuated on the Academy by blaming Grant and Aguiar.

268.    As a direct and proximate result of Hapoalim's failure to properly supervise Chan, Chan was able to convince the Academy's board of directors to misguidedly approve the issuance of the Bond, resulting in the significant economic losses the Academy suffered and continue to suffer.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Hapoalim, and award it the economic damages it suffered and continues to suffer as a result of Hapoalim's actions, lost profits, punitive damages, pre and post judgment interest, costs, and all other relief as appropriate.

## COUNT 10 – SECURITIES FRAUD - § 10(B) OF SECURITIES ACT OF 1934
## (AGAINST BURCKHART)

269.     The Academy incorporates paragraphs 1 through 188 as though fully set forth herein.

270.     In connection with, and to convince the Academy to approve the issuance of the approximately $24 million Bond for the Academy, Burckhart knew, but decided to omit from the Academy's other independent board of directors, information material to their decision about whether to authorize the issuance of the Bond.

271.     Specifically, and before the Academy's other independent board members approved the bond issuance, Burckhart knew and had agreed to help with the Misrepresent and Salvage Plan. During the June 19 board meeting when Chan and Hapoalim made the Intentional False Bond Statements, Burckhart knew the statements were false and were part of the Misrepresent and Salvage Plan.

272.     But, rather than inform the Academy's other independent board members that the Intentional False Bond Statements were purposely false and were part of the Misrepresent and Salvage Plan, Burckhart stayed quiet while the Academy's other independent board members justifiably, but misguidedly, approved the bond issuance.

273.     Burckhart's decision to not share the information with the Academy's other independent board members was fraught with scienter. He knew the information being shared with the Academy's other independent board members was patently false because Grant had informed him of the Misrepresent and Salvage Plan and requested Burckhart, as the chairman of the Academy's board of directors, manage the board's discussion in a manner that would convince the other independent board members to approve the bond without knowing the genesis and details of the plan. Burckhart followed through on his part of the plan as he agreed to.

274.     As a direct and proximate result of Burckhart's actions, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

275.     Furthermore, the significant economic losses the Academy suffered and continues to suffer were caused directly by Burckhart's material intentional false omissions.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Burckhart, and award it the economic damages it suffered as a result of Burckhart's actions, pre and post judgment interest, costs, and all other relief as appropriate.

### COUNT 11 – SECURITIES FRAUD – FLA. STAT. § 517.301
### (AGAINST BURCKHART)

276.     The Academy incorporates paragraphs 1 through 188 as though fully set forth herein.

277.     In connection with, and to convince the Academy to approve the issuance of the approximately $24 million Bond for the Academy, Burckhart knew, but decided to omit from the Academy's other independent board of directors, information material to their decision about whether to authorize the issuance of the Bond.

278.     Specifically, and before the Academy's other independent board members approved the bond issuance, Burckhart knew and had agreed to help with the Misrepresent and Salvage Plan.  During the June 19 board meeting when Chan and Hapoalim made the Intentional False Bond Statements, Burckhart knew the statements were false and were part of the Misrepresent and Salvage Plan.

279.     But, rather than inform the Academy's other independent board members that the Intentional False Bond Statements were purposely false and were part of the Misrepresent and Salvage Plan, Burckhart stayed quiet while the Academy's other independent board members justifiably, but misguidedly, approved the bond issuance.

280.    Burckhart's decision to not share the information with the Academy's other independent board members was fraught with scienter.  He knew the information being shared with the Academy's other independent board members was patently false because Grant had informed him of the Misrepresent and Salvage Plan and requested Burckhart, as the chairman of the Academy's board of directors, manage the board's discussion in a manner that would convince the other independent board members to approve the bond without knowing the genesis and details of the plan.  Burckhart followed through on his part of the plan as he agreed to.

281.    As a direct and proximate result of Burckhart's actions, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

282.    Furthermore, the significant economic losses the Academy suffered and continues to suffer were caused directly by Burckhart's material intentional false omissions.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Burckhart, and award it the economic damages it suffered as a result of Burckhart's actions, pre and post judgment interest, costs, and all other relief as appropriate.

### COUNT 12 – BREACH OF FIDUCIARY DUTIES AS DIRECTOR (AGAINST BURCKHART)

283.    The Academy incorporates paragraphs 1 through 188 as though fully set forth herein.

284.    The Academy's board of directors, and specifically Burckhart, pursuant to Fla. Stat. § 617.01011, *et. seq*., and more specifically, section 617.0830, had a duty to the Academy to discharge his obligations, *inter alia*, in good faith and in the best interests of the Academy.

285.    Burckhart, as a member of the Academy's board of directors breached his duties to the Academy.  More specifically, he breached his duties to act in good faith and in the best interest of the Academy by helping Hapoalim, Chan, Grant and others implement and carry out

the Misrepresent and Salvage Plan, including without limitation, failing to disclose the plan to and failing to inform the Academy's other independent board members that the Intentional False Bond Statements were patently false and could not be properly relied on as justification for approving the bond issuance.

286.    As a direct and proximate result of Burckhart's actions, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Burckhart, and award it the economic damages it suffered as a result of Burckhart's actions, pre and post judgment interest, lost profits, punitive damages, and all other relief as appropriate.

### COUNT 13 – AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES (AGAINST BURCKHART)

287.    The Academy incorporates paragraphs 1 through 188 as though fully set forth herein.

288.    The Academy's board of directors and officers, including Grant, pursuant to Fla. Stat. § 617.01011, *et. seq.*, and more specifically section 617.0830, had a duty to the Academy to discharge his obligations, *inter alia*, in good faith and in the best interests of the Academy.

289.    Grant, as a member of the Academy's board of directors and an officer of the Academy, breached his duties to the Academy.  More specifically, he breached the duties to act in good faith and in the best interest of the Academy by creating, implementing and/or misleading the Academy's other independent board of directors with respect to the Lantana 1, 2 and Seminole Bond Plan, the Lantana 1, 2 and 3 Bond Plan, and the Misrepresent and Salvage Plans.

290.    Burckhart knew that Grant owed and was breaching his duties to act in good faith and in the best interest of the Academy.

291.    But, rather than distance himself from Grant, and better yet, disclose Grant's breach of his fiduciary duties to the Academy's other independent board of directors, Burckhart decided to aid and abet Grant to continue breaching his duties.

292.    Specifically, Burckhart helped Grant further the Misrepresent and Salvage Plan by, *inter alia*, failing to disclose the plan to the Academy's other independent board of directors and failing to inform them that the Intentional False Bond Statements were patently false and could not be properly relied on as justification for approving the bond issuance.

293.    As a direct and proximate result of Burckhart's actions, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Burckhart, and award it the economic damages it suffered as a result of Burckhart's actions, pre and post judgment interest, lost profits, punitive damages, and all other relief as appropriate.

### COUNT 14 – COMMON LAW FRAUD/FRAUDULENT OMISSION (AGAINST BURCKHART)

294.    The Academy incorporates paragraphs 1 through 188 as though fully set forth herein.

295.    In connection with, and to convince the Academy to approve the issuance of the approximately $24 million Bond for the Academy, Burckhart knew, but decided to omit from the Academy's other independent board of directors, information material to their decision about whether to authorize the issuance of the Bond.

296.    Specifically, and before the Academy's other independent board members approved the bond issuance, Burckhart knew and had agreed to help with the Misrepresent and Salvage Plan.  During the June 19 board meeting when Chan and Hapoalim made the Intentional False Bond Statements, Burckhart knew the statements were false and were part of the Misrepresent and Salvage Plan.

297.    But, rather than inform the Academy's other independent board members that the Intentional False Bond Statements were purposely false and were part of the Misrepresent and Salvage Plan, Burckhart stayed quiet while the Academy's other independent board members justifiably, but misguidedly, approved the bond issuance.

298.    Burckhart's decision to not share the information with the Academy's other independent board members was fraught with scienter.  He knew the information being shared with the Academy's other independent board members was patently false because Grant had informed him of the Misrepresent and Salvage Plan and requested Burckhart, as the chairman of the Academy's board of directors, manage the board's discussion in a manner that would convince the other independent board members to approve the bond without knowing the genesis and details of the plan.  Burckhart followed through on his part of the plan as he agreed to.

299.    As a direct and proximate result of Burckhart's actions, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Burckhart, and award it the economic damages it suffered as a result of Burckhart's actions, pre and post judgment interest, lost profits, punitive damages, and all other relief as appropriate.

## COUNT 15 – CONSPIRACY TO COMMIT FRAUD
## (AGAINST BURCKHART)

300.     The Academy incorporates paragraphs 1 through 188 as though fully set forth herein.

301.     Before the Academy's board of directors approved the issuance of the bond, Burckhart learned about the Misrepresent and Salvage Plan.

302.     In fact, rather than distance himself from the Misrepresent and Salvage Plan, Burckhart agreed to help with the plan.  In particular, and in furtherance of the plan, Burckhart, contrary to his duties to the Academy, stayed silent while Hapoalim and Grant made the Intentional False Bond Statements, which Burckhart knew were patently false.

303.     As a direct and proximate result of Burckhart's actions and inactions, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Burckhart, and award it the economic damages it suffered and continues to suffer as a result of Burckhart's actions, lost profits, punitive damages, pre and post judgment interest, costs, and all other relief as appropriate.

## COUNT 16 – SECURITIES FRAUD - § 10(B) OF SECURITIES ACT OF 1934
## (AGAINST AGUIAR)

304.     The Academy incorporates paragraphs 1 through 188 as though fully set forth herein.

305.     Shortly after meeting Grant, Aguiar, who was interested in developing a franchise system for and expanding the Academy's program, imparted on Grant the need to expand and franchise the Academy's operations.  In connection with those discussions, Grant and Aguiar devised in secret the Lantana 1, 2 and Seminole and Lantana 1, 2 and 3 Bond Plans, and the Misrepresent and Salvage Plans when the bond plans began unraveling.

306.    Aguiar, like Grant, Burckhart, Hapoalim and Chan, knew the nefarious genesis of the bond plans and the Misrepresent and Salvage Plan before the Academy's board of directors, misguidedly relying on the Intentional False Bond Statements, approved the issuance of the bond.

307.    In fact, and before the Academy's board of directors approved the bond issuance, Aguiar had in her possession the ESJ No Construction Letter, which refuted the Intentional False Bond Statements.

308.    Remarkably, by virtue of her involvement with the Academy via the retention of Edu-Link and her decision to share material information, including about the bond, during board meetings held by the Academy's board of directors, Aguiar owed a duty to disclose to the Academy's board of directors information material to their decision to approve the issuance of the bond

309.    But, rather than inform the Academy's board of directors about the ESJ No Construction Letter, the bond plans, the Misrepresent and Salvage Plan, and that the Intentional False Bond Statements they were relying on were patently false, Aguiar stayed silent while the Academy's board of directors, relying on deliberate false information, approved the bond issuance.

310.    Aguiar's decision to not disclose to the Academy's board of directors the nefarious bond plans, the Misrepresent and Salvage Plan, the ESJ No Construction Letter, and that the Intentional False Bond Statements were false was fraught with scienter.  She knew the information being shared with the Academy's board members was patently false because she and Grant developed and took steps to implement the bond plans and the Misrepresent and Salvage Plan.

311.    As a direct and proximate result of Aguiar's actions, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

312.    Furthermore, the significant economic losses the Academy suffered and continues to suffer were caused directly by Aguiar's material intentional false omissions.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Aguiar, and award it the economic damages it suffered as a result of Aguiar's actions, pre and post judgment interest, costs, and all other relief as appropriate.

## COUNT 17 – SECURITIES FRAUD – FLA. STAT. § 517.301
## (AGAINST AGUIAR)

313.    The Academy incorporates paragraphs 1 through 188 as though fully set forth herein.

314.    Shortly after meeting Grant, Aguiar, who was interested in developing a franchise system for and expanding the Academy's program, imparted on Grant the need to expand and franchise the Academy's operations.  In connection with those discussions, Grant and Aguiar devised in secret the Lantana 1, 2 and Seminole and Lantana 1, 2 and 3 Bond Plans, and the Misrepresent and Salvage Plans when the bond plans began unraveling.

315.    Aguiar, like Grant, Burckhart, Hapoalim and Chan, knew the nefarious genesis of the bond plans and the Misrepresent and Salvage Plan before the Academy's board of directors, misguidedly relying on the Intentional False Bond Statements, approved the issuance of the bond.

316.    In fact, and before the Academy's board of directors approved the bond issuance, Aguiar had in her possession the ESJ No Construction Letter, which refuted the Intentional False Bond Statements.

317.    Remarkably, by virtue of her involvement with the Academy via the retention of Edu-Link and her decision to share material information, including about the bond, during board meetings held by the Academy's board of directors, Aguiar owed a duty to disclose to the Academy's board of directors information material to their decision to approve the issuance of the bond

318.    But, rather than inform the Academy's board of directors about the ESJ No Construction Letter, the bond plans, the Misrepresent and Salvage Plan, and that the Intentional False Bond Statements they were relying on were patently false, Aguiar stayed silent while the Academy's board of directors, relying on deliberate false information, approved the bond issuance.

319.    Aguiar's decision to not disclose to the Academy's board of directors the nefarious bond plans, the Misrepresent and Salvage Plan, the ESJ No Construction Letter, and that the Intentional False Bond Statements were false was fraught with scienter.  She knew the information being shared with the Academy's board members was patently false because she and Grant developed and took steps to implement the bond plans and the Misrepresent and Salvage Plan.

320.    As a direct and proximate result of Aguiar's actions, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

321.    Furthermore, the significant economic losses the Academy suffered and continues to suffer were caused directly by Aguiar's material intentional false omissions.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Aguiar, and award it the economic damages it suffered as a result of Aguiar's actions, pre and post judgment interest, costs, and all other relief as appropriate.

## COUNT 18 – COMMON LAW FRAUD/FRAUDULENT OMISSION
## (AGAINST AGUIAR)

322.    The Academy incorporates paragraphs 1 through 188 as though fully set forth herein.

323.    Shortly after meeting Grant, Aguiar, who was interested in developing a franchise system for and expanding the Academy's program, imparted on Grant the need to expand and franchise the Academy's operations.  In connection with those discussions, Grant and Aguiar devised in secret the Lantana 1, 2 and Seminole and Lantana 1, 2 and 3 Bond Plans, and the Misrepresent and Salvage Plans when the bond plans began unraveling.

324.    Aguiar, like Grant, Burckhart, Hapoalim and Chan, knew the nefarious genesis of the bond plans and the Misrepresent and Salvage Plan before the Academy's board of directors, misguidedly relying on the Intentional False Bond Statements, approved the issuance of the bond.

325.    In fact, and before the Academy's board of directors approved the bond issuance, Aguiar had in her possession the ESJ No Construction Letter, which refuted the Intentional False Bond Statements.

326.    Remarkably, by virtue of her involvement with the Academy via the retention of Edu-Link and her decision to share material information, including about the bond, during board meetings held by the Academy's board of directors, Aguiar owed a duty to disclose to the Academy's board of directors information material to their decision to approve the issuance of the bond

327.    But, rather than inform the Academy's board of directors about the ESJ No Construction Letter, the bond plans, the Misrepresent and Salvage Plan, and that the Intentional False Bond Statements they were relying on were patently false, Aguiar stayed silent while the

Academy's board of directors, relying on deliberate false information, approved the bond issuance.

328.    Aguiar's decision to not disclose to the Academy's board of directors the nefarious bond plans, the Misrepresent and Salvage Plan, the ESJ No Construction Letter, and that the Intentional False Bond Statements were false was fraught with scienter.  She knew the information being shared with the Academy's board members was patently false because she and Grant developed and took steps to implement the bond plans and the Misrepresent and Salvage Plan.

329.    As a direct and proximate result of Aguiar's actions, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Aguiar, and award it the economic damages it suffered as a result of Aguiar's actions, lost profits, punitive damages, pre and post judgment interest, costs, and all other relief as appropriate.

## COUNT 19 – CONSPIRACY TO COMMIT FRAUD
## (AGAINST AGUIAR)

330.    The Academy incorporates paragraphs 1 through 188 as though fully set forth herein.

331.    Shortly after meeting Grant, Aguiar, who was interested in developing a franchise system for and expanding the Academy's program, imparted on Grant the need to expand and franchise the Academy's operations.

332.    In connection with those discussions, Grant and Aguiar conspired and devised in secret the Lantana 1, 2 and Seminole and Lantana 1, 2 and 3 Bond Plans, and the Misrepresent and Salvage Plans when the bond plans began unraveling.

333. Aguiar took several steps in furtherance of the bond plans and the Misrepresent and Salvage Plan. For example, she introduced Hapoalim and Chan to the plan and solicited their help to effectuate the plan. Also, she introduced D'Ascola to the plan and solicited his help to effectuate the portions of the plan that required ESJ's involvement. Then, contrary to her obligation to share material information about the bond with the Academy's board of directors, she kept secret from the Academy's board of directors the bond plans, the Misrepresent and Salvage Plan, the ESJ No Construction Letter, and that the Intentional False Bond Statements were deliberately false.

334. Frankly, she was involved in all aspects of the conspiracy, including by way of example, coordinating what the members of the conspiracy needed to do to make the bond plans and Misrepresent and Salvage Plan work and to keep them secret because she was concerned about the usual suspects and how they would behave.

335. As a direct and proximate result of Aguiar's actions, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Aguiar, and award it the economic damages it suffered as a result of Aguiar's actions, lost profits, punitive damages, pre and post judgment interest, costs, and all other relief as appropriate.

## COUNT 20 – AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES (AGAINST AGUIAR)

336. The Academy incorporates paragraphs 1 through 188 as though fully set forth herein.

337.   The Academy's board of directors, pursuant to Fla. Stat. § 617.01011, *et. seq.*, and more specifically section 617.0830, each had a duty to the Academy to discharge their obligations, *inter alia*, in good faith and in the best interests of the Academy.

338.   Grant, Burckhart and Smith, as members of the Academy's board of directors, breached their duties to the Academy.  More specifically, they breached their duties to act in good faith and in the best interest of the Academy by creating, implementing and/or misleading the Academy's other independent board of directors with respect to the Lantana 1, 2 and Seminole Bond Plan, the Lantana 1, 2 and 3 Bond Plan, and the Misrepresent and Salvage Plans.

339.   Aguiar knew that Grant, Burckhart and Smith owed and were breaching their duties to act in good faith and in the best interest of the Academy.

340.   But, rather than distance herself from Grant, Burckhart and Smith, and better yet, disclose their breach of their fiduciary duties to the Academy's other independent board of directors, Aguiar decided to aid and abet Grant, Burckhart and Smith to continue breaching their duties.

341.   Specifically, Aguiar helped Grant devise and implement, with the help of Smith and Burckhart, the Lantana 1, 2 and Seminole Bond Plan, the Lantana 1, 2 and 3 Bond Plan, and the Misrepresent and Salvage Plan by, *inter alia*, introducing and soliciting Hapoalim, Chan and D'Ascola assistance in implementing the plans, including coordinating what the other defendants and Grant needed to do to make the bond plans and Misrepresent and Salvage Plan work and to keep them secret because she was concerned about the usual suspects and how they would behave.

342.     As a direct and proximate result of Aguiar's decision to aid and abet Grant, Smith and Burckhart in breaching their duties to the Academy, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against Aguiar, and award it the economic damages it suffered and continues to suffer as a result of Aguiar's actions, lost profits, punitive damages, pre and post judgment interest, costs, and all other relief as appropriate.

## COUNT 21 – SECURITIES FRAUD - § 10(B) OF SECURITIES ACT OF 1934 (AGAINST D'ASCOLA)

343.     The Academy incorporates paragraphs 1 through 188 as though fully set forth herein.

344.     In connection with, and to convince the Academy to approve the issuance of the approximately $24 million Bond for the Academy, D'Ascola knew, but decided to omit from the Academy's board of directors information material to their decision about whether to authorize the issuance of the bond.

345.     Specifically, and before the Academy's board members approved the bond issuance, D'Ascola knew and had agreed to participate in the Lantana 1, 2 and 3 Bond Plan.

346.     Consequently, during the May 28 board meeting, D'Ascola misrepresented to the Academy's board of directors that ESJ will build additional space at Lantana 2 for the Academy, reiterating and reinforcing the false narrative being presented to the Academy's board of directors by Grant, Hapoalim, Chan, Aguiar and others that ESJ would allocate a portion of the purchase price of Lantana 2 for the development of the additional space.

347.    D'Ascola, by virtue of electing to speak at the board meeting, owed, but breached his duties to the Academy's board of directors to be truthful and to fully disclose all information relating to the development of the additional space at Lantana 2.

348.    D'Ascola's decision to not share the truth about the development of the additional space at Lantana 2 was fraught with scienter, was intentional and was done solely to mislead the Academy's board of directors.  He knew that Hapoalim, Chan, Grant and others would use his statement to perpetuate a fraud on the Academy.  Before the Academy's board of directors approved the issuance of the bond, he knew that the ESJ No Construction Letter he forwarded to Aguiar to be signed by the Academy's board of directors was not forwarded to them since he never received a signed letter.  More importantly, he knew that the ESJ No Construction Letter would doom the bond plans and any other plans developed to save them.  Remarkably, instead of sending the ESJ No Construction Letter directly to the Academy's board of directors, he sat silently on the sidelines while Hapoalim, Chan, Grant and others deliberately provided false information to the Academy's board of directors, which information the board misguidedly relied on to approve the bond.

349.    As a direct and proximate result of D'Ascola's actions, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

350.    Furthermore, the significant economic losses the Academy suffered and continues to suffer were caused directly by D'Ascola's material intentional false omissions.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against D'Ascola, and award it the economic damages it suffered as a result of D'Ascola's actions, pre and post judgment interest, costs, and all other relief as appropriate.

## COUNT 22 – SECURITIES FRAUD – FLA. STAT. § 517.301
## (AGAINST D'ASCOLA)

351.    The Academy incorporates paragraphs 1 through 188 as though fully set forth herein.

352.    In connection with, and to convince the Academy to approve the issuance of the approximately $24 million Bond for the Academy, D'Ascola knew, but decided to omit from the Academy's board of directors information material to their decision about whether to authorize the issuance of the Bond.

353.    Specifically, and before the Academy's board members approved the bond issuance, D'Ascola knew and had agreed to participate in the Lantana 1, 2 and 3 Bond Plan.

354.    Consequently, during the May 28 board meeting, D'Ascola misrepresented to the Academy's board of directors that ESJ will build additional space at Lantana 2 for the Academy, reiterating and reinforcing the false narrative being presented to the Academy's board of directors by Grant, Hapoalim, Chan, Aguiar and others that ESJ would allocate a portion of the purchase price of Lantana 2 for the development of the additional space.

355.    D'Ascola, by virtue of electing to speak at the board meeting, owed, but breached his duties to the Academy's board of directors to be truthful and to fully disclose all information relating to the development of the additional space at Lantana 2.

356.    D'Ascola's decision to not share the truth about the development of the additional space at Lantana 2 was fraught with scienter, was intentional and was done solely to mislead the Academy's board of directors.  He knew that Hapoalim, Chan, Grant and others would use his statement to perpetuate a fraud on the Academy.  Before the Academy's board of directors approved the issuance of the bond, he knew that the ESJ No Construction Letter forwarded to Aguiar to be signed by the Academy's board of directors was not forwarded to them since he

never received a signed letter. More importantly, he knew that the ESJ No Construction Letter would doom the bond plans and any other plans developed to save them. Remarkably, instead of sending the ESJ No Construction Letter directly to the Academy's board of directors, he sat silently on the sidelines while Hapoalim, Chan, Grant and others deliberately provided false information to the Academy's board of directors, which information the board misguidedly relied on to approve the bond.

357.     As a direct and proximate result of D'Ascola's actions, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

358.     Furthermore, the significant economic losses the Academy suffered and continues to suffer were caused directly by D'Ascola's material intentional false omissions.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against D'Ascola, and award it the economic damages it suffered as a result of D'Ascola's actions, pre and post judgment interest, costs, and all other relief as appropriate.

## COUNT 23 – COMMON LAW FRAUD/FRAUDULENT OMISSION (AGAINST D'ASCOLA)

359.     The Academy incorporates paragraphs 1 through 188 as though fully set forth herein.

360.     In connection with, and to convince the Academy to approve the issuance of the approximately $24 million Bond for the Academy, D'Ascola knew, but decided to omit from the Academy's board of directors information material to their decision about whether to authorize the issuance of the Bond.

361.     Specifically, and before the Academy's board members approved the bond issuance, D'Ascola knew and had agreed to participate in the Lantana 1, 2 and 3 Bond Plan.

362.   Consequently, during the May 28 board meeting, D'Ascola misrepresented to the Academy's board of directors that ESJ will build additional space at Lantana 2 for the Academy, reiterating and reinforcing the false narrative being presented to the Academy's board of directors by Grant, Hapoalim, Chan, Aguiar and others that ESJ would allocate a portion of the purchase price of Lantana 2 for the development of the additional space.

363.   D'Ascola, by virtue of electing to speak at the board meeting, owed, but breached his duties to the Academy's board of directors to be truthful and to fully disclose all information relating to the development of the additional space at Lantana 2.

364.   D'Ascola's decision to not share the truth about the development of the additional space at Lantana 2 was fraught with scienter, was intentional and was done solely to mislead the Academy's board of directors.  He knew that Hapoalim, Chan, Grant and others would use his statement to perpetuate a fraud on the Academy.  Before the Academy's board of directors approved the issuance of the bond, he knew that the ESJ No Construction Letter forwarded to Aguiar to be signed by the Academy's board of directors was not forwarded to them since he never received a signed letter.  More importantly, he knew that the ESJ No Construction Letter would doom the bond plans and any other plans developed to save them.  Remarkably, instead of sending the ESJ No Construction Letter directly to the Academy's board of directors, he sat silently on the sidelines while Hapoalim, Chan, Grant and others deliberately provided false information to the Academy's board of directors, which information the board misguidedly relied on to approve the bond.

365.   As a direct and proximate result of D'Ascola's actions, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against D'Ascola, and award it the economic damages it suffered as a result of D'Ascola's actions, pre and post judgment interest, lost profits, punitive damages, costs, and all other relief as appropriate.

**COUNT 24 – CONSPIRACY TO COMMIT FRAUD**
**(AGAINST D'ASCOLA)**

366.    The Academy incorporates paragraphs 1 through 188 as though fully set forth herein.

367.    Upon meeting Grant via Aguiar, D'Ascola was informed about the plans devised by Grant and Aguiar, with assistance of Hapoalim and Chan, to commit fraud on the Academy by, *inter alia*, providing false information to the Academy's board of directors so they could approve the bond issuance, which would leave them with the Hobson's choice of shuttering their doors or adopting the Lantana 1, 2 and 3 bond plan without knowing its nefarious origins.

368.    Rather than distance himself from the fraudulent scheme, D'Ascola decided to participate in the scheme.

369.    In furtherance of the fraudulent scheme, D'Ascola decided to attend the May 28 board meeting and to make partial misstatements to the Academy's board or directors that would support and reinforce the false narrative being presented to the Academy's board of directors by Grant, Hapoalim, Chan, Aguiar and others.

370.    Specifically, during the May 28 board meeting, D'Ascola misrepresented to the Academy's board of directors that ESJ will build additional space at Lantana 2 for the Academy, reiterating and reinforcing the false narrative being presented to the Academy's board of directors by Grant, Hapoalim, Chan, Aguiar and others that ESJ would allocate a portion of the purchase price of Lantana 2 for the development of the additional space.

371.    D'Ascola, by virtue of electing to speak at the board meeting, owed, but breached his duties to the Academy's board of directors to be truthful and to fully disclose all information relating to the development of the additional space at Lantana 2.

372.    D'Ascola's decision to not share the truth about the development of the additional space at Lantana 2 was intentional and done solely to mislead the Academy's board of directors. In particular, D'Ascola knew that Hapoalim, Chan, Grant and others would use his statement to perpetuate a fraud on the Academy.  Before the Academy's board of directors approved the issuance of the bond, he knew that the ESJ No Construction Letter he forwarded to Aguiar to be signed by the Academy's board of directors was not forwarded to them since he never received a signed letter.  More importantly, he knew that the ESJ No Construction Letter would doom the bond plans and any other plans developed to save them.  Remarkably, instead of sending the ESJ No Construction Letter directly to the Academy's board of directors, he sat silently on the sidelines while Hapoalim, Chan, Grant and others deliberately provided false information to the Academy's board of directors, which information the board misguidedly relied on to approve the bond.

373.    As a direct and proximate result of D'Ascola's actions, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against D'Ascola, and award it the economic damages it suffered as a result of D'Ascola's actions, pre and post judgment interest, lost profits, punitive damages, costs, and all other relief as appropriate.

## COUNT 25 – AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES
## (AGAINST D'ASCOLA)

374.    The Academy incorporates paragraphs 1 through 188 as though fully set forth herein.

375.    The Academy's board of directors and officers, including Grant, pursuant to Fla. Stat. § 617.01011, *et. seq.*, and more specifically section 617.0830, had a duty to the Academy to discharge his obligations, *inter alia*, in good faith and in the best interests of the Academy.

376.    Grant, as a member of the Academy's board of directors and an officer of the Academy breached his duties to the Academy.  More specifically, he breached the duties to act in good faith and in the best interest of the Academy by creating, implementing and/or misleading the Academy's other independent board of directors with respect to the Lantana 1, 2 and Seminole Bond Plan, the Lantana 1, 2 and 3 Bond Plan, and the Misrepresent and Salvage Plans.

377.    D'Ascola knew that Grant owed and was breaching his duties to act in good faith and in the best interest of the Academy.

378.    But, rather than distance himself from Grant, and better yet, disclose Grant's breach of his fiduciary duties to the Academy's board of directors, D'Ascola decided to aid and abet Grant to continue breaching their duties.

379.    Specifically, during the May 28 board meeting, D'Ascola misrepresented to the Academy's board of directors that ESJ will build additional space at Lantana 2 for the Academy, reiterating and reinforcing the false narrative being presented to the Academy's board of directors by Grant, Hapoalim, Chan, Aguiar and others that ESJ would allocate a portion of the purchase price of Lantana 2 for the development of the additional space.

380.    D'Ascola, by virtue of electing to speak at the board meeting, owed, but breached his duties to the Academy's board of directors to be truthful and to fully disclose all information relating to the development of the additional space at Lantana 2.

381.    D'Ascola's decision to not share the truth about the development of the additional space at Lantana 2 was fraught with scienter, was intentional and was done solely to mislead the Academy's board of directors.  He knew that Hapoalim, Chan, Grant and others would use his statement to perpetuate a fraud on the Academy.  Before the Academy's board of directors approved the issuance of the bond, he knew that the ESJ No Construction Letter forwarded to Aguiar to be signed by the Academy's board of directors was not forwarded to them since he never received a signed letter.  More importantly, he knew that the ESJ No Construction Letter would doom the bond plans and any other plans developed to save them.  Remarkably, instead of sending the ESJ No Construction Letter directly to the Academy's board of directors, he sat silently on the sidelines while Hapoalim, Chan, Grant and others deliberately provided false information to the Academy's board of directors, which information the board misguidedly relied on to approve the bond.

382.    As a direct and proximate result of D'Ascola's actions, the Academy issued the Bond and suffered and continues to suffer significant economic losses.

**WHEREFORE**, the Academy respectfully requests the Court enter judgment in its favor and against D'Ascola, and award it the economic damages it suffered as a result of D'Ascola's actions, pre and post judgment interest, lost profits, punitive damages, and all other relief as appropriate.

<u>**DEMAND FOR JURY TRIAL**</u>

The Academy demands a jury trial on all issues so triable.

Respectfully submitted,

**HERNANDEZ LEE MARTINEZ, LLC**
*Counsel for Plaintiff Palm Beach Maritime Museum, Inc.*
P.O. Box 531029
Miami, Florida 33153
Phone: (305) 842-2100
Facsimile: (305) 842-2105

By: ____s/  Jermaine A. Lee_____
    **Jermaine A. Lee, Esq.**
    Florida Bar. No.: 0850861
    jlee@whlmlegal.com
    **Eric A. Hernandez, Esq.**
    Florida Bar No.: 340730
    eric@whlmlegal.com
    **Arturo Martinez, Esq.**
    Florida Bar No.: 526231
    Arturo@whlmlegal.com