# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
### (West Palm Beach)

### CASE NO.  18-CV-80596-DMM

PALM BEACH MARITIME MUSEUM, INC., etc.

       Plaintiff,

vs.

HAPOALIM SECURITIES USA, INC.,
a foreign corporation, EDWARD CHAN,
PATRICIA AGUIAR, FABIO D'ASCOLA,
and BILL BURCKHART,

       Defendants.

_____/

## DEFENDANT HAPOALIM SECURITIES USA, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT

Defendant Hapoalim Securities USA, Inc. ("**HSU**"), through its undersigned counsel, submits this memorandum in support of its motion to dismiss the complaint filed by Plaintiff Palm Beach Maritime Museum, Inc.'s (the "**Academy**") ("**Complaint**") [DE 1] for lack of subject matter jurisdiction and, alternatively to dismiss all counts directed at HSU (the first nine of the twenty-five counts), because each fails to establish a basis for this Court's subject matter jurisdiction and each fails to sufficiently state a legal claim.

## INTRODUCTION

In 2014, HSU worked to arrange two successful financial transactions from which the Academy obtained over $24 million to revive and expand its failing charter school business. The Academy's 83-page, 382-paragraph Complaint is rambling, prolix, confusing and contradictory, and should be dismissed for that reason alone.  Regardless, from what HSU can discern, the Academy filed this lawsuit to recover damages it supposedly suffered from the second financial transaction.

1

According to the Complaint, in the summer of 2013, the Academy operated its charter school on leased property in West Palm Beach ("**Lantana 1**"), and its lease-related financial obligations were onerous. The Academy's financial condition deteriorated further when it agreed to pay $500,000 to resolve another landlord's judgment [DE 1 ¶¶ 40-44, 56-57].[1] The Academy's financial burden increased further when it leased a second property ("**Lantana 2**"), which was owned by ESJ Capital Partners, LLC ("**ESJ**") [DE 1 ¶ 69]. By year-end 2013, the Academy suffered an unfavorable financial audit that cast doubt on its ability to continue operating and received a directive from the State of Florida to implement corrective measures [DE 1 ¶ 72]. In these dire circumstances, the Academy turned to HSU (a financial services firm incorporated in Delaware with its principal place of business in New York) and its employee Edward Chan ("**Chan**") to help the Academy raise money to survive and to improve its failing financial condition [DE 1 ¶ 73]. The relationship between HSU and the Academy is governed by an arm's length agreement which requires disputes between the parties to be brought in New York. Accordingly, simultaneously with this Motion, HSU has separately moved to transfer this matter to the Southern District of New York.

HSU first facilitated a successful $1 million bond and debt transaction for the Academy in April 2014 to meet its immediate needs. To fund the Academy's survival and expansion, HSU facilitated a second successful $24.6 million bond and debt transaction in June 2014. The Academy was neither the seller nor purchaser of any issued bond or other security. True to the adage "no good deed goes unpunished," this lawsuit followed.

---

[1] For purposes of its motion, HSU draws the facts from the Complaint (but does not admit their truth), as indicated by "DE ¶ __."

# I.  <u>LEGAL STANDARDS</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'."  *Ashcroft v. Iqbal*, 556 U.S. 662, 668 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Factual allegations must be enough to raise a right to relief above the speculative level" and must be a "'plain statement' possessing enough heft to 'sho[w] that the pleader is entitled to relief."  *Twombly*, 550 U.S. at 555, 557.  The truth assumption applies only to "well-pleaded, nonconclusory factual allegations", and not to "labels and conclusions"; "formulaic recitation[s] of the elements of a cause of action;" "naked assertion[s]" without "further factual enhancement"; "unwarranted deductions of fact"; and "internally inconsistent allegations".  *Iqbal*, 556 U.S. at 668.  *Twombly*, 550 U.S. at 555; *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (holding "unwarranted deductions of fact" are not assumed true when testing sufficiency of plaintiff's allegations); *Response Oncology, Inc. v. Metrahealth Ins. Co.*, 978 F.Supp. 1052, 1058 (S.D. Fla. 1997) (noting a district court "need not accept factual claims that are internally inconsistent [or] facts which run counter to facts of which the court can take judicial notice.").  Further, while the Court may make reasonable inferences in a plaintiff's favor, it is "not required to draw the plaintiff's inference."  *Aldana v. Del Monte Fresh Produce, N.A., Inc.,* 416 F.3d 1242, 1248 (11th Cir.2005).

A plaintiff who alleges fraud must also "state with particularity the circumstances constituting fraud…" Fed.R.Civ.P. 9(b); *West Coast Roofing and Waterproofing, Inc. v. Johns Manville, Inc.*, 287 Fed.App'x 81, 86 (11th Cir. 2008) (holding Rule 9(b) demands more than a conclusory allegation that a statement is fraudulent; it requires a plaintiff to plead facts giving rise to an inference of fraud.).  In a multiple-defendant case, a plaintiff must make specific fraud

allegations as to each defendant. "Generalized allegations 'lumping' multiple defendants together are insufficient…" *Id.*, 287 Fed.App'x at 86 (citation omitted).

To state a plausible *securities fraud* claim, a plaintiff must, "with respect to each act or omission alleged to violate [the relevant statute], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1) & (2) (§ 21D(b)(1) & (2), Private Securities Litigation Reform Act of 1995 ("PSLRA")); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 US 308, 323 (2007) (noting the PSLRA's "[e]xacting pleading requirements" compel a private securities fraud plaintiff to "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.") (citation omitted). A "strong" inference of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* A district court must find a strong inference of scienter for each respective defendant and with respect to each alleged statutory violation. *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004) ("[W]e believe…that a plaintiff, to proceed beyond the pleading stage, must allege facts sufficiently demonstrating each defendant's state of mind regarding his or her alleged violations.").

The court may consider the complaint, its attachments and "documents attached to a defendant's motion to dismiss if the attached documents are central to the plaintiff's claims and are referred to by the plaintiff…" when ruling on a motion to dismiss. *Brown v. One Beacon Ins. Co. Inc.,* 317 Fed.App'x. 915, 917 (11th Cir.2009). A document identified in or attached to a complaint is "a part of [that] pleading for all purposes;" if it contradicts the plaintiff's factual allegations, the document's language controls. Fed.R.Civ.P. 10(c); *Perret v. Wyndham Vacation*

*Resorts, Inc.*, 889 F.Supp.2d 1333, 1342 (S.D. Fla. 2012) (dismissing fraud claim with prejudice where contract directly contradicted plaintiff's allegations). Applying these standards, the Complaint is insufficient as a matter of law and should be dismissed.

## II. THE SURPLUSAGE SHOULD BE DISREGARDED

The prolix Complaint is far from the "short and plain statement" required by Rule 8(a). Much of it is unnecessary rhetoric (*e.g.*, "Warren Buffett said 'banking is a good business…" [DE 1 ¶ 1]); unnecessary side-stories (*e.g.*, "History of the Academy;" "The Existing Academy and Grant's Desire to Expand…" [DE 1 ¶¶ 18-50]); misleading and confusing labels (*e.g.*, "Secret Development Agreement," "Secret Funding Agreement," "Foundation Bribe" [DE 1 ¶¶ 28, 32-33]); statements or actions attributed to non-parties (*e.g.*, "Melbourne Smith," "Foundation," "Matthew O'Connor," "Link-Up's principal," "Beacon," "Moises Benzaquen" [DE 1 ¶¶ 20, 25, 28-37; 49, 51-54, 59; 61, 100]); and unwarranted deductions of fact (*e.g.*, "HSU and Chan made the Intentional False Bond Statements and other intentional false representations and omissions with scienter, the ESJ No Construction Letter illustrates this point." [DE 1 ¶ 206]). None of The Academy's musings are "well-pleaded, nonconclusory factual allegation[s]," so the Court should disregard them.[2]

## III. ALLEGATIONS AND FACTS

From 2011 through at least 2013, the Academy was a debt-ridden not-for-profit corporation [DE 1 ¶¶ 9, 44, 57, 71-72]. During that time, the Academy operated a Florida charter-school on leased property identified as Lantana 1 and Lantana 2 [DE 1 ¶¶ 26, 56, 69]. The Academy's escalating annual rent obligations were "onerous" and "burdensome" [DE 1 ¶¶

---

[2] Similarly, the Academy's general allegations consume 188 paragraphs, but the Complaint does not even incorporate 43 of those paragraphs [DE 1 ¶¶ 18-50] into the 9 counts directed against HSU. The paragraphs omitted are admittedly superfluous. The same is true as to the Academy's "Summary of Action" [DE 1 ¶¶ 1-8] as it, too, contains no "well-pleaded, nonconclusory factual allegations." As paragraphs 1-8 and 18-50 add no heft, the Court need not consider them.

42, 45, 71, 104] and, coupled with an adverse $500,000 settlement of a judgment, significant operating expenses and management fees, the Academy's lease obligations put "an economic strain" on it and "resulted in an unfavorable financial audit…" [DE 1 ¶¶ 67, 72].  In an attempt to alleviate its financial distress, the Academy sought to buy Lantana 1 and Lantana 2 using borrowed proceeds from a bond issue [DE 1 ¶¶ 53, 104-105].  In 2011 and 2012, the Academy retained two charter-school and bond-finance consultants and engaged an investment banker (not HSU) to "facilitate the issuance of a tax-exempt bond" and to "help [the Academy] to secure," "underwrite" or "obtain[] a bond." [DE 1 ¶¶ 41-51, 53].

When those efforts failed, the Academy[3] approached HSU with its bond-finance plan in November 2013 [DE 1 ¶ 75].  In April 2014, the Academy engaged HSU as the "sole placement agent" for a proposed $1 million bond issue and a subsequent financing of up to $25 million [DE 1 ¶¶ 99, 110; DE 1-10 at 1].  For that engagement, HSU agreed to identify and contact potential bond investors; advise the Academy as to the timing, structure and pricing of the bond issue; and assist the Academy to prepare a bond offering document [DE 1-10 at 3-4].  For its part, the Academy represented in its engagement letter that its bond offering document "will be complete and correct in all material respects and will not include an untrue statement of material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading…" and the engagement letter

---

[3] At all relevant times, the Academy acted through and communicated with HSU through its President and CEO John Grant ("**Grant**").  The Academy alludes to Mr. Grant throughout the Complaint and, despite being bound by his actions, generally derides his character and attributes unethical motives and illegal actions to him ("Grant…created the conditions that led to the Academy's unfavorable audit…" [DE 1 ¶ 73]; Grant developed "secret nefarious plans" and "furtive plans" to defraud the Academy [DE ¶¶ 67, 96, 101].  The Academy made similar allegations against Grant and defendant Bill Burckhart ("**Burckhart**") in a 2015 lawsuit filed by the Academy's sole member, Palm Beach Maritime Museum Foundation, Inc. ("**Foundation**"), in Palm Beach County Circuit Court Case No. 2015-CA-8644 [DE 1 ¶ 28, n. 1], but the Academy fully released Grant and all the claims against them were dismissed *with prejudice* – a fact that the Court may judicially note.  The Academy has not sued Grant in this case.

"contains the entire agreement between the parties…and supersedes all oral statements and prior writings…" [DE 1-10 at 4, 6].

Chan met with the Academy's board of directors ("**Board**") for the first time on April 22, 2014 (DE 1 ¶ 106).  According to the Academy, Chan "confirmed that he and HSU would be underwriting…a $20 million bond…for [the Academy] to purchase" Lantana 1 and Lantana 2 [DE 1 ¶¶ 104, 106].  The Academy's efforts to purchase Lantana 2 and the proposed bond issue progressed over the next two months (May and June, 2014).  The Academy signed a letter of intent to purchase Lantana 2 [DE 1 ¶ 87; DE 1-8 at 2].  During a May 28, 2014 meeting, the Board discussed the Lantana 2 purchase letter of intent; a proposed purchase and sale agreement for the Lantana 2 purchase; and potential amortization periods and interest rates for the to-be-issued bonds [DE 1 ¶¶ 110, 112-113, 119; DE 1-12 at 3-25].  Chan spoke with "potential investors/purchasers of the Bond" and shared those discussions with the Board [DE 1 ¶ 117; DE 1-11].  According to the Academy, the information Chan provided "was consistent with HSU and Chan's representations at the previous board meetings" [DE 1 ¶ 118].[4]

Chan forwarded a draft "As-Is Agreement for Sale and Purchase" and a "Conceptual LOI Term Sheet Proposed Palm Beach Maritime Academy High School Development" to the Academy on June 16, 2014 [DE 1 ¶ 119; DE 1-12].  The "As-Is Agreement of Sale and

---

[4] Chan's "Bond Investor Presentation" preliminarily identified $8 million of anticipated bond proceeds for "[a]cquisition of Lantana 2;" "Public Finance Authority (Wisconsin)" as bond issuer; proposed a fixed-rate term bond structure with a 35-year final maturity; forecasted a "Sale Price of: $8.0MM (includes $1.5MM Building Allowance for High School") which ***developer*** would use proceeds to build-out high school expansion"; and a forecasted "June 2-6 – Pricing and Settlement" [DE 1-11 at 20-21, 23-24](all emphasis supplied unless otherwise stated).  It also disclosed: "HSU Securities does not guarantee the accuracy of the information contained herein…HSU Securities; its directors, officers, employees and agents shall have no liability to any client or any other party for loss, claims, damages, liabilities, costs or expenses…arising from the use of or reliance on the information contained herein or from any errors or omissions in computing or delivering the information or any conclusions described or expressed herein…" [DE 1-11 at 26].

Purchase" identifies Lantana 600, LLC as "Seller" and the Academy as "Buyer," and discloses

an $8 million purchase price [DE 1-12 at 3, § 2.(a)].  That agreement also states:

> Buyer desires to develop a 20,000 sq. ft. high school addition to the Property, and to the extent such is allowed, then Seller and Buyer agree[sic] towards a mutually agreeable development agreement and construction budget up to $2,500,000 with respect thereto.

[DE 1-12 §1(c)].  Similarly, the "Conceptual LOI Term Sheet Proposed Palm Beach Maritime

Academy High School Development" provides in pertinent part:

> Palm Beach Maritime Academy ("PBMA") *will enter into a development agreement with ESJ Capital Partners ("ESJ") to develop, design, and construct* an approximately 120,000 sf high school development to accommodate up to 2,000 students.
>
>                                 ***
>
> *The First Phase will consist of a 20,000 sf addition to the Lantana 2 site to be completed by August 2015 for an estimated cost of $2.5 million* as detailed in Exhibit A…First phase will not start until ESJ have[sic] secure, got permitting and negotiate a 25 year lease with PMBA for phase two.

(DE 1-12 at 24).

The Academy's charter-school and bond-finance consultant (Edu-Link, LLC) reviewed

the draft "As-Is Agreement for Sale and Purchase" and "Conceptual LOI Term Sheet Proposed

Palm Beach Maritime Academy High School Development" for Lantana 2 [DE 1 ¶ 120].  The

Academy's consultant suggested that the Academy's purchase of Lantana 2 should be "treated

separately" from the Academy's long-term lease of a third to-be-developed location [DE 1-13 at

4] and later confirmed Chan's understanding that the borrowed bond proceeds would be used to

purchase Lantana 1 and 2 and to develop the additional space at Lantana 2, at no additional cost

to the Academy [DE 1 ¶ 122].

As the Academy's negotiations to buy Lantana 2 progressed, the Academy's project and

development consultant (defendant Patricia Aguiar ("**<u>Aguiar</u>**")), received a proposed "side

letter" from Lantana 2's owner representative, defendant Fabio C. D'Ascola  ("**<u>D'Ascola</u>**").

Through that proposed side letter, the Academy would confirm the $8 million Lantana 2 purchase price and its understanding that no portion of the purchase proceeds "is advance payment or consideration on account of any future Seller obligation, construction related or otherwise" [DE 1-8 at 1; DE 1 ¶¶ 80, 88, 90, 125; DE 1-15 at 3]. Aguiar forwarded the proposed side letter to Grant (Academy CEO) and Chan [DE 1 ¶125].

Grant and Chan attended the Academy's June 19, 2014 board meeting but "did not present" the proposed side letter [DE 1 ¶ 130]. Chan presented a letter to the Board [DE 1 ¶ 131; DE 1-16], which provides in pertinent part Chan's understanding and expectation:

> As stated in the current bond offering documents, the proceeds of the Series 2014 Bonds will be utilized for the acquisition of Lantana 1, the acquisition of Lantana 2, and the build-out of an additional facility for a total capacity of 1,100 students by Lantana 2's seller, at no additional cost to PBMA.

During the June 19, 2014 meeting, the Academy's Board:

➢ Reviewed and discussed the draft "As-Is Agreement for Sale and Purchase" for Lantana 2 along with the "Conceptual LOI Term Sheet Proposed Palm Beach Maritime Academy High School Development" [DE 1 ¶¶ 119, 143; DE 1-12];

➢ Approved and "authorized the issuance of the Bond totaling $24,640,000" [DE 1¶ 144]; and,

➢ Passed a resolution authorizing and directing Grant, as President and CEO, and defendant Burckhart, as Board Chairman and Secretary, to execute documents (identified in the resolution):

> in substantially the form presented at this meeting with such changes, modifications, deletions and insertions as the persons executing said documents on behalf of the Borrower may deem necessary and appropriate, ***such execution and delivery to be conclusive evidence of the approval thereof by the Borrower***, and such other documents which may be necessary or convenient to the same and to deliver all such documents and have the Borrower perform its obligations pursuant to all such documents[.]

[DE 1 ¶¶ 144, 146; DE 1-19 at 1]. Among the documents identified in the resolution (and presented to the Board during the June 19, 2014 meeting) are: (1) "Bond Purchase Agreement

by and among the Authority, the Borrower and Hapoalim Securities USA, Inc. (the "Underwriter"), expected to be dated as of June 19, 2014 (the "**Bond Purchase Agreement**" or "**BPA**");" and "the Preliminary Limited Offering Memorandum dated June 17, 2014 ("**PLOM**") and final Limited Offering Memorandum of the Borrower expected to be dated June 19, 2014 with respect to the Bonds.   The BPA and excerpts from the PLOM are attached to this memorandum as **Exhibit 1** and composite **Exhibit 2**, respectively.

On or before ***June 19, 2014***, before any bonds were issued or the Academy had borrowed any bond-issue proceeds, Grant, as CEO, signed an "As-Is Agreement for Sale and Purchase" for Lantana 2 [DE 1 ¶¶ 149-151; DE 1-20].  Like the draft "As-Is Agreement for Sale and Purchase" that the Board reviewed and discussed on June 16, 2014, the "As-Is Agreement for Sale and Purchase" that Grant signed states in pertinent part:

> (iv) Buyer has not relied upon any oral or written information provided by Seller except for the specific representations and warranties of Seller contained herein and acknowledges that ***no employee, agent or representative of Seller has been authorized to make, and that Buyer has not relied upon, any statements or representations other than those specifically contained in this Agreement*** (DE 1-20 § 8.(b)(i), (iii)-(iv)) (emphasis supplied);
>
> \*\*\*
>
> This Agreement embodies ***the entire contract between the parties*** hereto with respect to the Property and ***supersedes any and all prior agreements and understandings***, written or oral, formal or informal, without limitation, ***any letter of intent relating to a sale of the Property***. (DE 1-20 § 18(c)) (emphasis provided);
>
> \*\*\*
>
> Negotiation of Development Agreement.   Apart from this Agreement, to the extent Buyer in the future wishes to develop a 20,000 sqft high school addition to the Property, and to the extent such is allowed, then ***Seller and Buyer agree to negotiate in good faith toward a mutually agreeable construction agreement*** with respect thereto. (DE 1-20 § 18(y)) (emphasis added).

Two law firms represented the Academy in the $24.6 million transaction, one as bond-counsel and the other as corporate-counsel.   The Academy's charter-school and bond-finance

consultant reviewed the "final bond documents" *on June 25, 2014* [DE 1 ¶¶ 156-158].  The BPA is are among the listed "final bond documents."

The $24.6 million financing transaction closed on June 26, 2014.  The Academy and ESJ did not agree on the terms of a development agreement for the proposed Lantana 2 expansion and, ultimately, the Academy did not buy Lantana 2 from its landlord.

## IV.   THE ACADEMY FAILS TO STATE CLAIMS FOR SECURITIES FRAUD, COMMON LAW FRAUD, FRAUDULENT OR NEGLIGMENT MISREPRESENTATION OR "OMISSION" (COUNTS 1 THROUGH 5)

The Academy attempts to sue HSU for federal securities fraud in count 1.  The Complaint repeats count 1's allegations *verbatim* in counts 2 (for Florida securities fraud), 3 (for Florida "common law fraud/fraudulent misrepresentation") and 4 (for Florida "negligent misrepresentation"); and virtually those same allegations in count 5 (for "fraudulent omission") [compare DE 1 ¶¶ 189-199 with ¶¶ 200-210; 211-220; 221-230; 231-237].  The Complaint must be dismissed because there is no subject matter jurisdiction; Counts 1-5 must be dismissed because the Academy lacks standing to bring a federal or Florida securities fraud claim and the Complaint fails to state a plausible fraud-based legal claim against HSU in counts 1 through 5.

### A.   No Securities Fraud Standing (Counts 1 and 2)

The Academy generally alleges that it "approved the issuance" of a bond, but pointedly omits any allegation that it bought or sold any bond [DE 1 ¶¶ 144, 190-192, 197-198].  As the Academy neither bought nor sold a security, it lacks standing to sue for federal securities fraud. That has been the settled law for over 40 years. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 731–32 (1975) (noting "virtually all lower federal courts…in the hundreds of reported cases…over the past quarter century have reaffirmed…that…10(b) and Rule 10b–5 private damage actions [are] limited to purchasers and sellers of securities."); *Financial Security*

*Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276 (11th Cir. 2007) (no claim for bond guarantor who did not "purchase or otherwise acquire" or "sell or otherwise dispose of" bonds).[5]

The Academy's Florida securities fraud claim fares no better.  Florida Statutes Section 517.211(2) creates a civil remedy for a Section 517.301 violation; however, that remedy is limited to a person "selling the security" or one "purchasing the security."  *Eagletech Comm., Inc. v. Bryn Mawr Inv. Group, Inc.*, 79 So.3d 855, 865 (Fla. 4th DCA 2012) (dismissing Fla. Stat. § 517.301 securities fraud claim because plaintiff was not a securities purchaser or seller).

The Academy lacks standing to assert a securities fraud claim because it failed to allege, and cannot allege, that it purchased or sold any security.  Accordingly, that fatal omission may not be cured by amendment.   The Complaint alleges only federal-question jurisdiction [DE 1 at ¶ 15], which the Court lacks over the Academy's other HSU-directed state-law-based claims (counts 3 through 9).   As such, the Court should dismiss Complaint counts 1 and 2 *with prejudice* and dismiss counts 3 through 9 for lack of subject matter jurisdiction.

### B.      No Particularized False Statement or Omission (Counts 1 through 5)

The Academy fails entirely to "state with particularity the circumstances constituting fraud."  The Complaint does not precisely identify "what statements [HSU supposedly made] in what documents or oral representations or what omissions [HSU] made," the "time and place of each statement [HSU made or omitted]," the "content of such statements and the manner in

---

[5] Additionally, the Supreme Court has cautioned that, when interpreting the implied Section 10(b) private right of action, courts "must give "'narrow dimensions ... to a right of action Congress did not authorize when it first enacted the statute and did not expand when it revisited the law.'"  *Janus Capital Grp., Inc. v. First Deriv. Traders,* 131 S. Ct. 2296, 2302 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148 (2008) ; *see also Stoneridge,* 552 U.S. at 165 ("Concerns with the judicial creation of a private cause of action caution against its expansion ... the § 10(b) private right should not be extended beyond its present boundaries.").

which they misled [the Academy]," or what [HSU] obtained as a consequence…." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

Dissecting the Academy's contorted allegations is an impossible and ultimately unproductive chore – one that neither HSU nor the Court need undertake.  As one example, the Academy alludes to "the Intentional False Bond Statements," "other intentional false misrepresentations and omissions," and "their false representation that ESJ would sell Lantana 2 for $8 million and would allocate $2.5 million of the purchase price for the development of the additional space at Lantana 2"  throughout the Complaint and particularly in counts 1 through 5.

The phrase "Other intentional false misrepresentations and omissions" has no context and is indecipherable.  The Complaint defines "the Intentional False Bond Statements" as "the statements made in the Hapoalim Bond Letter" and seven stream-of-consciousness sentences in complaint paragraph 135 [DE 1 ¶¶ 135].  The "Hapoalim Bond Letter" [DE 1-16] contains four sentences; the Academy quotes only one, which reads:

> As stated in the current bond offering documents, the proceeds of the Series 2014 Bonds will be utilized for the acquisition of Lantana 1, the acquisition of Lantana 2, and the build-out of an additional facility for a total capacity of 1,100 students by Lantana's seller at no additional cost to [the Academy].

The Academy does not allege that the quoted sentence is false.  The Academy does not explain why the sentence is false, if it actually is false.  Although the sentence makes clear that "the proceeds of the Series 2014 Bonds" will fund the Lantana 2 buildout "at no additional cost to the Academy," in the Academy's view, this sentence *really* means "…that none of the $8 million purchase price for Lantana 2 would be used to develop the additional space at Lantana 2." [DE 1 ¶ 133].

Adding the 7 "statements" alleged in complaint paragraph 135 [DE 1 ¶ 135] to the mix compounds confusion further.  To illustrate, statement "(1)" reads "$2.5 million of the $8 million

purchase price for Lantana 2 will be placed in escrow to be used for the development of the additional space at Lantana 2." The Complaint alleges that "[HSU] and Chan 'stated' statement "(1)," but does not say when, how or to whom "[HSU] and Chan" purportedly did that. As a second example, statement "(4)" reads "[the Academy] would be able to satisfy its bond payment and other obligations under a no-growth scenario – i.e. based on the number of students at only Lantana 1 and 2 and the additional space developed at Lantana 2." The Complaint does not even allege that statement "(4)" is false or why it is false, if it actually is false.

Further, the Academy lumps HSU into several different and amorphous groups, each comprised of an assortment of defendants and non-parties. To each group, the Academy attributes generalized "plans", "representations" or "omissions" (*e.g.*, "Aguiar introduced Grant to [HSU] and Chan so they could formulate a secret plan…" [DE 1 ¶ 67]; "[HSU] and Chan made several significant and material false statements of facts and material omissions…" (DE 1 ¶ 190); "Secretly, Grant, Aguiar, HSU and Chan met with D'Ascola and agreed…Then they agreed..." [DE 1 ¶ 79]; "…the furtive plans that Grant, Aguiar, [HSU], Chan and ESJ via D'Ascola made." [DE 1 ¶ 101].

The Academy's lumped-group approach does not attribute any particular false statement or omission solely to HSU. As a result, the Academy's counts 1 through 5 do not "reasonably notify [HSU] of [its] purported role in [any] scheme" or "inform [HSU] of the nature of [its] alleged participation in [any] fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1381 (11th Cir.1997) (per curiam) (citing *Vicom, Inc. v. Harbridge Merch. Servs., Inc*., 20 F.3d 771, 778 (7th Cir. 1994)); *see also Eagletech Comm. Inc. v. Bryn Mawr Inv. Group, Inc*., 79 So.3d 855, 862 (Fla. 4th DCA) (dismissing state law fraudulent inducement and securities fraud claims where plaintiff's complaint "lumped twenty-nine separate defendants together and failed

to identify which defendant made which statement" and holding "trial court correctly concluded that these other allegations of fraud lacked the required specificity.").

### C.    No Strong Inference of Scienter or Fraud (Counts 1 through 5)

The Complaint offers nothing that suggests HSU intended to defraud the Academy or that any statement made by HSU was knowingly false.  Stripped bare, the Complaint shows that HSU engaged in an ordinary, well-structured and documented transaction, as a securities placement agent and underwriter.   On the actual facts, the inference of HSU's "nonfraudulent intent" overwhelms the Academy's threadbare statement that "[HSU] and Chan made the Intentional False Bond Statements and other intentional false representations and omissions with scienter." [DE 1 ¶¶ 195, 206, 217, 227].  The deficient Complaint cannot not pass the "pleadings stage [because it does not] allege facts sufficient[] to demonstrat[e] [HSU's] state of mind regarding [its] alleged violations."  *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004).

### D.    No Justifiable Reliance (Counts 1 through 5)

According to the Complaint, the Board "reasonably and justifiably relied on…the Intentional False Bond Statements" to "provide[] their approval for [HSU] and Chan to issue the Bond."  [DE 1 ¶¶ 191, 202, 213, 223, 235].  Apart from the fact that the Academy's CEO and Board Chairman were allegedly fully informed, the Complaint and its exhibits, however, show that the Board received the preliminary transaction documents before they "approved the Bond" on June 19, 2014.  The Complaint admits the Board received the final bond documents at least before the June 26, 2014 closing.  Those preliminary and final transaction documents show that the Board was advised of that which it now claims constituted "fraud" before the June 26, 2014 closing.  Indeed, even by June 19, the Board, its President and CEO, its consultants and its

counsel had reviewed and discussed several documents that made clear that Lantana 2's owner had *not* agreed to spend "$2.5 million of the $8 million purchase price for Lantana 2…to develop the additional space at Lantana 2" and that bond proceeds would fund the Lantana 2 buildout. They include:

➢ the "As-Is Agreement for Sale and Purchase" on June 16, 2014 [DE 1 ¶ 119; DE 1-12];

➢ the "Conceptual LOI Term Sheet Proposed Palm Beach Maritime Academy High School Development" on June 16, 2014 [DE 1 ¶ 119; DE 1-12];

➢ the "current bond offering documents", including the June 17, 2014 Preliminary Limited Offering Memorandum ("**<u>PLOM</u>**") which states in pertinent part: "The contract for the purchase of the Lantana 2 Facility has not been executed and is currently under negotiation" (Ex. 2 at 19); and

➢ the "final bond documents," including the "revised" "As-Is Agreement for Sale and Purchase" for Lantana 2 on or about June 19, 2014 [DE 1 ¶¶ 149-151; DE 1-20], which does not include any $2.5 Million use obligation but clearly provides in relevant part: "This Agreement embodies the entire contract between the parties hereto with respect to the Property and supersedes any and all prior agreements and understandings, written or oral, formal or informal, without limitation, any letter of intent relating to a sale of the Property." [DE 1-20 § 18(c)].

Before any bonds were issued or the Academy borrowed any bond-issue proceeds, the Board knew that Lantana 2's owner had not agreed to use $2.5 million of the $8 million sale proceeds to fund the Lantana 2 expansion. The purportedly concealed "ESJ No Construction Letter" [DE 1-15 at 2] does not say otherwise. As such, the Academy could not have justifiably relied on any statement that the Lantana 2 owner had agreed to do the opposite. *Garcia v. Santa Maria Resort, Inc.*, 528 F. Supp. 2d 1283, 1295-96 (S.D. Fla. 2007) ("[R]eliance on fraudulent representations is unreasonable as a matter of law where the alleged misrepresentations contradict the express terms of the ensuing written agreement."); *M/I Schottenstein Homes, Inc. v. Azam*, 813 So.2d 91, 94-95 (Fla. 2002) ("The question ... is whether the recipient of the misrepresentation is 'justified in relying upon its truth.' For if the recipient 'knows that [the

statement] is false or its falsity is obvious to him,' his reliance is improper, and there can be no cause of action for fraudulent misrepresentation.").

As the Academy fails to state a plausible fraud-based legal claim against HSU in counts 1 through 5, the Court should dismiss those counts.

## V.    THE ACADEMY FAILS TO STATE A BREACH OF FIDUCIARY DUTY OR NEGLIGENT SUPERVISION CLAIM (COUNTS 6 AND 9)

For count 6, the Academy alleges that "[HSU] and Chan, by virtue of their relationship with [the Academy], owed [the Academy] fiduciary duties…"   The April 2014 Engagement Agreement [DE 1-10] and the BPA (Ex. 2) conclusively prove otherwise.   Both documents, products of arms-length business negotiations, contractually limit HSU's obligations to the Academy.   Through both documents, the Academy agreed that HSU had not assumed and did not owe the Academy any fiduciary duty.   *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp*., 850 So.2d 536, 541 (Fla. 5th DCA 2003) ("When the parties dealing at arm's length, a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other.").

Specifically, in the Engagement Agreement, the Academy acknowledged "[HSU] has been retained solely to provide the services set forth in this letter" and agreed that the engagement letter "contains the entire agreement between the parties…and supersedes all oral statements and prior writings…" [DE 1-10 at 3, 6].   Similarly, in the BPA, the Academy agreed:

> The Issuer and the Borrower each acknowledge that in connection with the offering of the Bonds for sale and the discussions and negotiations relating to the terms of the Bonds set forth in this Purchase Agreement: (a) *the Underwriter has acted at arm's length, is not an agent of or advisor to, and owes no fiduciary duties to, the Issuer or the Borrower*, (b) *the Underwriter's duties and obligations to the Issuer and the Borrower shall be limited to those contractual duties and obligations set forth in this Purchase Agreement*…(Ex. 2 § 1);

The Academy may not avoid its express disclaimer that HSU owed it no fiduciary duty.   *Mac-*

*Gray Servs., Inc. v. DeGorge*, 913 So.2d 630, 633 (Fla. 4th DCA 2005) (enforcing "specific contractual disclaimer" of defendant's fiduciary duty to plaintiff).  This is particularly true where the Academy also agreed that "This Purchase Agreement when accepted by the Borrower and the Issuer in writing as heretofore specified shall constitute the entire agreement between us."  (Ex. 2 § 17).

The April 2014 Engagement Letter and the BPA also defeat the Academy's purported "negligent supervision" claim (count 9).   "Supervising" Chan is not among the limited obligations that HSU assumed in the April 2014 Engagement Letter or the BPA.   HSU's contractual "relationship with the Academy" imposed no fiduciary duty or other "supervisory" duty on HSU.

Similarly, HSU's "relationship" with FINRA does not impose any "supervisory" duty to the Academy on HSU.   More particularly, FINRA Rule 3110, like all self-regulatory-organization rules, does not carry or create a private right of action for the Academy.  *Thompson v. Smith Barney, Harris Upham & Co., Inc.*, 709 F.2d 1413 (11th Cir. 1983) ("We have considered all of the appellant's contentions raised on appeal, including his contention that there is a private cause of action under the federal securities laws for violation of both the New York Stock Exchange "know your customer rule" and the National Association of Securities Dealers' "suitability" rule, and find them to be without merit."); *Fox v. Lifemark Sec. Corp.*, 84 F. Supp. 3d 239, 245 (W.D.N.Y. 2015) ("FINRA does not provide a private right of action, thus even if defendants violated FINRA rules, plaintiff cannot recover for negligence based on the alleged violation of [a FINRA rule].").

As HSU owes the Academy no fiduciary or "supervision" duty, and FINRA Rules do not impose one, Counts 6 and 9 fail to state a legal claim against HSU and should be dismissed.

### VI.    THE ACADEMY FAILS TO STATE A CIVIL CONSPIRACY OR "AIDING AND ABETTING" CLAIM (COUNTS 7 AND 8)

For Counts 7 and 8, the Complaint generally accuses HSU of conspiring with other defendants and non-parties to defraud the Academy or aiding-and-abetting Grant's, Burckhart's and non-party Melbourne Smith ("**Smith**") breaches of their respective fiduciary duties to the Academy, all to trick the Academy to "approve the issuance of the Bond."   At its core, a conspiracy requires an actual agreement among two or more people to accomplish an illegal goal.  *Phelan v. Lawhon,* 2017 WL 1177595, at *4 (Fla. 3d DCA 2017) (*citing Raimi v. Furlong,* 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997)).  *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067 (noting a "claim that is found not to be actionable cannot serve as the basis for a conspiracy claim).  Where a civil conspiracy claim alleges that two or more parties agreed to commit fraud, a plaintiff must "plead this act with specificity".  *Id*. at 1067-68.

The Academy generally alleges that HSU, as a member of several groups of defendants and non-parties, "agreed" to develop "nefarious plans."  The Academy's "agreement" allegations are, at best, legal conclusions, which the Court should not assume to be true.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (holding antitrust plaintiff's allegation of agreement among defendants was a legal conclusion which was not entitled to assumption of truth).  Further, there can be no conspiracy to defraud where, as here, no underlying fraud occurred.

Similarly, there can be no aiding-and-abetting cause of action where there is no underlying breach of fiduciary duty cause of action or when HSU's knowledge of any breach is insufficiently alleged.[6]   The Academy has not asserted breach of fiduciary duty claims against Grant or Smith in this case.  As to Burckhart, Florida law  immunizes him from civil liability for

---

[6] *See Receiver of Lancer Offshore, Inc. v. Citgo Grp. Ltd.*, 2008 WL 926513, at *6 (S.D. Fla. Mar. 31, 2008).

"any statement, vote, decision, or failure to take an action, regarding organizational management or policy…***unless*** [he] breached or failed to perform [his] duties…***and*** [his breach or failure] constitutes: (1) ***a violation of the criminal law***…; (2) "a transaction from which [he] derived an ***improper personal benefit***…; or (3) *[r]eckless* or an act or omission that was ***committed in bad faith*** or with ***malicious purpose*** or…exhibiting ***willful disregard of human rights, safety or property***." Fla. Stat. § 617.0834(1)(a)-(c) (emphasis supplied). While the Complaint generally alludes to Grant's, Burckhart's and Smith's "fiduciary duties," it does not allege that any one of them violated the criminal law, derived an improper personal benefit or acted with recklessness, in bad faith, with malicious purpose or in disregard of human rights, safety or property.

Finally, the Academy – not Grant, Burckhart or Smith – received a $24.6 million benefit because the Academy "approved the issuance of the Bond." The Academy participated in (and benefitted from) the same "wrongdoing" that it now hopes to attribute to Grant, Burkhart and Smith – and ultimately to HSU. The Academy should not recover damages against HSU for that alleged wrongdoing. *O'Halloran v. PriceWaterhouseCoopers, LLP*, 969 So. 2d 1039 (Fla. 2d DCA 2007) (citing *Memorex Corp. v. Int'l Bus. Machs. Corp*., 555 F.2d 1379, 1382 (9th Cir.1977); and *Nisselson v. Lernout*, 469 F.3d 143, 151 (1st Cir.2006)).

The Court should dismiss Complaint counts 7 and 8 as they fail to state a legal claim against HSU.

## VII.   CONCLUSION

Based on the foregoing, HSU respectfully requests that the Court enter its order dismissing the Complaint as to HSU and awarding HSU entitlement to its attorneys' fees.

Respectfully Submitted,

*Stephen B. Gillman*
Stephen B. Gillman (FBN 196734)
Attorney Email: sgillman@shutts.com
Lonnie L. Simpson (FBN 821871)
Attorney Email: lsimpson@shutts.com
**SHUTTS & BOWEN LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, Florida 33131
Tel:  305.347.7311
Fax: 305.381.9982

*Attorneys for Hapoalim Securities USA, Inc.*

Carol M. Goodman (Pro Haec Pending)
Attorney Email: cgoodman@herrick.com
Scott C. Ross (Pro Haec Pending)
Attorney Email:sross@herrick.com
**HERRICK, FEINSTEIN LLP**
Two Park Avenue
New York, New York 10016
Tel: 212.592.1400
*Co-Counsel for Defendant Hapoalim*
    *Securities USA, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on June 5, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel identified below via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner.

**HERNANDEZ LEE MARTINEZ, LLC**
*Attorneys for Plaintiff*
Jermaine A. Lee, Esq.
Eric A. Hernandez, Esq.
Arturo Martinez, Esq.
P.O. Box  531029
Miami, Florida 33153
(T) (305) 842-2100
(F) (305) 842-2105
(E) jlee@whlmlegal.com
       eric@whlmlegal.com
       arturo@whlmlegal.com

**/s/ Stephen B. Gillman**
Of Counsel

# EXHIBIT 1

**EXECUTION COPY**

**$21,000,000**
## PUBLIC FINANCE AUTHORITY
## FIRST MORTGAGE EDUCATIONAL FACILITY REVENUE BONDS
## (PALM BEACH MARITIME ACADEMY PROJECT)
## SERIES 2014A

**$3,640,000**
## PUBLIC FINANCE AUTHORITY
## FIRST MORTGAGE EDUCATIONAL FACILITY REVENUE BONDS
## (PALM BEACH MARITIME ACADEMY PROJECT)
## TAXABLE SERIES 2014B

## BOND PURCHASE AGREEMENT

June 19, 2014

Palm Beach Maritime Museum, Inc.
  d/b/a/ Palm Beach Maritime Academy
4512 N. Flagler Drive, Suite 206
West Palm Beach, Florida 33407

Public Finance Authority
22 East Mifflin Street, Suite 900
Madison, Wisconsin 53703

Ladies and Gentlemen:

On the basis of the representations, warranties and covenants and upon the terms and conditions contained in this Bond Purchase Agreement, Hapoalim Securities USA, Inc. (the "Underwriter"), acting on behalf of itself and not as fiduciary for the Issuer, hereby offers to enter into this Bond Purchase Agreement (the "Purchase Agreement") with Palm Beach Maritime Museum, Inc. d/b/a Palm Beach Maritime Academy, a Florida non-profit corporation (the "Borrower") and the Public Finance Authority, a unit of government and a body corporate and politic existing under the laws of the State of Wisconsin (the "Issuer"), which, upon acceptance of this offer by the Borrower and the Issuer, will be binding upon the Borrower and the Issuer and upon the Underwriter.  This offer is made subject to written acceptance hereof by the Borrower and the Issuer at or before 5:00 p.m., local time, on the date hereof and, if not so accepted, will be subject to withdrawal by the Underwriter upon notice delivered to the Borrower

and the Issuer at any time prior to the acceptance hereof by the Borrower.  The parties hereto agree and acknowledge that the obligations of the Issuer and the Borrower hereunder do not constitute a general obligation of the Issuer or the Borrower.  Terms not otherwise defined herein shall have the same meanings ascribed thereto in the hereinafter defined Indenture and Offering Memorandum (the "Offering Memorandum") relating to the hereinafter defined Bonds.

      **1.**     **Purchase and Sale**.  Upon the terms and conditions and in reliance upon the representations, warranties, covenants and agreements set forth herein, the Underwriter hereby agrees to purchase, and the Issuer agrees to sell and to cause U.S. Bank, National Association, as trustee (the "Trustee") under the Trust Indenture to deliver to the Underwriter, all (but not less than all) of the aggregate principal amount of the Issuer's $21,000,000 First Mortgage Educational Facility Revenue Bonds (Palm Beach Maritime Academy Project) Series 2014A (the "Series 2014A Bonds") and all (but not less than all) of the aggregate principal amount of the Issuer's $3,640,000 First Mortgage Educational Facility Revenue Bonds (Palm Beach Maritime Academy Project) Taxable Series 2014B (the "Series 2014B Bonds" and together with the Series 2014A Bonds, the "Bonds").  The Bonds shall be dated the date of delivery.  The Series 2014A Bonds are being issued to (1) finance a portion of the cost to construct, equip and acquire the Borrower's two charter school facilities in Lantana, Palm Beach County, Florida (collectively, the "Facility"), (2) refund a portion of the outstanding principal of the Refunded Bonds, (3) make a deposit into the Debt Service Reserve Fund, (4) fund capitalized interest with respect to the Series 2014A Bonds and (5) pay a portion of the cost of issuance with respect to the Series 2014A Bonds.  The Series 2014B Bonds are being issued to (1) finance a portion of the cost to construct, equip and acquire the Facility, (2) refund a portion of the outstanding principal of the Refunded Bonds, (3) make a deposit into the Debt Service Reserve Fund, (4) fund capitalized interest with respect to the Series 2014B Bonds, and (5) pay a portion of the costs of issuance of the Bonds (collectively, the "Project").

      The purchase price for the Bonds shall be $23,900,650 (which price represents the aggregate par amount of the Bonds of $24,640,000, and less underwriter's discount of $739,350).

      The Bonds shall be as described in and shall be issued under and secured pursuant to the provisions of a Trust Indenture, dated as of June 1, 2014, by and between the Issuer and the Trustee (the "Indenture").  The Bonds shall mature at the times and in the amounts and bear interest at the rates and shall be subject to redemption at the times and at the prices set forth in Offering Memorandum.

      The proceeds of the Bonds shall be used to fund a loan to the Borrower in the aggregate amount of $24,640,000 (the "Loan") pursuant to the terms of a Loan Agreement, dated as of June 1, 2014, by and between the Issuer and the Borrower (the "Loan Agreement").  The Loan shall be evidenced by Note No. 1 in the principal amount of $21,000,000 and by Note No. 2 in the principal amount of $3,640,000, each dated as of June 1, 2014 from the Borrower to the Issuer (collectively, the "Notes").  The Notes shall be secured by a Mortgage and Security Agreement, dated as of June 1, 2014, from the Borrower to the Trustee (the "Mortgage").  The rights and obligations of the Issuer under the Loan Agreement shall be assigned to the Trustee pursuant to the Indenture.

The Issuer and the Borrower each acknowledge that in connection with the offering of the Bonds for sale and the discussions and negotiations relating to the terms of the Bonds set forth in this Purchase Agreement: (a) the Underwriter has acted at arm's length, is not an agent of or advisor to, and owes no fiduciary duties to, the Issuer or the Borrower, (b) the Underwriter's duties and obligations to the Issuer and the Borrower shall be limited to those contractual duties and obligations set forth in this Purchase Agreement, and (c) the Underwriter may have interests that differ from those of the Issuer and the Borrower.

**2.      Delivery of Limited Offering Memorandum**.

The Borrower hereby confirms that it has heretofore provided to the Underwriter a Preliminary Limited Offering Memorandum dated June 17, 2014 (the "Preliminary Offering Memorandum"). The Issuer confirms that it has authorized the distribution and use by the Underwriter of the Preliminary Offering Memorandum in connection with the offering and sale of the Bonds.

**3.      Intentionally Omitted**.

**4.      Limited Offering**. The Underwriter agrees to make an offering of all the Bonds at a price not in excess of the initial offering prices set forth on the inside cover page of the Offering Memorandum only to "Qualified Institutional Buyers" as defined in Rule 144A of the Securities Act of 1933, as amended. The Underwriter reserves the right to make certain concessions to dealers and to charge such initial public offering prices as the Underwriter reasonably deems necessary in connection with the marketing of the Bonds. Each purchaser shall deliver a Qualified Investor Letter in the form attached as Appendix F of the Offering Memorandum.

**5.      Intentionally Omitted**.

**6.      Representations, Warranties, Covenants and Agreements**.

(a)      By its acceptance hereof, the Borrower represents, warrants, covenants and agrees with the Underwriter that, as of the date hereof:

(i)      The Borrower is and will be, on the Date of Closing, a not-for-profit corporation duly organized, incorporated, validly existing, and in good standing under the laws of the State of Florida (particularly, Chapter 617, Florida Statutes, as amended) and has received a determination letter from the Internal Revenue Service that it is an organization described in Section 501(c)(3) of the Code and is exempt from federal income taxes under Section 501(a) of the Code and is not a "private foundation" as defined in Section 509(a) of the Code. The Borrower is in compliance with all terms, conditions, and limitations, if any, contained in such letter and the statements made in the request of the Borrower to the Internal Revenue Service for such letter were true and accurate when submitted and the facts presented in such requests, as modified by facts submitted to the Internal Revenue Service in subsequent transmissions, do not deviate in any material respect from the facts of the transactions contemplated by the Offering Memorandum. The Borrower continues to meet the requirements of the Code necessary for it not to be a "private foundation" under Section 509(a) of the Code. The Borrower

3

has not received any indication or notice, written or oral, from representatives of the Internal Revenue Service to the effect that its exemption under Section 501(c)(3) of the Code has been revoked or modified or that the Internal Revenue Service is considering revoking or modifying such exemption. All actions to be taken by the Borrower relating to the issuance of the Bonds, including but not limited to the execution and delivery of the Borrower Documents (as defined herein) have been authorized pursuant to a resolution of the Board of Trustees of the Borrower (the "Borrower Resolution").

(ii)     The Borrower and The School Board of Palm Beach County, Florida (the "School Board") have entered into a charter school contract dated as of July 1, 2012, as amended (the "Charter"), whereby the School Board has granted a charter to the Borrower to operate the Facility as a charter school, which Charter remains in full force and effect. So long as the Bonds remain outstanding, the Borrower shall take all actions necessary on its part to receive the Gross Revenues, including the Charter School Revenues, and shall not take any actions which would impede the receipt of the Charter School Revenues or other Gross Revenues.

(iii)    The Borrower has, had and will have at all relevant times, full legal right, power and authority to: (A) enter into, execute and deliver this Purchase Agreement, the Loan Agreement, the Notes, the Mortgage, and all other documents to which it is a party pertaining to the issuance of the Bonds (collectively, the "Borrower Documents") by official action of the Borrower taken prior to or concurrently with the acceptance hereof, and (B) to acquire, equip, construct, renovate and operate the Project and to make the payments on the Notes when due. This Purchase Agreement, the Borrower Resolution and the other Borrower Documents, when executed or adopted by the Borrower, will each be duly authorized and delivered and will constitute the legal, valid and binding obligations of the Borrower enforceable in accordance with their respective terms, except as the enforceability thereof may be affected by bankruptcy, insolvency or other laws affecting the rights of creditors or tenants generally or by general principles of equity or public policy. The Borrower has duly authorized and approved the performance and consummation by it of all other transactions contemplated by the Borrower Documents to have been performed or consummated at or prior to the Date of Closing.

(iv)    The undertaking of the Project, the execution and delivery by the Borrower of this Purchase Agreement and the other Borrower Documents, the issuance of the Bonds, the adoption of the Borrower Resolution and compliance with the obligations on the Borrower's part contained herein and in the Borrower Documents and Borrower Resolution, will not conflict with or constitute a material breach of or material default under any federal or Florida constitutional provision, law, administrative regulation, judgment, decree, loan agreement, indenture, bond, note, resolution, agreement, the Charter or other instrument to which the Borrower is a party or to which the Borrower or any of its properties or other assets is otherwise subject, nor will any such execution, delivery, adoption, implementation or compliance result in the creation or imposition of any material lien, charge or other security interest or encumbrance of any nature whatsoever upon any of the properties or other assets of the Borrower under the terms of any such provision, law, regulation, document or instrument, except as provided or permitted by the Borrower Documents.

4

(v)     All approvals, consents and orders of any governmental authority, legislative body, board, agency or commission having jurisdiction which would constitute a condition precedent to or the absence of which would materially adversely affect the due performance by the Borrower of its obligations under this Purchase Agreement, the Borrower Resolution, the Charter and the other Borrower Documents have been, or prior to the Closing will have been, duly obtained.

(vi)    the information in the Preliminary Offering Memorandum and the Offering Memorandum (as the same may be supplemented or amended as permitted hereby) relating to the Borrower and the Project and all of the information under the headings "ESTIMATED SOURCES AND USES OF PROCEEDS OF THE BONDS," "PALM BEACH MARITIME ACADEMY CHARTER SCHOOL," "THE BORROWER AND GUARANTOR" "THE CHARTER" "THE FACILITY AND THE PROJECT," "CERTAIN RISK FACTORS," "APPENDIX A-CERTAIN INFORMATION REGARDING THE BORROWER AND PALM BEACH MARITIME ACADEMY," "APPENDIX G – CHARTER," "APPENDIX H – ENVIRONMENTAL SITE ASSESSMENT REPORTS RELATIVE TO THE FACILITIES," and "APPENDIX K – AUDITED FINANCIAL STATEMENTS OF PALM BEACH MARITIME ACADEMY FOR THE FISCAL YEARS ENDED JUNE 30, 2013 AND JUNE 30, 2012" (collectively, the "Borrower's Portion of the Offering Memorandum") is correct in all material respects and does not omit to state a material fact with respect to the Borrower or the Project required to be stated therein or necessary to make the statements therein in the light of the circumstances under which they were made, not misleading.

(vii)   There is no action, suit, proceeding inquiry or investigation, at law or in equity before or by any court, governmental agency or public board or body, pending or, to the best knowledge of the Borrower, threatened:

(A)     which may affect the existence of the Borrower or the titles or rights of their officers to their respective offices;

(B)     which may affect or which seeks to prohibit, restrain or enjoin the sale, issuance or delivery of the Bonds, the collection or receipt of the Gross Revenues or assignment thereof to make payments on the Bonds and to make other payments under the Loan Agreement, or the acquisition and renovation of the Project;

(C)     which in any way contests or affects the validity or enforceability of the Charter, the Borrower Documents or any of them;

(D)     which would cause the interest on the Series 2014A Bonds to be included in gross income of the holders of the Series 2014A Bonds for purposes of federal income taxation; or

(E)     which contests in any way the completeness or accuracy of the Preliminary Offering Memorandum or the Offering Memorandum or which contests the powers of the Borrower or any authority or proceedings for the

issuance, sale or delivery of the Bonds, or the execution and delivery of this Purchase Agreement and the other Borrower Documents or any of them or the acquisition, equipping, construction, and renovation of the Project in accordance with the terms thereof;

nor, to the best knowledge of the Borrower, is there any basis therefor wherein an unfavorable decision, ruling or finding would materially adversely affect the validity or enforceability of the Charter, the Borrower Resolution or the Borrower Documents or any of them.

(viii)   The Borrower covenants to comply with the requirements of the Internal Revenue Code of 1986, as amended (the "Code") in order to maintain the exclusion from gross income for purposes of federal income taxation of the interest on the Series 2014A Bonds. These requirements include, but are not limited to, provisions which prescribe yield and other limits within which the proceeds of the Series 2014A Bonds and other amounts are to be invested and require that certain investment earnings on the foregoing must be rebated on a periodic basis to the Treasury Department of the United States.

(ix)   The Borrower has not, since December 31, 1975, been in default in the payment of principal of, premium, if any, or interest on, or otherwise been in default with respect to, any bonds, notes or other obligations which it has issued, assumed or guaranteed as to payment of principal, premium, if any, or interest.

(x)   The Borrower will not take or omit to take any action which action or omission will, in any way, cause the proceeds of the Bonds to be applied in a manner contrary to that provided for in the Indenture and as described in the Offering Memorandum.

(b)   By its acceptance hereof, the Issuer represents, warrants, covenants and agrees with the Underwriter that, as of the date hereof:

(i)   The Issuer is and will be, on the Date of Closing (as defined herein), a unit of government and a body corporate and politic existing under the laws of the State of Wisconsin with the powers and authority set forth in Sections 66.0301, 66.0303 and 66.0304 of the Wisconsin Statutes, as amended (collectively, the "Act"). The Issuer is authorized and empowered under the Act to issue bonds for the purposes of financing the costs of the Project. The Issuer duly authorized the issuance of the Bonds pursuant to a Resolution adopted by its Board of Directors on June 19, 2014 (the "Resolution").

(ii)   The Issuer has, had and will have at all relevant times, full legal right, power and authority to enter into and deliver this Purchase Agreement, the Bonds, the Indenture, the Loan Agreement, the Resolution and all other documents to which it is a party necessary or required to consummate the issuance of the Bonds (collectively, the "Issuer Documents") by official action of the Issuer taken prior to or concurrently with the acceptance hereof. The Resolution has been duly adopted in accordance with the Constitution and laws of the State and is in full force and effect and has not been rescinded. This Purchase Agreement, the Bonds and the other Issuer Documents, when

6

executed by the Issuer, will each be duly authorized and delivered and will constitute the legal, valid and binding obligations of the Issuer enforceable in accordance with their respective terms, except as the enforceability thereof may be affected by bankruptcy, insolvency, and other laws affecting the rights of creditors generally or by general principles of equity or public policy, to the exercise of judicial discretion in appropriate cases and to the limitation on legal remedies against governmental units and joint powers commissions in the State of Wisconsin. The Issuer has duly approved the performance and consummation by it of all other transactions contemplated by the Issuer Documents and the Resolution to have been performed and consummated at or prior to the Date of Closing.

(iii)    The execution and delivery by the Issuer of the Bonds, this Purchase Agreement and the other Issuer Documents, and the adoption of the Resolution, and compliance with the obligations on the Issuer's part contained herein and therein, will not conflict with or constitute a material breach of or material default under any law, administrative regulation, judgment, decree, loan agreement, indenture, bond, note, resolution, agreement or other instrument to which the Issuer is a party or to which the Issuer is subject, nor will any such execution, delivery, adoption, implementation or compliance result in the creation or imposition of any material lien, charge or other security interest or encumbrance of any nature whatsoever upon any of the properties or other assets of the Issuer under the terms of any such provision, law, regulation, judgment, decree, document or instrument, except as provided or permitted by the Issuer Documents.

(iv)    All approvals, consents and orders of any governmental authority, legislative body, board, agency or commission having jurisdiction which would constitute a condition precedent to or the absence of which would materially adversely affect the due performance by the Issuer of its obligations under this Purchase Agreement, the Resolution or the other Issuer Documents have been, or prior to the Closing will have been, duly obtained; provided, however, that this representation and warranty does not apply to such approvals, consents and orders as may be required under the Blue Sky or securities laws of any state in connection with the offering and sale of the Bonds.

(v)    The statements and information contained in the Preliminary Offering Memorandum under the caption "THE AUTHORITY" were as of its date and at all times to the date hereof true, correct and complete in all material respects and the statements and information under said caption did not contain any untrue statement of a material fact or omit any statement or information which should have been included therein for the purposes for which the Preliminary Offering Memorandum was used or which was necessary to make the statements or information contained therein, in light of the circumstances under which they were made, not misleading. The statements and information contained in the Offering Memorandum (as it may be supplemented or amended as permitted hereby) under the caption "THE AUTHORITY" will as of its date and at all times through the Date of Closing, be true and correct and complete in all material respects and will not contain any untrue statement of a material fact or omit any statement or information which should be included therein which is necessary to make

7

the statements and information contained therein, in light of the circumstances under which they were made, not misleading.

(vi)     Except as described in the Offering Memorandum, to the knowledge of the Issuer, there is no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court, governmental agency, public board or body, pending against the Issuer seeking to restrain or enjoin the sale or issuance of the Bonds, or in any way contesting or affecting any proceedings of the Issuer taken concerning the sale thereof, the pledge or application of any moneys or security provided for the payment of the Bonds, in any way contesting the validity or enforceability of the Issuer Documents or contesting in any way the existence or powers of the Issuer relating to the sale of the Bonds..

(vii)     The Issuer will furnish such information, execute such instruments, and take such other action not inconsistent with law in cooperation with the Underwriter, as the Underwriter may reasonably request, in order (A) to qualify the Bonds for offer and sale under the Blue Sky or other securities laws and regulations of such states and other jurisdictions of the United States as the Underwriter may designate, and (B) to determine the eligibility of the Bonds for investment under the laws of such states and other jurisdictions, and will use its best efforts to continue such qualifications in effect so long as required for the distribution of the Bonds; provided that the Issuer shall not be obligated to qualify to do business or to take any action that would subject it to general service of process in any state where it is not now so subject.

(viii)     The Issuer has covenanted in the Tax Certificate, subject to the limitations and qualifications therein, to comply with the requirements of the Code in order to maintain the exclusion from gross income for purposes of federal income taxation of the interest on the Series 2014A Bonds.

(ix)     Except as otherwise disclosed in the Offering Memorandum, to the Issuer's knowledge it has not, since December 31, 1975, been in default in the payment of principal of, premium, if any, or interest on, or otherwise been in default with respect to, any bonds, notes or other obligations which it has issued, assumed or guaranteed as to payment of principal, premium, if any, or interest.

(c)     (i)     If, after the date of this Purchase Agreement and until the earlier of (A) ninety (90) days from the end of the "underwriting period" (as established under Subparagraph (ii), below) or (B) the time when the Offering Memorandum is available to any person from a nationally recognized repository, but in no case less than twenty-five (25) days following the end of the underwriting period, any event shall occur which might or would cause the Offering Memorandum, as then supplemented or amended, to contain any untrue statement of a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, the Borrower shall notify the Underwriter and the Issuer thereof, and, if in the opinion of the Underwriter such event requires the preparation and publication of a supplement or amendment to the Offering Memorandum, the Borrower will, at its sole expense, forthwith prepare and furnish to the Underwriter a sufficient number of copies of an

8

amendment of or supplement to the Offering Memorandum (in form and substance satisfactory to the Underwriter and its counsel) which will supplement or amend the Offering Memorandum so that it will not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances existing at such time, not misleading;

(ii)     The Issuer and the Borrower shall assume that the "underwriting period" ends on the Date of Closing unless otherwise notified, in writing, by the Underwriter, in which case the Underwriter shall also notify the Issuer and the Borrower, in writing, of the date on which the "underwriting period" ends.

**7.     The Closing**.  At 12:00 p.m., local time, June 26, 2014 (such date herein called the "Date of Closing"), or at such later time or on such later date as may be mutually agreed upon by the Borrower, the Issuer, the Trustee and the Underwriter, the Issuer shall cause the Trustee, subject to the terms and conditions hereof, to deliver the Bonds to the Underwriter in definitive form (all the Bonds to bear proper CUSIP numbers), duly executed in book-entry only form, together with the other documents hereinafter mentioned, and, subject to the terms and conditions hereof, the Underwriter shall accept such delivery to and pay the purchase price of the Bonds as set forth in Section 1 hereof in immediately available federal funds to the order of the Trustee (such delivery of and payment for the Bonds herein called the "Closing").  The Closing shall occur at the offices of Greenspoon Marder, P.A., West Palm Beach, Florida, or such other place as shall have been mutually agreed upon by the Borrower, the Issuer, the Trustee and the Underwriter.  The Bonds shall be prepared and delivered as fully registered bonds and will be made available for inspection at the offices of Greenspoon Marder, P.A., in West Palm Beach, Florida, or at such other place as shall be mutually agreed upon, not later than 12:00 p.m., Florida time, on the business day prior to the Date of Closing.

**8.     Closing Conditions**.  The Underwriter is entering into this Purchase Agreement in reliance upon the representations, warranties and agreements of the Borrower and the Issuer contained herein, and in reliance upon the representations, warranties and agreements to be contained in the documents and instruments to be delivered at the Closing and upon the performance of the covenants and agreements herein, as of the date hereof and as of the Date of Closing.  Accordingly, the Underwriter's obligation under this Purchase Agreement to purchase, to accept delivery of and to pay for, the Bonds shall be conditioned upon the performance of the covenants and agreements to be performed hereunder and under such other documents and instruments to be delivered at or prior to the Closing, and shall also be subject to the following additional conditions:

(a)     The representations and warranties of the Borrower and the Issuer contained herein shall be true, complete and correct on the date hereof and on and as of the Date of Closing, as if made on the Date of Closing, and certificates to that effect shall be delivered to the Underwriter by the Borrower and the Issuer at Closing.

(b)     At the date of execution hereof and on the Date of Closing, the Resolution shall have been duly approved and adopted by the Issuer, shall be in full force and effect, and shall not have been amended, modified or supplemented, except as otherwise agreed to in writing by the Underwriter.

9

(c)     On the Date of Closing there will be no pending or threatened litigation or proceeding of any nature seeking to restrain or enjoin the issuance, sale or delivery of the Bonds, or the collection or application of the Gross Revenues to make payments on the Bonds or in any way contesting or affecting the validity or enforceability of the Bonds, the Resolution, this Purchase Agreement, the Borrower Documents or the Issuer Documents or contesting in any way the proceedings of the Borrower, the Issuer or the Trustee taken with respect thereto, or contesting in any way the due existence or powers of the Borrower, the Issuer or the Trustee or the title of any of the members or officials of the Borrower, the Issuer or the Trustee to their respective offices and the Underwriter will receive the certificates of the Borrower, the Issuer and the Trustee to the foregoing effect, or opinions of counsel to the Borrower, the Issuer and the Trustee that any such litigation is without merit.

(d)     There shall have been no material adverse change in the financial condition of the Borrower since June 30, 2013 (the date of the most recent audited financial statements of the Borrower, if any).

(e)     At the Closing, the Underwriter shall receive the following documents, each dated as of the Date of Closing:

(i)     Original executed copies of the opinion of Greenspoon Marder, P.A., Bond Counsel, dated the Date of Closing, in substantially the form attached to the Offering Memorandum as APPENDIX E.

(ii)     An original executed copy of the supplemental opinion of Bond Counsel dated the Date of Closing addressed to the Underwriter substantially to the effect that (1) the Underwriter may rely upon the opinions referred to in Section 8(e)(i) hereof as though addressed to the Underwriter; and (2) the Bonds are not subject to the registration requirements of the Securities Act of 1933, as amended and the Trust Indenture is exempt from qualification pursuant to the Trust Indenture Act of 1939, as amended.

(iii)     An original executed copy of the opinion of counsel to the Borrower, dated the Date of Closing, addressed to the Underwriter and the Trustee, substantially to the effect that: (1) the Borrower has been duly organized and is validly existing as a not for profit corporation in good standing under the laws of the State and has all necessary power and authority to execute and deliver this Purchase Agreement and the other Borrower Documents; (2) the Borrower is an organization described in Section 501(c)(3) of the Code and is exempt from federal income taxes under Section 501(a) of the Code and is not a "private foundation" as defined in Section 509(a) of the Code and, to his/her knowledge, the Borrower has not failed to file any required report with the Internal Revenue Service or engaged in conduct inconsistent with its status as an exempt organization; (3) assuming due authorization, execution and delivery thereof by the other parties thereto and subject to the terms and conditions thereof, this Purchase Agreement and the other Borrower Documents constitute legal, valid and binding agreements of the Borrower enforceable in accordance with their terms, except to the extent that the enforceability of the rights and remedies set forth therein may be limited by bankruptcy, insolvency or other laws affecting creditors' or tenants' rights generally and by general principles of equity or public policy; (4) the statements and information in the Offering

10

Memorandum as to legal matters relating to the Borrower, the Project, the Facility and the Borrower Documents, are correct in all material respects and do not omit any statement which, in its opinion, should be included or referred to therein and, in addition, such counsel shall state that, based upon its review of the Offering Memorandum as counsel to the Borrower and without having undertaken to determine independently the accuracy, completeness or fairness of the statements contained in the Offering Memorandum (except to the extent expressly set forth in this Subparagraph (4)), as of the Date of Closing nothing has come to its attention causing it to believe that the Offering Memorandum contains any untrue statement of a material fact or omits or omitted to state a material fact with respect to the Borrower, the Project or the Facility required to be stated therein or necessary to make the statements therein in the light of the circumstances under which they were made, not misleading (except for the financial, statistical and demographic information contained in the Offering Memorandum and the information relating to DTC and its book-entry only system of registration as to all of which no view need be expressed); (5) to the best of his/her knowledge, the Borrower is not in material breach of or material default under any agreement or applicable constitutional provision, law or administrative regulation of the State or the United States or any applicable judgment or decree or any loan agreement, indenture, bond, note, material resolution, material agreement or other material instrument to which the Borrower is a party or to which the Borrower or any of its property or assets is otherwise subject, and no event has occurred and is continuing that with the passage of time or the giving of notice, or both, would constitute a default or event of default under any such instrument; (6) the execution and delivery of this Purchase Agreement and the other Borrower Documents and compliance with the provisions on the Borrower's part contained herein or therein, will not conflict with or constitute a material breach of or default under any constitutional provision, law, administrative regulation, judgment, decree, loan agreement, indenture, bond, note, resolution, agreement, the Charter or other instrument to which the Borrower is a party or to which the Borrower or any of its property or assets is otherwise subject, and any such execution, delivery, adoption or compliance will not result in the creation or imposition of any lien, charge or other security interest or encumbrance of any nature whatsoever upon any of the property or assets of the Borrower under the terms of any such law, regulation or instrument, except as expressly provided by the Borrower Documents; (7) the corporate resolution authorizing the Borrower's actions with respect to the Project and the Borrower Documents has been duly and lawfully adopted by the Borrower, is in full force and effect and has not been altered, amended or repealed; (8) to the best of his/her knowledge, and except as otherwise disclosed in the Offering Memorandum, there is no action, suit, proceeding, inquiry or investigation at law or in equity before or by any court, government agency, public board or body, pending or threatened against or affecting the Borrower, nor is there any basis for any such action, suit, proceeding, inquiry or investigation, wherein an unfavorable decision, ruling or finding would have a materially adverse effect upon the transactions contemplated by the Offering Memorandum or the validity of the Bonds or the Borrower Documents, or this Purchase Agreement; (9) all authorizations, consents, approvals and reviews of governmental bodies or regulatory authorities then required for the Borrower's adoption, execution or performance of its obligations under this Purchase Agreement and the other Borrower

11

Documents have been obtained or affected, and he/she has no reason to believe that the Borrower will be unable to obtain or effect any such additional authorization, consent, approval or review that may be required in the future for performance of any of them by the Borrower; and (10) such other matters relating to the recording of the Mortgage and perfection of the security interests as set forth in the Borrower Documents as required by the Underwriter and its counsel.

(iv)     An original executed copy of the opinion of counsel to the Issuer, dated the Date of Closing, addressed to the Underwriter and the Trustee, in substance stating that in such counsel's opinion: (i) the Issuer is a commission created under Section 66.0304 of the Wisconsin Statutes and is a unit of government and a body corporate and politic under the laws of the State; and has the power to issue the Bonds and to enter into and perform its obligations under the Issuer Documents; (ii) the Resolution was duly adopted at a meeting of the governing body of the Issuer duly noticed, called and conducted pursuant to the laws of the State of Wisconsin and the Joint Exercise Agreement, and has not been amended, modified or superseded and is in full force and effect on the date hereof; (iii) the Bonds have been validly issued in accordance with the provisions of Section 66.0304 of the Wisconsin Statutes and the laws of the State and are the valid and binding limited obligations of the Authority, payable by it solely from the funds pledged for their payment in accordance with the Issuer Documents; and (iv) the Issuer Documents have been duly authorized, executed and delivered by the Issuer and constitutes the valid and binding obligations of the Issuer enforceable against the Issuer in accordance with their respective terms.  Such opinion may be made subject to such assumptions, qualifications, exclusions and limitations as are customary for opinions of this type.

(v)     A certificate, dated the Date of Closing, signed by an authorized officer of the Borrower or other appropriate official satisfactory to the Underwriter, to the effect that, to the best his/her knowledge: (1) the representations of the Borrower herein are true and correct in all material respects as of the Date of Closing; (2) the Borrower has performed all obligations to be performed and has satisfied all conditions on its part to be observed or satisfied under this Purchase Agreement and the other Borrower Documents, as of the Date of Closing; (3) except as disclosed in the Offering Memorandum, there is no litigation of which they have notice, and, to the best of their knowledge, no litigation is pending or threatened: (A) to restrain or enjoin the issuance or delivery of any of the Bonds, (B) in any way contesting or affecting any authority for the issuance of the Bonds or the validity of this Purchase Agreement or any other Borrower Document, (C) in any way contesting the corporate existence or powers of the Borrower or its status as a tax-exempt 501(c)(3) organization under the Code, (D) to restrain or enjoin the collection of the Gross Revenues or the application thereof to make the payments on the Bonds, (E) which may result in any material adverse change in the business, properties, assets and the financial condition of the Borrower taken as a whole, or (F) asserting that the Offering Memorandum contains any untrue statement of a material fact or omits any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; (4) since June 30, 2013, no material adverse change has occurred in the financial position or results of operations of the Borrower except as set forth in or contemplated by the Offering Memorandum and the Borrower

12

has not incurred any material liabilities other than in the ordinary course of business or as set forth in or contemplated by the Offering Memorandum; and (5) the Offering Memorandum did not as of its date, and does not as of the Date of Closing contain any untrue statement of a material fact or omit to state a material fact required to be included therein or necessary in order to make the statements contained therein, in light of the circumstances in which they were made, not misleading (provided that no opinion need be expressed with respect to the information contained therein relating to DTC and its book-entry only system of registration).

(vi)     A certificate, dated the Date of Closing, signed by an authorized officer of the Issuer, to the effect that, in each case to his/her knowledge: (1) the representations of the Issuer herein are true and correct in all material respects as of the Date of Closing; (2) the Issuer has performed all obligations to be performed and has satisfied all conditions on its part to be observed or satisfied under this Purchase Agreement and the other Issuer Documents as of the Date of Closing; (3) except as disclosed in the Offering Memorandum, there is no litigation pending or threatened: (A) to restrain or enjoin the issuance or delivery of any of the Bonds, (B) in any way contesting or affecting any authority for the issuance of the Bonds or the validity of the Resolution, this Purchase Agreement or any other Issuer Document, or (C) asserting that the Offering Memorandum contains any untrue statement of a material fact or omits any material fact necessary to make the statement therein, in light of the circumstances under which they were made, not misleading; and (4) the information in the Offering Memorandum under the caption "THE AUTHORITY" did not as of its date, and does not as of the Date of Closing contain any untrue statement of a material fact or omit to state a material fact required to be included therein or necessary in order to make the statements contained therein, in light of the circumstances in which they were made, not misleading.

(vii)    A certificate dated the Date of Closing, signed by an authorized officer of the Trustee to the effect that: (1) the Trustee is a national banking association duly organized and in good standing under the laws of the United States of America; (2) the Trustee has full corporate power, authority and legal right to execute and deliver, and perform its obligations under the Indenture and the Bonds and has taken any and all actions and has obtained any and all consents and approvals required in connection with the foregoing; (3) the execution, delivery and acceptance of the Indenture and the Bonds and all actions necessary or appropriate to carry out and consummate the transactions contemplated hereby and thereby, are within the trust powers of the Trustee; (4) the execution and delivery of, and the performance under, each of the foregoing will not conflict with, violate or result in a breach of or constitute a default under the Trustee's charter or bylaws or a material default under any indenture, agreement or other instrument by which the Trustee or any of its properties may be bound or any material constitutional or statutory provision or order, rule, regulation, decree or ordinance of any federal or state court, government or governmental body having jurisdiction over the Trustee or any of its property and by which the Trustee or any of its property may be bound; (5) there is no litigation, proceeding or investigation relating to the Trustee before or by any court, public board of body pending or, to the knowledge of the Trustee, threatened against or affecting the Trustee, challenging the validity of, or in which an unfavorable decision, ruling or finding would materially adversely affect the Bonds or the

Trust Indenture; (6) the Bonds have been duly delivered to and authenticated by the Trustee in accordance with the Trust Indenture; and (7) the Trustee has performed all obligations to be performed and has satisfied all conditions on its part to be observed or satisfied under the Trust Indenture and the Bonds at or prior to the Closing.

(viii)   An original executed copy of the opinion of Edwards Wildman Palmer LLP ("Underwriter's Counsel"), addressed to the Underwriter in form and substance satisfactory to the Underwriter.

(ix)   Execution and delivery of the Mortgage.

(x)   Original executed copies of each of the Borrower Documents and the Issuer Documents by the respective parties thereto.

(xi)   A written order to the Trustee from the Issuer to execute and deliver the Bonds.

(xii)   An executed copy of the Report of Fishkind & Associates, Inc. attached to the Preliminary Offering Memorandum and the Offering Memorandum as Appendix J dated June 16, 2014 (the "Feasibility Report") and a certificate from Fishkind & Associates, Inc. to the effect that (A) the information in the Preliminary Offering Memorandum and Offering Memorandum attributable to them, and in the section therein entitled "APPENDIX J – Report of Feasibility Consultant" attached thereto, does not, to their knowledge, contain any untrue statement of a material fact or omit or fail to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, (B) the Underwriter is authorized to rely upon the Feasibility Report to the same extent as if it were addressed to them, (C) the firm consents to the inclusion of the Feasibility Report in the Preliminary Offering Memorandum and Offering Memorandum and to the references to the firm in the Preliminary Offering Memorandum and Offering Memorandum and (D) the firm believes the assumptions used in compiling the Feasibility Report are reasonable.

(xiii)   Commitments for the title insurance satisfactory to the Underwriter and the Borrower's certificate of insurance evidencing liability insurance coverage in amounts acceptable to the Underwriter, the Issuer and the Trustee.

(xiv)   An Original executed copy of the Guaranty Agreement made by Palm Beach Maritime Foundation, Inc., as Guarantor for the benefit of the Trustee.

(xv)   An original executed copy of the opinion of counsel to the Guarantor, dated the Date of Closing, addressed to the Underwriter and the Trustee, substantially to the effect that: (1) the Guarantor has been duly organized and is validly existing as a not for profit corporation in good standing under the laws of the State of Maryland and has all necessary power and authority to execute and deliver the Guaranty Agreement; (2) the Guarantor is an organization described in Section 501(c)(3) of the Code and is exempt from federal income taxes under Section 501(a) of the Code and is not a "private foundation" as defined in Section 509(a) of the Code; (3) the Guaranty Agreement constitutes the legal, valid and binding agreement of the Guarantor enforceable in

14

accordance with its terms, except to the extent that the enforceability of the rights and remedies set forth therein may be limited by bankruptcy, insolvency or other laws affecting creditors' or tenants' rights generally and by general principles of equity or public policy; (4) the statements and information in the Offering Memorandum as to legal matters relating to the Guarantor and the Guaranty Agreement, are correct in all material respects and do not omit any statement which, in its opinion, should be included or referred to therein (5) to the best of his/her knowledge, the Guarantor is not in material breach of or material default under any agreement or applicable constitutional provision, law or administrative regulation of the State or the United States or any applicable judgment or decree or any loan agreement, indenture, bond, note, material resolution, material agreement or other material instrument to which the Guarantor is a party or to which the Guarantor or any of its property or assets is otherwise subject, and no event has occurred and is continuing that with the passage of time or the giving of notice, or both, would constitute a default or event of default under any such instrument; (6) the execution and delivery of the Guaranty Agreement and compliance with the provisions on the Guarantor's part contained herein or therein, will not conflict with or constitute a material breach of or default under any constitutional provision, law, administrative regulation, judgment, decree, loan agreement, indenture, bond, note, resolution, agreement or other instrument to which the Guarantor is a party or to which the Guarantor or any of its property or assets is otherwise subject, and any such execution, delivery, adoption or compliance will not result in the creation or imposition of any lien, charge or other security interest or encumbrance of any nature whatsoever upon any of the property or assets of the Guarantor under the terms of any such law, regulation or instrument; (7) all authorizations, consents, approvals and reviews of governmental bodies or regulatory authorities then required for the Guarantor's adoption, execution or performance of its obligations under the Guaranty Agreement have been obtained or affected, and he/she has no reason to believe that the Guarantor will be unable to obtain or effect any such additional authorization, consent, approval or review that may be required in the future for performance of any of them by the Guarantor; and (8) to the best of his/her knowledge, there is no action, suit, proceeding, inquiry or investigation at law or in equity before or by any court, government agency, public board or body, pending or threatened against or affecting the Guarantor, nor is there is any basis for any such action, suit, proceeding, inquiry or investigation, wherein an unfavorable decision, ruling or finding would have a materially adverse effect upon the Guaranty Agreement.

(xvi) Such additional legal opinions, certificates, instruments and other documents as the Underwriter may reasonably require to evidence the truth and accuracy, as of the date hereof and as of the Date of Closing, of the representations and warranties contained herein and of the statements and information contained in the Offering Memorandum and the due performance or satisfaction on or prior to the Date of Closing of all the agreements then to be performed and conditions then to be satisfied by the Borrower, the Issuer or the Trustee.

All of the evidence, opinions, letters, certificates, instruments and other documents, mentioned above or elsewhere in this Purchase Agreement shall be deemed to be in compliance with the provision hereof if, but only if, they are in the form specified herein or are otherwise in form and substance satisfactory to the Underwriter and counsel to the Underwriter.

15

If the conditions to the obligations of the Underwriter to purchase, to accept delivery of and to pay for the Bonds contained in this Purchase Agreement are not satisfied, or if the obligations of the Underwriter to purchase, to accept delivery of and to pay for the Bonds shall be terminated for any reason permitted by hereunder, this Purchase Agreement shall terminate and neither the Underwriter nor the Borrower, the Issuer or the Trustee shall be under any further obligation hereunder, except that the respective obligations of the Issuer and the Underwriter set forth in Section 10 hereof shall continue in full force and effect.

9.   **Termination**.  The Underwriter may terminate this Purchase Agreement by notice to the Borrower in the event that between the date hereof and the Date of Closing (a) legislation shall be enacted by the Congress of the United States or adopted by either House thereof or a decision by a court of the United States or the Tax Court of the United States shall be rendered or a ruling, regulation or official statement by or on behalf of the Treasury Department of the United States, the Internal Revenue Service or other State or Federal governmental agency shall be made, with respect to State or Federal taxation of revenues or other income of the general character expected to be derived under the Loan Agreement from the Borrower or upon interest received on securities of the general character of the Series 2014A Bonds or which would have the effect of changing, directly or indirectly, the Federal income tax consequences of the ownership of the Bonds or the receipt of interest on securities of the general character of the Series 2014A Bonds in the hands of the holders thereof, which in the reasonable opinion of the Underwriter would materially adversely affect the market price of the Bonds; (b) the United States shall become engaged in hostilities that have resulted in a declaration of war or, any other national or international emergency, calamity or hostilities relating to the effective operation of government or the financial community shall have occurred or escalated, which, in the opinion of the Underwriter, subsequent to consultation with appropriate representatives of the Borrower, materially adversely affects the market price of the Bonds; (c) there shall be in force a general suspension of trading on the New York Stock Exchange as the result of an event affecting the national economy; (d) a general banking moratorium shall have been established by Federal, New York or State authorities; (e) any event shall have occurred or shall exist which, in the opinion of the Underwriter or its counsel, would or might cause the information contained in the Offering Memorandum, as then supplemented or amended, to contain any untrue statement of a material fact or to omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading as of such time (f) legislation shall be enacted, or a decision by a court of the United States shall be rendered, that, in the opinion of counsel for the Underwriter, has the effect of requiring the contemplated distribution of the Bonds or any action or instrument pertaining thereto to be registered under the Securities Act of 1933, as amended, or under Florida law, or of requiring the Trust Indenture, or any instrument or act pertaining thereto to be qualified under the Trust Indenture Act of 1939, as amended; or (g) there shall have been any materially adverse change in the affairs of the Issuer or the Borrower that, in the reasonable judgment of the Underwriter, materially and adversely affects the market price or marketability of the Bonds or the ability of the Underwriter to enforce contracts for the sale of the Bonds.

10.   **Expenses**.

(a)   Except as provided in (b) below, the Underwriter shall be under no obligation to pay, and the Borrower shall pay, all expenses incidental to the issuance of the Bonds and the

16

performance of the Issuer's and the Borrower's obligations hereunder, including, but not limited to the following expenses: (i) the cost of preparing and printing or other reproduction of the Borrower Documents or the Issuer Documents; (ii) the cost of preparing and printing the Bonds, the Preliminary Offering Memorandum and the Offering Memorandum; (iii) the fees and disbursements of the Trustee; (iv) the fees and expenses of counsel to the Underwriter; and (v) the fees and disbursements of any other experts, accountants, consultants or advisors retained by the Borrower and the Issuer including, without limitation, their respective counsel, financial advisor, Bond Counsel and the Feasibility Consultant.

(b)      The Underwriter shall pay expenses related to the initial purchase and sale of the Bonds as follows: (i) all advertising expenses in connection with the public offering of the Bonds; and (ii) all other expenses incurred by the Underwriter in connection with the offering of the Bonds.

## 11.      Indemnification.

(a)      The Borrower will indemnify and hold harmless the Underwriter, its officers and employees, and each person who controls the Underwriter within the meaning of Section 15 of the Securities Act of 1933, as amended, or Section 20(a) of the Securities Exchange Act of 1934, as amended, (collectively, the "Indemnified Parties" and when anyone is intended, the "Indemnified Party"), against any losses, claims, damages or liabilities, joint or several, to which any Indemnified Party may become subject, insofar as such losses, claims, damages or liabilities, or actions in respect thereof, (i) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in the Borrower's Portion of the Offering Memorandum or any amendment or supplement thereto or (ii) arise out of or are based upon the omission or alleged omission to state in the Borrower's Portion of the Offering Memorandum or any amendment or supplement thereto a material fact necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. The foregoing indemnity shall include reimbursement for any legal or other expenses reasonably incurred by any Indemnified Party in connection with investigating or defending any such action or claim.

The Underwriter will, promptly after receiving notice of the commencement of any action against the Underwriter in respect of which indemnification may be sought against the Borrower, notify the Borrower in writing of the commencement of the action. Failure of the Underwriter to give such notice will reduce the liability of the Borrower under this indemnity agreement by the amount of the damages attributable to the failure to give the notice; but the failure will not relieve the Borrower from any liability it may have to the Underwriter otherwise than under the indemnity agreement in this Section. If any such action is brought against the Underwriter and the Underwriter notifies the Borrower of its commencement, the Borrower may, or if so requested by the Underwriter shall, participate in its or assume its defense, with counsel reasonably satisfactory to the Underwriter, and after being so requested to assume such defense or if the Underwriter gives notice to the Borrower that it elects to assume such defense, the Borrower (subject to the next succeeding sentence) will not be liable to the Underwriter under this Section for any legal or other expenses subsequently incurred by the Underwriter other than reasonable costs of investigation incurred at the request, or with the consent, of the Borrower. If the Borrower does not employ counsel to have charge of the defense or if the Underwriter

17

reasonably concludes that there may be defenses available to it which are different from or in addition to those available to the Borrower (in which case the Borrower will not have the right to direct the defense of such action on behalf of the Underwriter), reasonable legal and other expenses incurred by the Underwriter will be paid by the Borrower. Any obligation under this Section of the Borrower to reimburse the Underwriter for expenses includes the obligation to make advances to the Underwriter to cover such expenses in reasonable amounts and at reasonable periodic intervals not more often than monthly as requested by the Underwriter.

(b)     If the indemnification provided for in subsection (a) of this Section is unavailable to the Underwriter (or any controlling person thereof) in respect to any losses, claims, damages or liabilities referred to therein, then the Borrower shall, in lieu of indemnifying the Underwriter, contribute to the amount paid or payable by the Underwriter as a result of such losses, claims, damages or liabilities in such proportion as is appropriate to reflect the relative benefits received by the Borrower and the Underwriter, respectively, from the underwriting of the Bonds. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then the Borrower shall contribute to such amount paid or payable by the Underwriter in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Borrower and the Underwriter, respectively, in connection with the statements or omission which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative benefit received by the Borrower or the Underwriter, respectively, shall be deemed to be in the same proportion as the total proceeds from the sale of the Bonds (before deducting costs and expenses other than underwriting fees and expenses), on the one hand, bear to the total underwriting fees and expenses received by the Underwriter, on the other hand. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact related to information supplied by the Borrower or the Underwriter and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Borrower and the Underwriter, respectively, agree that it would not be just and equitable if contribution pursuant to this Section were determined by pro rata allocation or by any other method of allocation which does not take account of the equitable considerations referred to above in this Section. The amount paid or payable by the Underwriter as a result of the losses, claims, damages or liabilities referred to above in this Section shall be deemed to include any legal or other expenses reasonably incurred by the Underwriter in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this subsection (b), the Underwriter shall not be required to contribute any amount in excess of the amount of the Underwriter's discount as set forth in Section 1 hereof.

(c)     The Borrower acknowledges and agrees that its indemnification obligations under Section 5.15 of the Loan Agreement shall extend to and encompass all actions and omissions of the Issuer or any Authority Indemnified Party (as defined in the Loan Agreement) under this Purchase Agreement as if fully set forth herein.

The obligations of the Borrower under this Section 11 shall survive the issuance and the maturity of the Bonds and the termination of this Agreement.

AM 34108690.5

**12.** **Notices**.  Any notice or other communication to be given to the Borrower under this Purchase Agreement may be given by delivering the same to Mr. John Grant, Palm Beach Maritime Museum and Academy, 4512 N. Flagler Drive, Suite 206, West Palm Beach, Florida 33407.  Any notice or other communication to be given to the Issuer under this Purchase Agreement may be given may be delivering the same to Mr. Scott Carper, Wisconsin Public Finance Authority, 22 Mifflin Street, Suite 900, Madison, Wisconsin 53703.  Any notice or other communications to be given to the Underwriter under this Purchase Agreement may be given by delivering the same in writing to Mr. Edward K. Chan, Managing Director, Hapoalim Securities USA, Inc., One Battery Park Plaza, 2nd Floor, New York, NY 10004.

**13.** **Parties in Interest**.

(a)  This Purchase Agreement is made solely for the benefit of the Borrower, the Issuer and the Underwriter (including their respective successors or assigns) and no other person shall acquire or have any right hereunder or by virtue hereof.  All of the representations, warranties and agreements of the Borrower contained in this Purchase Agreement shall remain operative and in full force and effect, regardless of: (i) any investigations made by or on behalf of the Underwriter; (ii) delivery of and payment for the Bonds pursuant to this Purchase Agreement; or (iii) any termination of this Purchase Agreement, but only to the extent provided by the last paragraph of Section 8 hereof.

(b)  No covenant, stipulation, obligation or agreement contained in this Purchase Agreement shall be deemed to be a covenant, stipulation, obligation or agreement of any member, agent or employee of the Borrower or the Issuer in his individual capacity and neither the members of the Borrower, any Authority Indemnified Party (as defined in the Loan Agreement) nor any official executing this Purchase Agreement shall be liable personally under this Purchase Agreement or be subject to any personal liability or accountability by reason of the execution hereof.

(c)  The Issuer shall not be directly, indirectly, contingently or otherwise liable for any costs, expenses, losses, damages, claims or actions of any conceivable kind under any conceivable theory under this Purchase Agreement or any document or instrument referred to herein or by reason of or in connection with this Purchase Agreement or other document or instrument except to the extent it receives amounts from the Borrower available for such purpose.

**14.** **Effectiveness**.  This Purchase Agreement shall become effective upon the execution or the acceptance hereof on behalf of the Borrower and the Issuer by their duly authorized officers, and shall be valid and enforceable at the time of such acceptance.

**15.** **Counterparts**.  This Purchase Agreement may be executed in several counterparts, which together shall constitute one and the same instrument.

**16.** **Florida Law Governs**.  The validity, interpretation and performance of this Purchase Agreement shall be governed by the laws of the State of Florida *provided*, that, with respect to the existence, corporate powers, legal capacity, rights, privileges, powers,

19

obligations and liabilities of the Issuer, this Purchase Agreement shall be governed by the laws of the State of Wisconsin, excluding conflicts of law principles.

      **17.**    **Entire Agreement**.  This Purchase Agreement when accepted by the Borrower and the Issuer in writing as heretofore specified shall constitute the entire agreement between us.

      **18.**    **Headings**.  The headings of the Sections of this Purchase Agreement are inserted for convenience only and shall not be deemed to be part hereof.

[SIGNATURE PAGES TO FOLLOW]

**SIGNATURE PAGE TO**
**BOND PURCHASE AGREEMENT**

**Public Finance Authority**
**First Mortgage Educational Facility Revenue Bonds, Series 2014A and**
**First Mortgage Educational Facility Revenue Bonds, Taxable Series 2014B**
**(Palm Beach Maritime Academy Project)**

Very truly yours,

**HAPOALIM SECURITIES USA, INC.**
on behalf of the Underwriter

By: _____
    Name: _____Dennis E. Louden_____
    Title: _____CEo_____

By: _____
    Name: _____Steven J. Raggio_____
    Title: _____CFO_____

21

**SIGNATURE PAGE TO**
**BOND PURCHASE AGREEMENT**

**Public Finance Authority**
**First Mortgage Educational Facility Revenue Bonds, Series 2014A and**
**First Mortgage Educational Facility Revenue Bonds, Taxable Series 2014B**
**(Palm Beach Maritime Academy Project)**

Agreed and accepted as of the date hereof:

**PALM BEACH MARITIME MUSEUM, INC.**
**d/b/a PALM BEACH MARITIME ACADEMY**

By: _William E Burckart_
Name: _William E. Burckart_
Title: _Chairman_

AM 34108690.5

**SIGNATURE PAGE TO**
**BOND PURCHASE AGREEMENT**

**Public Finance Authority**
**First Mortgage Educational Facility Revenue Bonds, Series 2014A and**
**First Mortgage Educational Facility Revenue Bonds, Taxable Series 2014B**
**(Palm Beach Maritime Academy Project)**

Agreed and accepted as of the date hereof:

**PUBLIC FINANCE AUTHORITY**

By: _____

Name: JOSH BINDL

Title: Authorized Signatory

23

# COMPOSITE EXHIBIT 2

**PRELIMINARY LIMITED OFFERING MEMORANDUM DATED JUNE 17, 2014**

**NEW ISSUE - BOOK-ENTRY ONLY**
**LIMITED OFFERING**

**NOT RATED**

*In the opinion of Greenspoon Marder, P.A., Bond Counsel to the Authority, assuming compliance by the Authority and the Borrower with certain tax covenants described herein, under existing law, interest on the Series 2014A Bonds is excluded from gross income of the owners thereof for federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), and interest on the Series 2014A Bonds is not an item of tax preference under Section 57 of the Code for purposes of computing the alternative minimum tax.  In the case of certain corporate holders of the Series 2014A Bonds, interest on the Series 2014A Bonds will be included in the calculation of the federal alternative minimum tax as a result of the inclusion thereof in "adjusted current earnings."  Interest on the Series 2014B Bonds is not excludible from gross income for income tax purposes.  See "TAX MATTERS" herein.*



**PUBLIC FINANCE AUTHORITY**
**$21,000,000\* First Mortgage Educational Facility Revenue Bonds  (Palm Beach Maritime Academy Project)**
**Series 2014A**

**$3,315,000\* First Mortgage Educational Facility Revenue Bonds (Palm Beach Maritime Academy Project)**
**Taxable Series 2014B**

**Dated: Date of Delivery**                                                                 **Due: May 1, as shown on the inside cover page hereof**
**Price: 100%**

The Public Finance Authority, a unit of government and a body corporate and politic of the State of Wisconsin (the "Authority"), is issuing its $21,000,000\* First Mortgage Educational Facility Revenue Bonds ( Palm Beach Maritime Academy Project), Series 2014A (the "Series 2014A Bonds") and $3,315,000\* First Mortgage Educational Facility Revenue Bonds (Palm Beach Academy Project), Taxable Series 2014B (the "Series 2014B Bonds"), which together with the Series 2014A Bonds are collectively referred to herein as the "Bonds"). The Authority will loan the proceeds of the Bonds to the Palm Beach Maritime Museum, Inc. d/b/a Palm Beach Maritime Academy, a Florida non-profit corporation (the "Borrower"). The Borrower has been granted a charter by the School Board of Palm Beach County, Florida (the "School Board") to operate the Palm Beach Maritime Academy charter school (the "Palm Beach Maritime Academy"). The Bonds are being issued only in fully registered form, without coupons, in denominations of $100,000 or integral multiples of $5,000 in excess thereof. The Bonds, when issued, will be registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company ("DTC"), New York, New York. Purchases of beneficial interests in the Bonds will be made in book-entry only form. Accordingly, principal of and interest on the Bonds will be paid from the sources identified below by the Trustee (hereinafter defined), directly to DTC as the registered owner thereof. Disbursement of such payments to the DTC Participants is the responsibility of DTC and disbursement of such payments to the beneficial owners is the responsibility of the DTC Participants and the Indirect Participants, as more fully described herein.    Any purchaser as a beneficial owner of a Bond must maintain an account with a broker or dealer who is, or acts through, a DTC Participant to receive payment of the principal of and interest on such Bonds.  See "DESCRIPTION OF THE BONDS—Book-Entry Only System" herein.

For further information concerning the Authority, see "THE AUTHORITY" herein.

The Bonds are being issued pursuant to Section 66.0304 of the Wisconsin Statutes and a Trust Indenture (the "Indenture") dated as of June 1, 2014, between the Authority and U.S. Bank National Association, as trustee (the "Trustee").  Capitalized terms not otherwise defined herein shall have the meanings assigned to them in the Indenture. See "APPENDIX B — Form of the Indenture.

The Authority will lend the proceeds of the Bonds to the Borrower pursuant to a Loan Agreement dated as of June 1, 2014 (the "Loan Agreement") between the Authority and the Borrower. The Series 2014A Bonds are being issued to (1) finance a portion of the cost to construct, equip and acquire the Borrower's two charter school facilities in Lantana, Palm Beach County, Florida (collectively, the "Facility"), (2) refund the principal amount of the Authority's $1,000,000 Education Facility Revenue Bonds (Palm Beach Academy Project), Series 2014A (the "Refunded Bonds"), (3) make a deposit into the Debt Service Reserve Fund, (4) fund capitalized interest with respect to the Series 2014A Bonds and (5) pay a portion of the cost of issuance with respect to the Series 2014A Bonds. The Series 2014B Bonds are being issued to  (1) finance a portion of the cost to construct, equip and acquire the Facility, (2) make a deposit into the Debt Service Reserve Fund, (3) fund capitalized interest with respect to the Series 2014B Bond, and (4) pay a portion of the costs of issuance of the Bonds. See "ESTIMATED SOURCES AND USES OF PROCEEDS OF THE BONDS." The Bonds are payable solely from the assets and revenues pledged to the payment thereof under the Indenture. The Borrower's obligation to repay the loan of the proceeds of the Bonds is secured by the Borrower's two promissory notes to the Authority in the same aggregate principal amount as the Bonds (the "Notes"). The Notes are secured by a pledge of and lien on the Gross Revenues and certain funds and accounts created under the Indenture (the "Trust Estate"). The Borrower's obligation to repay the loan of the proceeds of the Bonds is secured by a Guaranty Agreement dated as of June 1, 2014 (the "Guaranty Agreement") from Palm Beach Maritime Foundation, Inc., a Maryland non-profit corporation (the "Guarantor") to the Trustee. The Borrower's obligation to repay the loan of the proceeds of the Bonds is also secured by a Mortgage and Security Agreement dated as of June 1, 2014 (the "Mortgage and Security Agreement") from the Borrower to the Trustee. The Authority has assigned to the Trustee (1) all right, title and interest in and to the Notes, and (2) all right, title and interest in and to the Loan Agreement (except for certain "Unassigned Rights" defined therein), and the Trust Estate all as more fully described under "SECURITY AND SOURCES OF PAYMENT FOR THE BONDS."

The Bonds are subject to optional, mandatory sinking fund and extraordinary mandatory and extraordinary optional redemption, as more fully described herein.  See "DESCRIPTION OF THE BONDS—Redemption Provisions."

THE BONDS ARE LIMITED OBLIGATIONS OF THE AUTHORITY PAYABLE SOLELY FROM THE TRUST ESTATE (AS DEFINED IN THE INDENTURE).  EXCEPT FROM SUCH SOURCE, NONE OF THE AUTHORITY, ANY MEMBER, THE STATE OF WISCONSIN OR ANY POLITICAL SUBDIVISION THEREOF OR ANY POLITICAL SUBDIVISION APPROVING THE ISSUANCE OF THE BONDS SHALL BE OBLIGATED TO PAY THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST THEREON OR ANY COSTS INCIDENTAL THERETO.  THE BONDS DO NOT, DIRECTLY, INDIRECTLY OR CONTINGENTLY, OBLIGATE, IN ANY MANNER, ANY MEMBER, THE STATE OF WISCONSIN OR ANY POLITICAL SUBDIVISION THEREOF OR ANY POLITICAL SUBDIVISION APPROVING THE ISSUANCE OF THE BONDS TO LEVY ANY TAX OR TO MAKE ANY APPROPRIATION FOR PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST THEREON OR ANY COSTS INCIDENTAL THERETO.  NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF ANY MEMBER, THE STATE OF WISCONSIN OR ANY POLITICAL SUBDIVISION THEREOF OR ANY POLITICAL SUBDIVISION APPROVING THE ISSUANCE OF THE BONDS, NOR THE FAITH AND CREDIT OF THE AUTHORITY, SHALL BE PLEDGED TO THE PAYMENT OF THE PRINCIPAL OF, PREMIUM, IF ANY, OR INTEREST ON, THE BONDS OR ANY COSTS INCIDENTAL THERETO.  THE AUTHORITY HAS NO TAXING POWER.

**The Bonds are not rated, may not be appropriate for some investors and are subject to certain risks. See "CERTAIN BONDHOLDERS' RISKS" herein. There are restrictions on who may purchase the Bonds.  In addition, this Limited Offering Memorandum only contains limited information regarding the Bonds and is not to be considered a complete description of the matters necessary for the making of an informed investment decision. Additional information may be obtained from the Borrower at the address contained herein. Each initial purchaser of the Bonds will be required to execute and deliver an investment letter in the form attached to this Limited Offering Memorandum as APPENDIX F.** See "RESTRICTIONS ON OWNERSHIP AND TRANSFER OF BONDS" herein.  POTENTIAL INVESTORS ARE SOLELY RESPONSIBLE FOR EVALUATING THE MERITS AND RISKS OF AN INVESTMENT IN THE BONDS. SEE "SUITABILITY FOR INVESTMENT" HEREIN.

THE BONDS WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY SECURITIES LAW OF ANY STATE IN THE UNITED STATES OF AMERICA.  THE BONDS ARE ONLY BEING OFFERED AND SOLD TO "QUALIFIED INSTITUTIONAL BUYERS" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT).  THE BONDS ARE SUBJECT TO RESTRICTIONS ON TRANSFER AND RESALE AS SET FORTH IN THE INDENTURE AND DESCRIBED HEREIN, AND FURTHER MAY NOT BE TRANSFERRED OR SOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME. EACH INVESTOR, AT THE TIME OF DELIVERY OF THE BONDS WILL BE REQUIRED TO EXECUTE A QUALIFIED INVESTOR LETTER IN THE FORM ATTACHED HERETO AS APPENDIX F WHEREBY THEY WILL REPRESENT, AMONG OTHER THINGS, THAT THEY ARE A "QUALIFIED INSTITUTIONAL BUYER" WITHIN THE MEANING OF THE SECURITIES ACT.

**This cover page contains certain information for quick reference only.  It is not a summary of the Bonds.**

All summaries of documents and agreements in this Limited Offering Memorandum are qualified in their entirety by reference to such documents and agreements, and all summaries of the Bonds are qualified in their entirety by reference to the form included in the aforesaid documents and agreements.

The Bonds will be delivered when, as and if issued by the Authority, subject to prior sale, withdrawal or modification of the offer without notice and the receipt of the opinion of Greenspoon Marder, P.A., West Palm Beach, Florida, Bond Counsel, as to the validity of the Bonds and the excludability of interest on the Series 2014A Bonds from gross income for federal income tax purposes. von Briesen & Roper, s.c., Milwaukee, Wisconsin is serving as Counsel to the Authority.  Edwards Wildman Palmer LLP, West Palm Beach, Florida is serving as Counsel to the Underwriter. Tripp Scott, P.A., is serving as Counsel to the Borrower.

It is expected that the Bonds will be delivered in book-entry form through the facilities of DTC, New York, New York on or about June 26, 2014.



Dated: June ___, 2014

---

\* Preliminary; subject to change.

PRELIMINARY LIMITED OFFERING MEMORANDUM DATED JUNE 17, 2014 - This Preliminary Limited Offering Memorandum and the information contained herein are subject to completion or amendment. These securities may not be sold nor may offers to buy be accepted prior to the time the Limited Offering Memorandum is delivered in final form. Under no circumstances shall this Preliminary Limited Offering Memorandum constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds in any jurisdiction in which such offer, solicitation or sale would be unlawful prior to registration, qualification or exemption under the securities laws of such jurisdiction.

This Limited Offering Memorandum does not constitute an offer to sell the Bonds in any jurisdiction to any person to whom it is unlawful to make such offer in such jurisdiction. No dealer, salesman or other person has been authorized by the Authority, the Borrower or the Underwriter to give any such other information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Authority, the Borrower, the Underwriter, or any other person. Nothing contained herein shall be construed to be an endorsement by the Authority or the Borrower of the feasibility of the Project or of the investment quality of the Bonds.

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE SECURITIES OFFERED HEREBY, INCLUDING THE MERITS AND RISKS INVOLVED. THE BONDS HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933 OR UNDER THE SECURITIES ACTS OF ANY STATE DUE TO EXEMPTIONS FROM REGISTRATION, NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES AUTHORITY ENDORSED THE MERITS OF THIS OFFERING OR PASSED UPON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

The information set forth herein has been obtained from the Authority and the Borrower, The Depository Trust Company and other sources, that are believed to be reliable, but it is not guaranteed as to accuracy or completeness by, and is not to be construed as a representation of the Underwriter, the Authority or the Borrower as to information from other sources. References herein to laws, rules, regulations, resolutions, agreements, reports and other documents do not purport to be comprehensive or definitive. All references to such documents are qualified in their entirety by reference to the particular document, the full text of which may contain qualifications of and exception to statements made herein. The information and the expressions of opinion herein are subject to change without notice, and neither the delivery of this Limited Offering Memorandum nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Borrower or in the Facility since the date hereof or the earliest date as of which such information is given.

**This Limited Offering Memorandum has been prepared solely for an offering to certain "qualified institutional buyers" without general solicitation, or advertising. Each initial purchaser will be required to sign an investor letter stating that such buyer is a "qualified institutional buyer" as defined in Rule 144A of the Securities Act of 1933, as amended. A form of the investor letter is attached to this Limited Offering Memorandum as APPENDIX F.**

The Underwriter has provided the following sentence for inclusion in this Limited Offering Memorandum. The Underwriter has reviewed the information in this Limited Offering Memorandum in accordance with, and as part of, its responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriter does not guarantee the accuracy of completeness of such information.

This Limited Offering Memorandum contains certain forward-looking statements (as such term is defined in the Securities Act of 1933, as amended) concerning the Borrower. These statements are based upon beliefs of certain officers of the Borrower and others as well as a number of assumptions and estimates which are inherently subject to significant uncertainties, many of which are beyond the control of the Borrower. Future events may differ materially from those expressed or implied by such forward-looking statements. The words "anticipates," "believes," "estimates," "expects," "plans," "intends," "projections" and similar expressions, as they relate to the Borrower are intended to specifically identify forward-looking statements. Such statements reflect the current views of the Borrower with respect to future events and are subject to certain risks, uncertainties and assumptions. The Borrower will undertake no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise. In light of these risks and uncertainties, there can be no assurances that the events described or implied in the forward-looking statements contained in this Limited Offering Memorandum will in fact occur.

## RESTRICTION ON DENOMINATIONS

The purchase of the Bonds is suitable only for participants of substantial financial means who have no need for liquidity in their investment and who understand and can afford the financial and other risks of this investment. To help prevent purchase of Bonds by investors who may not be appropriate investors, the Bonds will be issued in denominations of $100,000 and integral multiples of $5,000 in excess thereof.

THIS LIMITED OFFERING MEMORANDUM SHALL NOT CONSTITUTE A CONTRACT BETWEEN THE UNDERWRITER OR THE BORROWER AND ANY OWNER OF THE BONDS.

U .S. Bank National Association, by acceptance of its duties as Trustee under the Trust Indenture, has not reviewed this Limited Offering Memorandum and has made no representations as to the information contained herein, including but not limited to, any representations as to the financial feasibility or related activities.

**Lantana 1**

The Lantana 1 Facility to be acquired is located at 1518 West Lantana Road containing approximately 49,770 square feet of building area situated on a land area of approximately 5.01 acres, consisting of a one-story 38,588 square feet building ("Palm Beach Maritime Academy"), a 6,636 square feet Dollar General store ("Dollar General") and a McDonald's outparcel of 4,546 square feet ("McDonald's").

Palm Beach Maritime Academy has been leasing its Lantana 1 Facility space from an unrelated third party for three years. Palm Beach Maritime Academy plans to use the proceeds of the Bonds to purchase the Lantana 1 Facility for a cost of $8,600,000. The Palm Beach Maritime Academy will continue to operate as a K-5 school in its current facility, while the dollar General building will be converted and improved into additional classroom space. The McDonald's will continue to operate as a tenant under a long-term ground lease, but the Borrower does not receive the lease payments.

**Lantana 2**

The Lantana 2 Facility to be acquired is located at 600 South East Coast Avenue, consisting of three buildings containing approximately 9,070 square feet of building area for building 1, approximately 23, 907 square feet of area for building 2 and approximately 7,470 square feet of area for building 3. The Lantana 2 Facility is sited on a land area of approximately 5.01 acres.

Palm Beach Maritime Academy has been leasing its Lantana 2 Facility space from an unrelated third party for one year. Palm Beach Maritime Academy plans to use the proceeds of the Bonds to purchase the Lantana 2 Facility for a total cost of $8,000,000. $2,500,000 of the purchase price of Lantana 2 will be used by the seller to finance the construction of a 20,000 square feet addition to the existing improvements for the purpose of adding additional classrooms. The contract for the purchase of the Lantana 2 Facility has not been executed and is currently under negotiation.

## CERTAIN RISK FACTORS

A PURCHASER OF THE BONDS IS SUBJECT TO CERTAIN RISKS. EACH PROSPECTIVE INVESTOR IN THE BONDS IS ENCOURAGED TO READ THIS LIMITED OFFERING MEMORANDUM IN ITS ENTIRETY. PARTICULAR ATTENTION SHOULD BE GIVEN TO THE FACTORS DESCRIBED BELOW WHICH, AMONG OTHERS, COULD AFFECT THE MARKET PRICE OF THE BONDS TO AN EXTENT THAT CANNOT BE DETERMINED. IN ADDITION, THIS LIMITED OFFERING MEMORANDUM ONLY CONTAINS LIMITED INFORMATION REGARDING THE BONDS AND IS NOT TO BE CONSIDERED A COMPLETE DESCRIPTION OF THE MATTERS NECESSARY FOR THE MAKING OF AN INFORMED INVESTMENT DECISION. ADDITIONAL INFORMATION MAY BE OBTAINED FROM THE BORROWER AT THE ADDRESS SET FORTH UNDER THE CAPTION "INTRODUCTION."

**Debt Service Coverage**

The forecasts contained in the Market Feasibility Study for Palm Beach Maritime Academy, Lantana, Florida (the "Feasibility Report") prepared by Fishkind & Associates, Inc. (the "Feasibility Consultant") are forward-looking statements based on certain assumptions made by the Feasibility